206

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

HONORABLE EDWARD RAFEEDIE JUDGE PRESIDING

FILED
Jun 18 1993
CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

- - - - -

UNITED STATES OF AMERICA,          )
                                   )
                Plaintiff,         )
                                   )
        vs.                        )     Case No. CR-87-422-ER
                                   )
RAFAEL CARO-QUINTERO, et al.,      )
                                   )     ORIGINAL
                Defendants.        )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

THURSDAY, DECEMBER 3, 1992

MARY TUCKER, CSR 9308
Official Court Reporter
429-D U.S. Courthouse
312 North Spring Street
Los Angeles, Calif. 90012
213/687-0530

FORM LASER BOND A PENGAD/INDY 1-800-631-6989

207

1    APPEARANCES:

2

3        For the Plaintiff:

4            TERREE A. BOWERS
             United States Attorney
5            ROBERT BROSIO
             Assistant United States Attorney
6            Chief, Criminal Division
             JOHN CARLTON
7            Assistant United States Attorney
             MANUEL MEDRANO
8            Special Assistant United States Attorney
             312 North Spring Street
9            Los Angeles, California  90012

10

11        For the Defendant:

12
             JAMES E. BLANCARTE
13           MARY FULGINITI
             JEFFER, MANGELS, BUTLER & MARMARO
14           2121 Avenue of the Stars
             10th Floor
15           Los Angeles, California  90067
                  - and -
16           EDWARD M. MEDVENE
             JACK R. LUELLEN
17           MITCHELL, SILBERBERG & KNUPP
             11377 West Olympic Boulevard
18           Los Angeles, California  90064

19

20

21

22

23

24

25

208

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| AYALA, HORACIO | | | | |
| By Mr. Medrano | 210 | | | |
| By Mr. Medvene | | 214 | | |
| By Mr. Rubin | | 215 | | |
| | | | | |
| WALLACE, VICTOR | | | | |
| By Mr. Carlton | 217 | | | |
| By Mr. Medvene | | 224 | | |
| | | | | |
| GONZALES, JOSEPH | | | | |
| By Mr. Medrano | 226 | | 245 | |
| By Mr. Medvene | | 237 | | 246 |
| By Mr. Rubin | | 241 | | 246 |
| | | | | |
| SPENCER, JERRY | | | | |
| By Mr. Medrano | 248 | | 278/281 | |
| By Mr. Medvene | | 273 | | |
| By Mr. Rubin | | 274 | | 280 |
| | | | | |
| COLLINS, CARL | | | | |
| By Mr. Medrano | 282 | | | |
| By Mr. Rubin | | 301 | | |
| | | | | |
| CLEMENTS, DONALD | | | | |
| By Mr. Medrano | 311 | | | |
| By Mr. Rubin | | 317 | | |
| | | | | |
| DILLON, JOHN | | | | |
| By Mr. Carlton | 320 | | | |
| By Mr. Rubin | | 330 | | |
| | | | | |
| OAKES, WAYNE | | | | |
| By Mr. Carlton | 332 | | | |
| | | | | |
| RAWALT, RONALD | | | | |
| By Mr. Carlton | 336 | | 365 | |
| By Mr. Medvene | | 356 | | 366 |
| By Mr. Rubin | | 360 | | |
| | | | | |
| MALONE, MICHAEL | | | | |
| By Mr. Carlton | 367 | | | |

209

1                         I N D E X

2    EXHIBITS              FOR IDENTIFICATION          IN EVIDENCE

3    13A-H                                               378
     22                                                  214
4    23A-D                                                233
     24A-E                                                233
5    25                                                   237
     28-37                                                329
6    35B                                                  329
     38A-B                                                329
7    40                                                   335
     41                                                   335
8    42A-G                                                422
     44                                                   365
9    45                                                   365
     47A-B                                                365
10   48A-H                                                298
     50A-H                                                422
11   51                                                   295
     52A-J                                                378
12   53-65                                                384
     57                                                   300
13   66                                                   422
     67                                                   422
14   68A-B                                                422
     69                                                   422
15   70                                                   422
     71-76                                                422
16   78-79                                                422
     81-82                                                422
17   84A                                                  422
     85A                                                  422
18   87A-88-A                                             422
     89B                                                  422
19   92A                                                  422
     95A                                                  422
20   96A                                                  422
     98                                                   422
21   99                                                   287
     100                                                  301
22   101B                                                 329
     102                                                  300
23   103                                                  317
     160                                                  422
24   161                                                  422
     166                                                  292
25

210

1      LOS ANGELES, CALIF.; THURSDAY, DECEMBER 3, 1992; 9:30 AM

2                              (Jury in)

3          THE COURT:  Good morning.

4          THE COURTROOM:  Good morning, Your Honor.

5          THE COURT:  Call the next witness for the

6  government.

7          MR. MEDRANO:  Your Honor, at this time the

8  government would call Mr. Horacio Ayala to the stand.

9          THE CLERK:  Please raise your right hand.

10         HORACIO AYALA, PLAINTIFF'S WITNESS, SWORN

11         THE WITNESS:  I do.

12         THE CLERK:  Please be seated.

13         THE WITNESS:  Thank you.

14         THE CLERK:  Please state your full name for the

15  record and spell your last name.

16         THE WITNESS:  My name is Horacio, last name Ayala,

17  A-Y-A-L-A.

18                      DIRECT EXAMINATION

19  BY MR. MEDRANO:

20  Q    Mr. Ayala, who are you employed by, sir?

21  A    The Drug Enforcement Administration.

22  Q    How long have you served with the D.E.A.?

23  A    Since 1973.

24  Q    Approximately 19 years?

25  A    Approximately 19 years.

211

1  Q    And your current assignment?

2  A    I'm the Assistant Special Agent in charge of the

3  Denver Office in Denver, Colorado.

4  Q    In that capacity, how many agents do you supervise?

5  A    Approximately 55 agents.

6  Q    Any other law enforcement experience, other than

7  working with the D.E.A.?

8  A    I was assigned to the Customs Agency Service from 1971

9  to 1973.

10 Q    Mr. Ayala, let me direct your attention to the month

11 of February of 1985.

12        Sir, were you involved or part of the

13 investigative team regarding the disappearance of Special

14 Agent Enrique Camarena?

15 A    Yes, sir, I was.

16 Q    And let me direct your attention more specifically to

17 about February 11th of 1985.

18        On this particular date, did you participate in

19 any searches in Guadalajara?

20 A    Yes, sir, I did.

21 Q    Before I forget, did you know Enrique Camarena before

22 February of '85?

23 A    Yes, sir, I did.

24 Q    When did you meet him?

25 A    I met Enrique Camarena the first time in Operation

212

1    Funnel in 1976.

2    Q    So what happens on February 11th?

3    A    On February the 11th, I was called to assist the

4    Mexican Federal Judicial Police in searching a home in

5    Guadalajara, Jalisco, Mexico, at the street of Mixcoatal.

6    Q    Mixcoatal?

7    A    Mixcoatal, yes, sir.

8    Q    Were there any Mexican authorities accompanying you

9    for this search?

10   A    Yes, sir, there were.

11   Q    From what agency?

12   A    The Mexican Federal Judicial Police.

13   Q    Were there any other D.E.A. agents accompanying you?

14   A    Yes, sir, there were two, as far as I can remember.

15   Q    Who was in charge of the M.F.J.P. for the search?

16   A    Comandante Armando Pavon-Reyes.

17   Q    What happens when you arrived at the residence?

18   A    When we arrived at the residence, the Mexican Federal

19   Judicial Police secured the residence, entered the home,

20   and proceeded to conduct a search of that residence.

21   Q    Was anyone located at the residence when you and the

22   M.F.J.P. arrived?

23   A    Yes, sir.  There was a female who identified herself

24   as Elvira Murrillo de Felix.

25   Q    Who is that?

213

1    A    She was the wife of Miguel Felix-Gallardo, a known

2    trafficker.

3    Q    Were there any men present to arrest when you arrived?

4    A    No, sir, not that I can remember.

5    Q    Did you actually participate yourself in the search of

6    the residence?

7    A    Yes, sir, I did.  I assisted the Mexican Federal

8    Judicial Police.

9    Q    Now, can you tell us the results of your search?

10   A    Yes, sir.  In one of the rooms at the house that was

11   identified by Elvira Murrillo de Felix as the private

12   office of Miguel Felix-Gallardo, we searched that office,

13   and I remember that Comandante Espino reached behind him,

14   there was some book shelves at the office, he reached up

15   and grabbed a handbag.  He retrieved that handbag, and as

16   he did so, there was a couple of pieces of documents, as

17   well as a photograph that fell to the floor.

18        I reached down to obtain the photograph, and it

19   was a photograph of Enrique Camarena.

20   Q    Now, if I can ask you to look in this black book

21   directly in front of you, go to Exhibit 22.  It's more

22   towards the beginning.  Twenty-two.

23   A    Thirty-two?

24   Q    Twenty-two.

25   A    Yes, sir.

214

1    Q    Can you tell me what that is?

2    A    Yes, sir.  This is a photograph of Enrique Camarena.

3    The photograph that was found at the office of Miguel

4    Felix-Gallardo.

5              MR. MEDRANO:  Your Honor, we move its admission.

6              THE COURT:  It may be admitted.

7                 (Plaintiff's Exhibit 22 received.)

8              MR. MEDRANO:  One moment, Your Honor.

9              That concludes direct.

10             THE COURT:  Very good.

11             Any questions for this witness?

12                      CROSS-EXAMINATION

13   BY MR. MEDVENE:

14   Q    How long, Agent Ayala, were you in Guadalajara working

15   on the investigation involving Enrique Camarena's

16   disappearance?

17   A    The first time, sir, I was only there for two months;

18   and subsequently, I took over the office in Guadalajara and

19   I was there for two-and-a-half years, from 1985 to 1988.

20   Q    And what was the approximate number of agents, to your

21   knowledge, the approximate number of the D.E.A. agents that

22   assisted, to your knowledge, in the investigation of Mr.

23   Camarena's disappearance from February 8 through the rest

24   of the year?

25   A    I don't quite remember, sir.  There were 12, 14.  I

215

1    really couldn't tell you how many, because they came in and

2    they left and they came in and left, so I really couldn't

3    tell you how many there were, but there were many.  There

4    were several.

5    Q    A large number?

6    A    I would say, yes.

7    Q    And an intensive investigation?

8    A    Very intensive.

9    Q    There were rewards, to your knowledge, offered for

10   anyone with information with regard to the kidnapping?

11   A    Yes, sir, there was.

12   Q    These rewards were publicized?

13   A    Yes, sir, they were.

14   Q    Now, at the search of Felix-Gallardo's house, you

15   found no photo of Mr. Zuno, did you?

16   A    No, sir, we didn't.

17   Q    No items connecting Mr. Zuno to Felix-Gallardo; isn't

18   that correct?

19   A    That is correct.

20           MR. MEDVENE:  Thank you, very much.

21                     CROSS-EXAMINATION

22   BY MR. RUBIN:

23   Q    Agent Ayala, during the course of the investigation,

24   did the amount of the awards ever increase?

25   A    I don't recall that it did, sir, but I couldn't be

216

1    sure.

2    Q    Do you know the name of the person who was responsible

3    for handling the reward aspect and the money aspect of the

4    investigation?

5    A    The responsibility fell to Mr. Ed Heath.  He was the

6    country attache at that time.  Ed Heath.

7    Q    Ed Keith?

8    A    Heath.

9    Q    Heath.

10         And do you know where Mr. Heath is located today?

11   A    I believe that he is in charge of the Intelligence

12   Unit in El Paso, EPIC.

13   Q    Still in the D.E.A.?

14   A    Yes, sir, he is.

15   Q    And during the search of Mr. Gallardo's home, did you

16   find any photographs or information concerning Dr. Humberto

17   Alvarez-Machain?

18   A    No, sir, we didn't.

19         MR. RUBIN:  No further questions.

20         THE COURT:  Any redirect?

21         MR. MEDRANO:  No redirect, Your Honor.

22         THE COURT:  You may step down.

23               (Witness excused.)

24         THE COURT:  Call the next witness.

25         MR. CARLTON:  Government calls Victor Wallace.

217

1          THE CLERK:  Please raise your right hand.

2          VICTOR WALLACE, PLAINTIFF'S WITNESS, SWORN

3          THE WITNESS:  I do.

4          THE CLERK:  Please be seated.

5          State your full name for the record and spell your

6    last name.

7          THE WITNESS:  My name is Victor D. Wallace,

8    W-A-L-L-A-C-E.

9                    DIRECT EXAMINATION

10   BY MR. CARLTON:

11   Q    Mr. Wallace, what is your present employment?

12   A    I'm a Criminal Investigator with the Drug Enforcement

13   Administration.

14   Q    How long have you been employed by the D.E.A.?

15   A    Approximately 18 years.

16   Q    Since 1974?

17   A    Since 1974.

18   Q    And before working for the D.E.A., did you have any

19   other law enforcement experience?

20   A    Prior to coming on with the D.E.A., I was with the

21   Imperial County Sheriff's Office for 15 years.

22   Q    At some point during your career with the D.E.A., were

23   you assigned to its Guadalajara Office?

24   A    Yes.  In September 1st, 1984 I arrived at the

25   Guadalajara Office for my new assignment.

218

1   Q      How long did you work there?

2   A      Approximately one year.

3   Q      Did you know Enrique Camarena?

4   A      Yes, I knew him very well.  We both grew up in the

5   City of Calexico, California.  I was 10 years older than

6   Kiki was, but we both grew up there.

7   Q      Did you ever work with him?

8   A      Yes.  Prior to coming on D.E.A. in 1974, we worked

9   together with the Imperial County Narcotics Task Force.

10  Q      And do you know whether before working with the

11  Imperial County Narcotics Task Force, Enrique Camarena had

12  any prior law enforcement experience?

13  A      Yes.  He came on to the Imperial Sheriff's Office from

14  the Calexico Police Department.

15  Q      Let me draw your attention to February 8th of 1985.

16         Did you receive a telephone call that morning?

17  A      Yes.  At approximately 6:30 a.m. on the 8th of

18  February, I received a call from Mrs. Camarena inquiring as

19  to the whereabouts of Kiki Camarena.

20  Q      Did you know those whereabouts?

21  A      No, I did not.  I told her I would check into it and

22  call her back.

23  Q      And what did you do at that point?

24  A      Well, I felt maybe there was something wrong, so I

25  called my agent in charge.  It would be James Kuykendall,

219

1   and advised him of the call from Mrs. Camarena.

2   Q    Did you assist in looking for Agent Camarena on that

3   day, February 8th?

4   A    Yes.   What I did is I went directly to the Mexican

5   Federal Judicial Police Office.   Mr. Kuykendall went to the

6   U.S. Consulate.

7   Q    What happened when you got to the M.F.J.P. Office?

8   A    When I arrived at the M.F.J.P. Office, there was only

9   one M.F.J.P. agent there.   He told me the rest of the

10  office --

11           THE COURT:  Let me move this.

12           THE WITNESS:  Okay.

13           THE COURT:  I'm sorry.

14           THE WITNESS:  Okay.  The M.F.J.P. agent told me

15  the rest of the agents at that headquarters had gone to

16  Colima on an investigation.

17  BY MR. CARLTON:

18  Q    Did you make any other efforts on that day to find

19  Agent Camarena?

20  A    Yes.  I advised this M.F.J.P. agent that we believed

21  that Kiki was missing, that something was wrong, so he and

22  I started checking the hospitals.  We checked a couple

23  hospitals, and I even went to the morgue.  I believe it was

24  that day or the following day.  I went to the morgue to

25  check the bodies there.

220

1    Q    At some point, did you actually stay with Mrs.

2    Camarena for a period?

3    A    Yes.  On the 8th, that evening, I suggested, and she

4    was willing, to have me and family stay with her at her

5    house until we heard something positive, and also I'd be

6    liaison between Mrs. Camarena and the office to let her

7    know whatever was going on, and for security purposes.

8    Q    How long did that arrangement continue?

9    A    I stayed there several months after the 8th and 9th,

10   and I would get out once in a while to go in the field and

11   help out with the investigation.

12   Q    Let me draw your attention then to early March of

13   1985.

14        Did you have occasion to go to the neighboring

15   state of Michoacan in relation to this investigation?

16   A    Yes.  That was on March 6th, 1985.  I was assigned to

17   go to the Bravo family ranch.  It was in the adjoining

18   state of Michoacan.

19   Q    Are you certain it was March 6th?

20   A    As far as I can recollect, it was March 6 -- 5th or

21   6th.  I believe it was March 6.  It was the day that Agent

22   Camarena's body was found, I believe.

23   Q    What did you do and why did you go to Michoacan?

24   A    Well, the purpose of myself and another agent, Bobby

25   Hernandez from D.E.A., accompanied approximately 30

221

1    M.F.J.P. agents and their helpers, known as Madrinas, to go

2    to the Bravo Ranch.  It was cause information that received

3    that possibly Agent Camarena's body was buried behind the

4    ranch in the orchards or on the property itself.

5    Q    And did you and these other individuals search the

6    ranch?

7    A    Yes.  We searched the ranch and we took shovels, and

8    we dug around the trees, and in the back fields which

9    appeared to be like an alfalfa field.  There was also some

10   dirt land belonging to that property, and we dug in soft

11   spots and everything in search of Agent Camarena's body

12   according to the information that they had received.

13   Q    How long did you continue doing that?

14   A    We did that most of the day.  In fact, we left

15   approximately 5:00 p.m. that evening, without success.

16   Q    Agent Wallace, I'd ask you to look in the book in

17   front of you at what has been marked as Exhibits 23-A

18   through D.  Actually, only C and D may be in the books.  A

19   and B, I believe, are on the cart next to you.

20   A    23-C?

21   Q    Um-um.

22   A    I have before me 23-C and 23-D.

23   Q    I believe A and B are larger items on the cart

24   immediately to your right.

25   A    Do you want me to put them up here?

222

1    Q    Do you --

2    A    This is 23-A.

3    Q    Do you recognize that?

4    A    Yes.  This is the residence of the Bravo family.  This

5    portion right here (indicating) is the entrance to the

6    orchards and the alfalfa field, and the other property to

7    the rear of this Bravo residence is where we dug in search

8    of Agent Camarena's body.

9    Q    Do you see 23-B?

10   A    This is 23-B.

11   Q    Is that the rear of the same residence?

12   A    Yes.  This is the rear of the residence, and here's

13   the entrance I pointed out here, the side, and the rear is

14   here (indicating).

15   Q    And 23-C and D, do you recognize those two?

16   A    Yes, 23-C, this one here, it's also the picture of the

17   residence of the Bravo family.

18   Q    And D also?

19   A    And also D, 23-D.

20   Q    If you would look at what has been marked as Exhibits

21   24-A through E in the book.

22   A    Okay.  Exhibit 24-A is a picture of several M.F.J.P.

23   agents digging in the rear of the Bravo Ranch.

24   Q    On the day that you were there?

25   A    On March 6th, on the day I was there.

223

1   Q    Generally looking through all of that group of

2   pictures, what do those pictures depict?

3   A    Okay.  Continue this.  There's also a picture here of

4   us digging in the alfalfa -- what I feel was the alfalfa

5   field -- throughout the area looking for soft spots,

6   looking for Agent Camarena's body according to the

7   information.

8         Another picture, around the alfalfa field and the

9   sides of the alfalfa field.  We're all spread out with

10  shovels, looking for Agent Camarena's body.

11        Also the orchards, right immediately behind the

12  Bravo family ranch.  The trees and then a bare spot before

13  the orchards, and agents looking through the orchards.

14        Okay.  This is the picture of the bare

15  uncultivated land, just the dirt, and agents all over

16  the -- this particular property looking for Agent

17  Camarena's body.

18        And that's the end of the pictures.

19        MR. CARLTON:  Move the admission of 23-A through

20  D, and 24-A through E, Your Honor.

21        THE COURT:  It may be admitted.

22        (Plaintiff's Exhibits 23-A through 23-D

23          and 24-A through 24-E received.)

24  BY MR. CARLTON:

25  Q    Agent Wallace, at the time you were looking on this

224

1    ranch, Agent Camarena's body had not been found, had it?

2    A    No, it had not been found; and we stopped our project

3    approximately 5:00 o'clock, 5:00 p.m. and departed the

4    area.

5    Q    How long after that did you learn that his body had

6    been found?

7    A    I learned the following day from the agents at the

8    office that Agent Camarena's body was found that same day,

9    the day I was there, only a little -- hour-and-a-half --

10   approximately an hour-and-a-half after we left.

11            MR. CARLTON:  Nothing further.

12            THE COURT:  Do you have any questions for this

13   witness?

14            MR. MEDVENE:  Just a few, Your Honor.

                      CROSS-EXAMINATION

16   BY MR. MEDVENE:

17   Q    How long were you in Guadalajara working on the

18   investigation of Enrique Camarena's disappearance?

19   A    From February 8th, 1985, until I was reassigned to

20   come back to the States, the United States, to San Diego,

21   California, and I reported approximately September 1st,

22   1985.

23   Q    You worked virtually full time on the disappearance

24   and trying to uncover evidence of who caused the

25   kidnapping?

225

1    A    That's correct.  And mostly I was with Mrs. Camarena

2    and her children, comforting her and acting as liaison.  If

3    any news about Kiki came up, they would call me and I would

4    advise her.

5    Q    Were you involved in a number of searches?

6    A    No, I was not.  I was mostly involved in this Bravo

7    Ranch, and I did on my own go to different residences of

8    suspected traffickers that we knew, and that's about what I

9    did, other than stay with Mrs. Camarena.

10   Q    What residences did you go to?

11   A    Well, on the 8th of February, as far as I can

12   recollect, that evening or on the end or on the 9th of

13   February 9th, 1985, I had gone to the Hotel Americana, next

14   to the Hyatt Hotel.  I went to the residence that -- I

15   don't remember the streets, but that allegedly belonged to

16   either Caro-Quintero or Ernesto Fonseca, and I went to the

17   Felix-Gallardo residence.  Of course, I didn't go on these

18   properties.  I drove by to see if I could see any

19   activities.  It was mostly drive-bys.

20              MR. MEDVENE:  I have nothing further, Your Honor.

21              THE COURT:  Do you have anything?

22              MR. RUBIN:  No questions.

23              THE COURT:  Redirect?

24              MR. CARLTON:  Nothing, Your Honor.

25              THE COURT:  You may step down.

226

1        (Witness excused.)

2            THE COURT:  Next witness, please.

3            MR. MEDRANO:  Your Honor, the government would

4    call Joseph Gonzales to the stand.

5            THE CLERK:  Please raise your right hand.

6            JOSEPH GONZALES, PLAINTIFF'S WITNESS, SWORN

7            THE WITNESS:  I do.

8            THE CLERK:  Please be seated.

9            State your full name for the record and spell your

10   last name.

11           THE WITNESS:  Joseph Gonzales, G-O-N-Z-A-L-E-S.

12                   DIRECT EXAMINATION

13   BY MR. MEDRANO:

14   Q    Mr. Gonzales, you are a D.E.A. agent?

15   A    Yes, sir, I am.

16   Q    How long have you served in that capacity?

17   A    A little over 22 years now.

18   Q    Your current position is where?

19   A    I'm a Group Supervisor stationed in San Ysidro,

20   California.

21   Q    In your current position, do you supervise agents?

22   A    I have a task force of approximately 12 agents.  It's

23   a combined task force, involving D.E.A.,

24   San Diego Police, State Narcotics and other Federal

25   agencies.

227

1   Q    Mr. Gonzales, prior to 1985, did you know Kiki

2   Camarena?

3   A    Yes, I did.  I met him when he was stationed in

4   Calexico in the early '70's.

5   Q    I'd like to direct your attention, Agent Gonzales, to

6   February of '85.

7        What is your assignment at that timeframe?

8   A    During February of '85, February 9th of '85, I arrived

9   in Guadalajara, Mexico from San Diego.  I was a Senior

10  Special Agent in San Diego at the time.

11  Q    And the reason for going to Guadalajara, or to Mexico?

12  A    I was sent to Guadalajara temporary duty in an attempt

13  to locate Special Agent Camarena, who at that time was

14  missing.

15  Q    On this date are other agents flying in as well?

16  A    Yes.  There were other agents arriving in Guadalajara

17  from other points in the United States and other parts of

18  Mexico.

19  Q    Let me direct your attention now, sir, to around

20  March 6th of 1985.

21       On that date where are you?

22  A    I am still in Guadalajara, Mexico.

23  Q    And can you tell us what happens on this day?

24  A    The early morning of March 6th, I -- prior to going to

25  work, I was listening to a Mexican news television, and

228

1    they had a -- about 7:00 a.m. they had a news report that

2    two bodies had been found in the neighboring state of

3    Michoacan, and they believed that these bodies were the

4    bodies of Special Agent Camarena and Mr. Zavala.

5    Q    Michoacan, the state, is that immediately adjacent to

6    the State of Jalisco?

7    A    Yes, it is.

8    Q    Well, what do you do next?

9    A    Well, we proceeded to the office, and once we arrived

10   in the office, Mr. Ed Heath, who was the Country Attache of

11   D.E.A. in Mexico, had been summoned to the Mexican Federal

12   Judicial Police Office, and they asked him to bring two

13   other agents with him.  I accompanied Mr. Heath, along with

14   Special Agent Robert Castillo.  We proceeded to the

15   M.F.J.P. Office.

16   Q    What happens at the M.F.J.P. Office?

17   A    At the office, we were met by Mexico Federal Police

18   Comandante who told us that they wanted us to go to the

19   State of Michoacan to look at the bodies that had been

20   discovered there, and they took us via car to the

21   Guadalajara Airport where they had a waiting helicopter

22   there.

23         We got into the helicopter and we had to wait for

24   about 15, 20 minutes for the arrival of the Personal

25   Secretary of the Director of the M.F.J.P. who arrived from

229

1    Mexico City.  He had a video camera with him and -- a 35

2    millimeter camera.  I can't remember the man's name.

3    Q    Do you ultimately leave the Guadalajara Airport?

4    A    Yes, we did.  We went via helicopter to the City of

5    Zamora, Michoacan which is about 70 to 75 miles southeast

6    of Guadalajara.  We landed in the City of Zamora in the

7    helicopter.

8    Q    Let me stop you there, Agent Gonzales.

9         The month of February in '85, you were part of the

10   investigative team; is that correct?

11   A    Yes.

12   Q    Working very hard?

13   A    Yes.

14   Q    You were searching for Camarena?

15   A    We were searching for Camarena.  We were following up

16   every possible lead that we could.

17   Q    Had you ever apprised your Mexican counterparts that

18   at a minimum, you wanted the bodies if they could be found?

19   A    Yes.

20   Q    And you made that known to the Mexican authorities?

21   A    Yes.

22   Q    Now, what happens when you arrive via helicopter in

23   Zamora?

24   A    We arrived via helicopter.  We are met by a

25   contingency of M.F.J.P. agents, and we were transported to

230

1    the Red Cross Hospital or morgue in the City of Zamora.

2    Q    And this is in the State of Michoacan?

3    A    Yes, it is.

4    Q    What happens next, Agent Gonzales?

5    A    When we arrived at this location, we are met by the

6    M.F.J.P. Comandante in charge of the Mexican investigation

7    into the location of Camarena.

8          A gentleman by the name of Pavon-Reyes.  He met us

9    outside and escorted us into the morgue, into a large

10   passageway, and took us to -- showed us the location.  He

11   had two sheets spread out on the ground.  Each sheet had a

12   sign on it.  One had "Cadaver 1," "Cadaver 2," and on the

13   sheets there was a pile of clothing and there were other

14   items on each sheet.

15   Q    Well, were these piles of clothing associated with

16   each particular cadaver?

17   A    Yes.  Mr. Pavon, when we arrived, explained to us that

18   the previous evening -- it would be sometime in the

19   afternoon or evening of March 5th -- these cadavers had

20   been found close to the Bravo Ranch, and each cadaver

21   had -- the clothing that were on these sheets, were the

22   clothing that the cadavers allegedly were clad in when they

23   were found.

24   Q    Now, Mr. Gonzales, let me direct you to the body or

25   Cadaver 1.  I want you to just focus on that for a moment,

231

1    and I want you to focus on the clothing for Cadaver 1.

2            Can you tell us what attire or clothing that

3    consisted of?

4    A    Cadaver 1 consisted of a pair of light blue denim

5    trousers, a pair of boxer shorts.  There was a T-shirt, I

6    think it was a sweatshirt, a short sleeve, light colored

7    button shirt, a pair of socks.  There was some rope ties.

8    Rope ties, Venetian blind rope, a small brown rope, and

9    there were loops on them.  There were four loops, and they

10   appeared to be cut, two loops together in one section and

11   then they had a string going down and two loops together on

12   the other section.  And there were also --

13   Q    Let me stop you there for a second.

14            A string?

15   A    Yes.

16   Q    And two loops at the end of each string?

17   A    Yes.

18   Q    Or a Venetian blind rope, I'm sorry?

19   A    Yes.

20   Q    Now, what was the condition of these materials that

21   you found?

22   A    The condition, they were dirty, they were brown and

23   dirty.  It was filthy.

24   Q    Anything else you found associated with that clothing?

25   A    There was some gauze and some tape.

232

1    Q    Let me have you focus on the second pile of clothing

2    for body or Cadaver 2.

3    A    Yes.

4    Q    Can you tell me what clothing that consisted of?

5    A    That consisted of a pair of jockey shorts and the rope

6    ties.

7    Q    Were the rope ties, were they similar to the previous

8    ones you described?

9    A    Yes, they were.

10   Q    Anything else you found?

11   A    There was gauze there and some tape.  It appeared to

12   be blindfolds.

13   Q    Okay.  Anything else, Agent Gonzales?

14   A    Yes.  There were -- there was a sheet or a shower

15   curtain with a green floral design on it there, and also --

16   there was also some white plastic fertilizer bags made of

17   thick plastic.  It had the green lettering on them in

18   Spanish, and it had "fertilizer" on it.

19         Mr. Pavon-Reyes represented to us that the

20   cadavers had been contained inside these bags of

21   fertilizer.

22   Q    The material for these plastic bags, describe that?

23   A    It was a thick plastic.

24   Q    Was it a transparent plastic?

25   A    No.  No, it was not.

233

1  Q     The pile of clothing for Cadaver 2, what was the

2  condition of those materials?

3  A     There was -- it was dirty.  It was dirty brown.  It

4  was very dirty.

5  Q     Incidentally, for Pile 2, for Cadaver 2, did you ever

6  find any blindfold there?

7  A     Yes.  The blindfold was there.  It was a gauze and

8  some tape.

9  Q     Now, what happens after this initial viewing that you

10  made?

11  A     We were taken to a room by some Mexican doctors that

12  were there, and we were shown two cadavers in this room,

13  and the doctors there explained what their findings of

14  their examination of the cadavers had been.

15  Q     Can you describe exactly the location of the remains?

16  A     Cadaver 1 was on a cement slab about two feet off the

17  ground, and Cadaver 2 was on a higher slab, about three

18  feet off the ground.  It was a cement slab.  Both bodies

19  were laid out there on their back.

20  Q     Let's talk about the body on the high slab.  Brief

21  description, if you can.

22  A     It was a cadaver of a Hispanic male, 35 to 40 years of

23  age.  The body was decomposed.  The face was

24  unrecognizable.  It appeared to be in a mummified state.

25  The skull was crushed.  It was an indentation of the skull.

234

1    The right hand around the forearm appeared to -- the right

2    arm appeared to be broken.  The skin was broken.  There

3    were lesions on the wrist and on the ankles of the body.

4    Q    The second -- I'm sorry, is there anything else about

5    that body?

6    A    No.

7         The second cadaver appeared to be also of an

8    Hispanic male, and he was -- appeared to be in his

9    mid-50's.  You could tell the body of the person had been

10   obese, and he also had lesions to his wrist and he was

11   decomposed also, but he had more facial features than the

12   other cadaver.

13   Q    Were you able to tell who that was?

14   A    Well, no.  No, I couldn't.

15   Q    Was this second body also in this mummified state?

16   A    Yes, it was.

17   Q    Now, at any point, Agent Gonzales, do you leave the

18   morgue?

19   A    Yes, we do.  We left the morgue shortly after we were

20   shown the cadavers and we were briefed by the doctors, and

21   then we were escorted by the M.F.J.P. in their vehicles to

22   the site where the cadavers were found.

23   Q    Can I stop you there.

24        Who is it that's taking you there?

25   A    The M.F.J.P. in their vehicles.  It would be

235

1    Comandante Pavon.   Comandante Espino is there.   As a matter

2    of fact, I rode in the vehicle with Comandante Espino.

3    Q    All right.   Where do you go?

4    A    We proceed, it would be northwest, I believe, on the

5    road towards -- the road between Zamora and Guadalajara,

6    and we proceed to the site where the bodies were found,

7    which is about 1,500 yards southeast of the Bravo Ranch.

8    Q    Fifteen hundred yards southeast of the ranch?

9    A    Yes.

10   Q    What side of the road were you taken to?

11   A    That was on the north side of the road about, between

12   eight to fifteen yards from the road side.

13   Q    And again, the approximate distance from Guadalajara

14   is what?

15   A    To that location, it's about 60 to 65 miles.

16   Q    Now, would you tell us what you found when you arrived

17   at the scene?

18   A    There was a lot of people milling around there.   There

19   didn't appear to be any attempt by the M.F.J.P. to protect

20   the site at all.   There was a lot of newspaper reporters

21   and just a lot of people milling around the area.

22   Q    Did you have an opportunity to examine that site?

23   A    Yes, I did.   I examined the site.   I went over -- you

24   could still smell the decomposition of the bodies.   That

25   odor was still lingering.

236

1        There was also pieces of hair in the underbrush of

2   the area.

3   Q    This area, this road, did it appear to you to be a

4   well-traveled road?

5   A    Yes.  It's an agricultural area.  There are farms

6   throughout the area, and it's a well-traveled road,

7   especially by the farmers going to and from their fields.

8   Q    Incidentally, did you ascertain if there was any body

9   fluids of any sort in that area?

10  A    I didn't see any.

11  Q    Based on the absence of any blood fluids, did you form

12  an opinion as to whether or not the bodies had been there

13  long?

14  A    Yes, I did.

15  Q    What was that, sir?

16  A    The bodies had not been there very long.  Simply

17  because as well-traveled as that road is, it would have

18  been discovered.  I believe that they were found shortly

19  after they were left.

20  Q    And you mentioned no body fluids as well?

21  A    No body fluids at all.

22  Q    If I can ask you -- to your right there is a cart.

23  Can I ask you to pull up Exhibit 25.

24        No, to your right, sir.  Keep going to your right.

25        Can you tell me what that is?

237

1    A    This is a photograph from the road, looking out to

2    where the cadavers were found.   The cadavers were in this

3    area here, between these shrubs in this area (indicating).

4    Q    You can put that down.

5            MR. MEDRANO:   Your Honor, we move the admission of

6    that exhibit.

7            THE COURT:   It may be admitted.

8            (Plaintiff's Exhibit 25 received.)

9            MR. MEDRANO:   Your Honor, that concludes direct.

10            THE COURT:   You may cross-examine the witness.

11                        CROSS-EXAMINATION

12   BY MR. MEDVENE:

13   Q    Agent Gonzales, how long did you work on the Enrique

14   Camarena kidnapping investigation?

15   A    Several years.

16   Q    Starting from approximately February 9th, when you

17   arrived?

18   A    February 9th, 1985, until approximately 1987.

19   Q    How long were you in Guadalajara, during that whole

20   period?

21   A    I was in Guadalajara probably from February 9th till

22   mid-March, the end of March, sometime in that area.

23   Q    Would you go back periodically?

24   A    Yes, I did.

25   Q    Did you either alone or with other agents participate

238

1    in the searches of a number of residences as part of the

2    investigation?

3    A    Yes, I did.

4    Q    And what residences were those?

5    A    We participated in the search of the -- there was a

6    hotel that we searched that belonged to Felix-Gallardo.  I

7    think it was the Suites Royal, I believe.  And there were

8    some ranches that we searched also.  One that belonged to

9    Emilio Quintero, and at least two that belonged to

10   Caro-Quintero.

11   Q    Any others that you recall?

12   A    No.

13   Q    Now --

14   A    I also -- but this is -- I searched other locations,

15   but they were not during that period of time.

16   Q    What other locations?

17   A    The location where Mr. Camarena was eventually taken

18   after he was kidnapped, and that would be the only one.

19   Q    Now, in addition to the searches that you participated

20   in, what other things did you do in the course of your

21   investigation?

22   A    Well, I'd done numerous things.  I interviewed a lot

23   of witnesses, interviewed a lot of suspects during that

24   period of time.

25   Q    Were some 30 to 50 people arrested by the Mexican

239

1    Federal Judicial Police in connection with the

2    investigation of the kidnapping, to your knowledge?

3           MR. MEDRANO:  Objection, Your Honor.  Leading.

4    Beyond the scope.

5           THE COURT:  Well, leading is permitted, but it may

6    be beyond the scope.  It is.

7           The objection is sustained.

8    BY MR. MEDVENE:

9    Q    Did you attend a number of interrogations?

10   A    By whom?

11   Q    By either D.E.A. agents or law enforcement agencies,

12   the Mexican Police?

13   A    No.  I personally did not attend any interrogation by

14   the M.F.J.P.

15   Q    Other D.E.A. agents, to your knowledge, did; isn't

16   that correct, sir?

17          MR. MEDRANO:  Objection, Your Honor.  This is

18   beyond the scope.

19          MR. MEDVENE:  They put him on, Your Honor --

20          THE COURT:  You may answer.

21          THE WITNESS:  Pardon me?

22   BY MR. MEDVENE:

23   Q    Other D.E.A. agents, to your knowledge, did attend

24   interrogations of people that were involved in the

25   kidnapping; isn't that correct?

240

1    A    I don't know.  I believe so.

2    Q    You read a number of interrogations that were

3    conducted, didn't you?  You read the transcripts?

4         MR. MEDRANO:  Objection, Your Honor.  This is

5    beyond the scope.

6         THE COURT:  Sustained.

7    BY MR. MEDVENE:

8    Q    On the basis of your investigation, your searches,

9    your interrogations, you found no evidence that Ruben Zuno

10   was involved in any meetings where the planning of the

11   kidnapping of Enrique Camarena was discussed; isn't that

12   correct, sir?

13        MR. MEDRANO:  Objection, Your Honor.  Relevance.

14   Beyond the scope.  Lack of foundation.  Lack of personal

15   knowledge.

16        THE COURT:  Overruled.

17   BY MR. MEDVENE:

18   Q    Isn't that correct, sir?

19   A    Pardon me?  Can you ask me again, please.

20   Q    Isn't it correct, sir, that based on your

21   investigation, the interviews you conducted, the searches

22   you conducted, you found no evidence that Ruben Zuno

23   attended any meetings where the kidnapping of Enrique

24   Camarena was discussed; isn't that correct?

25   A    That is correct.

241

1          MR. MEDVENE:  Thank you, sir.

2          THE COURT:  Do you have any questions?

3          MR. RUBIN:  Yes, Your Honor.

4                    CROSS-EXAMINATION

5    BY MR. RUBIN:

6    Q    Agent Gonzales, you indicated that you met with

7    Comandante Pavon-Reyes in March of 1985?

8    A    Yes, I did.

9    Q    Were you aware at that time of the incident that

10   occurred at the Guadalajara Airport with Pavon-Reyes in

11   February of 1985?

12   A    Yes.

13   Q    And at any time, did you or the D.E.A. contact Mexican

14   officials to advise them of your suspicions or that

15   anything improper had happened with Comandante Pavon-Reyes

16   at the airport?

17   A    I did not.

18   Q    Do you know if any other D.E.A. agent did?

19   A    Not that I know of.

20   Q    When you saw that it was him that was bringing you out

21   there, did you protest that or ask that somebody else be

22   involved in that?

23          MR. MEDRANO:  Objection, Your Honor.  Beyond the

24   scope of direct.

25          THE COURT:  Overruled.

242

1          You may answer.

2          THE WITNESS:  No.  We did not protest and request

3   anyone else, because, in effect, there was no one else.  He

4   was the man in charge out there, and we didn't ask for

5   anyone else to be present.

6   BY MR. RUBIN:

7   Q    So at the time that you were going out there, you

8   suspected you were being assisted by a person who was in

9   cahoots, if you will, with the drug cartel?

10  A    Yes, Counselor.  Unfortunately, occasionally that does

11  happen when we were dealing in Mexico.

12          We did protest with Mr. Pavon in at least one

13  instance that day; and the protest was that Mr. Pavon-Reyes

14  extended the theory that the bodies had been left at that

15  location by the people at the Bravo Ranch; and we told him

16  that we definitely did not believe that, and that we

17  believed that the bodies had been left there to give the

18  impression that they were tied into the Bravo Ranch.

19  Q    Now, when the bodies where taken back to the Mexican

20  doctor, where was this specifically?

21  A    Pardon me?

22  Q    Was it a morgue that they were taken to?

23  A    That's where I saw the cadavers, was in a morgue.

24  Where they specifically were taken to from there, I don't

25  know.

243

1   Q    I mean, when the bodies were found -- when you first

2   saw the bodies, was it at the morgue?

3   A    Yes, it was.

4   Q    At the hospital?

5   A    Yes, they were in a morgue.

6   Q    Now, do you know which cadaver was ultimately

7   identified as Enrique Camarena?

8   A    Yes.

9   Q    Which one was that?

10  A    Cadaver 2.

11  Q    Now, when you saw it, did Cadaver 2, you spoke of the

12  decomposition, but did Cadaver 2 still have hair on it?

13  A    Yes.

14  Q    Did it still have tissue on it?

15  A    Yes.

16  Q    And if forensic people wanted to test the hair and

17  tissue of Enrique Camarena, there was material to test?

18       MR. MEDRANO:  Objection, Your Honor.  Lack of

19  foundation.

20       THE COURT:  Sustained.

21  BY MR. RUBIN:

22  Q    How much hair was still there on the body that you

23  saw?

24  A    There was still quite a bit of hair.

25  Q    Was there still quite a bit of tissue?

244

1    A    Yes.

2    Q    Who is Emilio Quintero?

3    A    Emilio Quintero-Payan is Caro-Quintero's uncle.

4    Q    You've been at 881 Lope de Vega?

5    A    Yes.

6    Q    Could you describe how big a residence or compound it

7    is?

8    A    It is a large compound.  It's a large compound.  They

9    have -- the residence itself is -- it's actually -- the one

10    floor has three or four bedrooms, has a small basement, and

11    it has an office on the second floor.  It's got the

12    kitchen, dining room, of course, swimming pool.  They have

13    a large area for parking or whatever.  You have an aviary,

14    and they have tennis courts and showers, steam room.  It's

15    very large, a very nice residence.

16    Q    How many different buildings are there?

17    A    You have a maid's quarters also, I forget.  You have

18    the main residence, the maid's quarters.  You have the

19    steam room area.  Those are the actual out houses and so

20    forth.  You have also kind of a patio area.  You have a

21    built in barbecue and so forth, right next to the swimming

22    pool.  It's a beautiful house.

23    Q    Is there a guest house there?

24    A    I don't remember.  I don't have the floor plan.

25    Q    Okay.

245

1    A    I wasn't prepared for this so.

2         MR. RUBIN:  No further questions.  Thank you,

3    Agent.

4         THE COURT:  Redirect?

5         MR. MEDRANO:  Briefly.

6                   REDIRECT EXAMINATION

7    BY MR. MEDRANO:

8    Q    Agent Gonzales, in '85 when you were part of that

9    investigation, you told Mr. Medvene that you developed no

10   information tying Zuno to the kidnapping; is that correct?

11   A    Yes.

12        MR. MEDVENE:  Objection, Your Honor.

13   BY MR. MEDRANO:

14   Q    I'm sorry, is that correct?

15        THE COURT:  Objection is overruled if there is an

16   objection.

17        THE WITNESS:  Yes, it is.

18   BY MR. MEDRANO:

19   Q    That conclusion you gave us was based on the

20   information you had in '85; is that correct?

21   A    Yes.

22   Q    And is your conclusion based also on the lack of

23   cooperation you were receiving from the Mexican

24   authorities?

25        MR. MEDVENE:  Objection, calls for a conclusion.

246

1          THE COURT:  You may answer.

2          THE WITNESS:  Yes.

3          MR. MEDRANO:  One moment, Your Honor.

4              (Government counsel confer.)

5    BY MR. MEDRANO:

6    Q    In addition, in '85, were you the person in charge of

7    the Camarena investigation?

8    A    Yes, portions of it.  Yes.

9    Q    But you weren't the supervisor in charge of the entire

10   operation?

11   A    No.

12         MR. MEDRANO:  Thank you, Your Honor.

13                 RECROSS-EXAMINATION

14   BY MR. MEDVENE:

15   Q    Your investigation, you told us, lasted past '85;

16   isn't that correct, sir?

17   A    Yes.

18   Q    Lasted into '87?

19   A    Portions of it, yes.

20         MR. MEDVENE:  Thank you.

21         MR. RUBIN:  Just a couple.

22                 RECROSS-EXAMINATION

23   BY MR. RUBIN:

24   Q    Since you were in charge of portions of the

25   investigation, were you responsible for the offering of

247

1   rewards in any way, for information?

2   A    Sometimes, yes.  It would depend on the reward.

3   Q    Did you offer rewards for information?

4   A    Oh, offer rewards, you mean, no.

5        MR. MEDRANO:  Beyond the scope of direct, Your

6   Honor.

7        THE WITNESS:  No.  Offer a reward, you mean?

8   BY MR. RUBIN:

9   Q    Yes, offer rewards?

10  A    No, I didn't.

11  Q    That wasn't in your area?

12  A    No.

13       MR. RUBIN:  No questions.

14       THE COURT:  You may step down.

15       THE WITNESS:  Thank you.

16              (Witness excused.)

17       THE COURT:  Call the next witness.

18       MR. MEDRANO:  Call Jerry Spencer to the stand,

19  Your Honor.

20       THE CLERK:  Would you raise your right hand.

21       JERRY SPENCER, PLAINTIFF'S WITNESS, SWORN

22       THE WITNESS:  I do.

23       THE CLERK:  Please be seated.

24       State your full name for the record and spell your

25  last name, please.

248

1    THE WITNESS:  Yes, my name is Jerry Douglas

2  Spencer.  Last name is spelled S-P-E-N-C-E-R.

3                    DIRECT EXAMINATION

4  BY MR. MEDRANO:

5  Q    Your occupation, sir?

6  A    I'm a medical officer, a Navy physician in the United

7  States Navy.

8  Q    Do you have a rank?

9  A    Yes.  I'm a Captain in the Medical Corps in the Navy.

10  Q    Where are you currently assigned to?

11  A    I'm currently assigned to the Armed Forces Institute

12  of Pathology, which is located on the grounds of the Walter

13  Reed Medical Center in Washington, D.C.

14  Q    Is this a supervisory position?

15  A    Yes.  My title is Assistant Armed Forces Medical

16  Examiner.  The Armed Forces Institute of Pathology has

17  several departments.  One of the departments is called the

18  Office of the Armed Forces Medical Examiner, and I'm

19  basically the Deputy in Charge of that particular

20  department.

21  Q    How many people are under you?

22  A    Fourteen pathologists work for me.  We have a

23  toxicologist.  We have also a DNA Identification

24  Laboratory, approximately 60 people.

25  Q    Briefly, your current duties or responsibilities?

249

1  A    Again, my title is Assistant Armed Forces Medical

2  Examiner.  I have administrative responsibilities in

3  directing operations of my particular department.

4       Currently we have aircraft accident investigations

5  going on recently, and I'm in charge of the Residency

6  Program and overall administrative control of the

7  department.

8  Q    Now, before your current assignment, Dr. Spencer,

9  where were you stationed or assigned?

10 A    Prior to my current assignment, I was in the Naval

11 Hospital in Kyushu, Japan.  Kyushu is a Naval Base close to

12 Tokyo.  I was there for two years, from 1990 to 19 -- July

13 of 1992.

14      Prior to that time, I was assigned to the Naval

15 Hospital, Okinawa, Japan, from 1985 to 1990, and for the

16 six years prior to my assignment to Okinawa, I was at my

17 current station, the Armed Forces Institute of Pathology

18 from 1979 to 1985.

19 Q    Now, when stationed overseas, particularly in Okinawa,

20 briefly what were your duties then?

21 A    I, again, had administrative duties, and I was also

22 the Regional Medical Examiner for the Pacific Region, which

23 involved a considerable amount of traveling to do autopsies

24 and testifying in military court martial.

25      I traveled to the Philippines many times, Korea

250

1   many times, also to Guam; and at that time I was in

2   Okinawa, and I also had to travel to the mainland of Japan.

3   Q    Dr. Spencer, are you Board certified in any specific

4   areas?

5   A    Yes.  I'm a Board certified in Anatomic Pathology,

6   Clinical Pathology, and Forensic Pathology.

7   Q    Now, briefly, Board certified, what does that mean?

8   A    Board certification is a process that specialists go

9   through in the United States, where you take a competitive

10  examination.  After qualifying for the examination by going

11  through a period of training, then you take the

12  examination.  If you pass, then you are certified as a

13  specialist in that particular area of medicine.

14  Q    Under the American system, is there more than one

15  Board?

16  A    Yes.  There are many boards.  The American Board of

17  Pathology is the one that I'm certified by.  There is also

18  American Board of Surgery, American Board of Internal

19  Medicine, American Board of Pediatrics, and so on.

20  Q    You mentioned Board certified in Anatomic Pathology.

21  Define Anatomic Pathology for us, please.

22  A    Yes.  Anatomic Pathology is one of the two general

23  broad areas in pathology in that particular specialty.

24  Anatomic Pathology deals with Surgical Pathology, that is,

25  looking at specimens removed at the time of surgery.  For

251

1    example, breast biopsies to determine whether they are

2    benign or malignant.

3           Anatomic Pathology also deals with psychology,

4    like pap smears, and also with autopsies.

5    Q    What is Clinical Pathology?

6    A    Clinical Pathology, again, is another broad area of

7    pathology, which involves doing various laboratory tests,

8    like blood tests, urine tests, blood banking, microbiology,

9    and that type of thing.

10   Q    Finally, Forensic Pathology?

11   A    Forensic Pathology is a subspecialty of Anatomic

12   Pathology, which involves generally doing autopsies, to

13   investigate medical legal deaths.  That is deaths that are

14   sudden, unexpected, violent, or mysterious.

15   Q    Your undergraduate work was where, Dr. Spencer?

16   A    I received my undergraduate degree from Kansas State

17   University in Manhattan, Kansas.

18   Q    What happened after that?

19   A    Then I went into the Navy for four years as a Line

20   Officer.  I became a Naval Flight Officer and flew off

21   aircraft carriers for four years.  Then I was released from

22   active duty and went to medical school at the University of

23   Kansas.

24   Q    Graduating when?

25   A    I graduated from the University of Kansas Medical

252

1   School in 1972.  That was followed by an internship at the

2   Naval Hospital in San Diego, followed by a four-year

3   residency training program in San Diego.  I finished that

4   in 1977.  Then I was a Staff Pathologist, running the

5   autopsy service for two years at the Naval Hospital, San

6   Diego.

7          During that time I also attended law school at the

8   University of San Diego and finished that in 1979.

9          I then went for a subspecialty training in

10  Forensic Pathology at the Armed Forces Institute of

11  Pathology and completed that in 1980.  And then I stayed at

12  the Armed Forces Institute of Pathology until 1985.

13  Q    By the way, did you take the Bar exam?

14  A    Yes, I took the Bar examination here in California in

15  1979.

16  Q    Now, in your experience, you have had opportunities to

17  conduct autopsies?

18  A    Yes, I've done many autopsies, more than 1,500 that I

19  have done personally or I've reviewed.

20  Q    Finally, have you been qualified as an expert in court

21  before in this area?

22  A    Yes, I have, many times.  More than 100.

23          MR. MEDRANO:  Your Honor, at this time we offer

24  Dr. Spencer as an expert in the area of Forensic Pathology.

25          THE COURT:  That's not necessary, Counsel.

253

1          MR. MEDRANO:    Thank you.

2    BY MR. MEDRANO:

3    Q    Let me direct your attention, sir, to about March 6th

4    of 1985.

5          Can you tell us what happens on this day?

6    A    On the 6th of March, I was initially called and asked

7    to recommend pathologists from the southwest region to

8    observe an autopsy in Guadalajara.  I was informed that a

9    body had been found, suspected to be the body of Enrique

10   Camarena.

11         I made some recommendations.  A short time later,

12   I was called back at my office, again by the Drug

13   Enforcement Administration, and asked if I would be an

14   observer at an autopsy to be performed at the Institute of

15   Forensic Medicine in Guadalajara, Mexico.

16   Q    Did you, in fact, go to Mexico?

17   A    Yes, I went to Guadalajara, Mexico on the 7th of

18   March, 1985.

19   Q    You flew, obviously.

20   A    Yes.  I flew from Washington, D.C. where I was at the

21   time, through Dallas and on to Guadalajara, Mexico.  When I

22   arrived at Dallas, I was informed that an autopsy had been

23   performed already in the State of Michoacan where the body

24   was actually found.

25         I then was also told that I would still be an

254

1    observer at the autopsy, which would be the second autopsy

2    at the Institute of Forensic Medicine in Guadalajara.

3    Q    Where do you go next, or what happens next?

4    A    I arrived in Guadalajara in the early afternoon on the

5    7th of March.  I was met by two D.E.A. agents at the

6    airport who informed me that, in fact, the second autopsy

7    had been performed before I arrived, but that I should

8    still look at the body, and we then went from the airport

9    directly to a city hospital.

10        The second autopsy had been performed at the

11   Institute of Forensic Medicine, and the bodies -- there

12   were actually two bodies -- moved to a city hospital in the

13   City of Guadalajara.

14   Q    Now, Dr. Spencer, at some point are you permitted to

15   do an autopsy on the remains of Camarena?

16   A    Yes.

17   Q    And prior to that, sir, had you been advised whether

18   or not Camarena had been identified?

19   A    Yes.  I -- we arrived at the city hospital.  We were

20   conducted into the morgue area of the city hospital.  There

21   were quite a number of people inside.  Some uniformed

22   personnel who I assumed to be Mexican Police.  There were

23   some hospital personnel, at least two doctors that could

24   speak English and talked to me.  Also there were two FBI

25   agents, a man by the name of Carl Collins and another, a

255

1    man by the name of John Dillon.

2         I knew John Dillon well.  He had been an

3    instructor for me in the past.

4         And they informed me at the time I arrived that

5    they had just finished the identification of Camarena by

6    fingerprint examination.

7    Q    Now, this autopsy that you were about to conduct, what

8    number autopsy would this be then?

9    A    What number?  I'm sorry.  I don't understand the

10   question.

11   Q    Well, previous autopsies had been done already?

12   A    Yes.  This -- yes, I understand.

13        The autopsy that I did was the third autopsy on

14   Camarena.  There had been an autopsy done in the State of

15   Michoacan where the body was found, and the second autopsy

16   was done at the Institute of Forensic Medicine in the state

17   of -- in the City of Guadalajara, so I was conducting the

18   third autopsy.

19   Q    Dr. Spencer, are you ultimately shown the bodies?

20   A    Yes.  The bodies were laying on autopsy tables in the

21   morgue area of the city hospital.  That was the only area

22   of the hospital that I saw, but both bodies were laying on

23   autopsy tables.

24   Q    Were you directed to the body that was identified as

25   that of Camarena?

256

1   A    Yes.  I took a quick look at both the bodies, but then

2   the body had been identified as Camarena, so I started with

3   that body.

4   Q    Incidentally, while you were arriving there, is anyone

5   else doing anything with the bodies?

6   A    Well, the two FBI agents told me they had just

7   finished the identification.  They were at the time

8   photographing the clothing and ligatures that had

9   accompanied the bodies.

10  Q    What is a "ligature"?

11  A    A ligature is a binding.  It's used to, in some cases,

12  bind hands and feet, but it's a binding rope.  It could be

13  any kind of object that's flexible, but in this case they

14  were ropes.

15  Q    Dr. Spencer, any clothes on any of the bodies?

16  A    There was no clothes on either body.  Again, the

17  clothes where laying -- at the time I saw them -- were

18  laying on a -- either a plastic sheet or cloth sheet, and

19  they were in the process of being photographed by the FBI

20  agents.

21  Q    Give us briefly a description of the two bodies as you

22  found them?

23  A    Both bodies looked approximately the same.  Both

24  bodies were in a state of moderate to severe decomposition.

25  Both bodies had considerable drying change, called

257

1    mummification.  They were decayed basically.  Both bodies

2    had -- were brown to dark brown in color.  Both bodies had

3    evidence of previous autopsies, and there was also a

4    moderate odor of decay.

5    Q    Now, I don't know if you mentioned this term, but are

6    you familiar with the term "mummification"?

7    A    Yes.  Mummification is, again, a drying change, when

8    the body is no longer moist or produces moisture, then the

9    body tends to dry out and this change is called

10   mummification.  The body can actually -- the skin can

11   actually take a leather-like, a very dry, leather-like

12   appearance.

13   Q    And the condition of these two bodies?

14   A    Again, moderate to advanced decomposition with

15   mummification changes.

16   Q    Did you discern on any of the two bodies any evidence

17   of insects?

18   A    No.  I carefully examined Camarena.  I saw both

19   bodies.  I saw no evidence of any insect infestation, like

20   maggots or fly larvae.  Another insect that is attracted to

21   dead bodies is beetles.  There was no evidence of either

22   maggots or their pupal stage of maggots or any beetle

23   infestation.

24   Q    Now, this absence of any type of insect infestation,

25   based on your experience, what did you conclude?

258

1    A    Well, I concluded on the basis of the absence of

2    insects, plus the presence of dirt on both bodies -- I

3    forgot to mention that there was dirt -- that the bodies

4    had been buried and that because they had been buried,

5    insects did not have access, that is, they could not get to

6    the bodies.

7        You could also see the same thing if the bodies

8    were in a room or a location where insects could not get to

9    them; but in this case, the fact that they had dirt on the

10   bodies, plus the absence of insects, indicated that they

11   had been buried for some time.

12   Q    Dr. Spencer, conversely, what is the impact or the

13   effect of having the presence of infestation?

14   A    The fact that insects can get access to the body,

15   markedly accelerates the process of decomposition.  It was

16   pretty clear that the bodies had been -- since they had

17   been buried, had been dead for at least two weeks, but

18   the -- if they had laid on the ground in the area around

19   Guadalajara and where insects could've gotten to the

20   bodies, they would have been skeletons.

21   Q    Dr. Spencer, can you walk us through now briefly what

22   the autopsy of Camarena, your observations?

23   A    Yes.  The -- I did a general examination of the body,

24   noting first tremendous head injuries, which I came back to

25   later.  Then looked at the body.  In general, did an

259

1    external examination of the body.  Again, the body had

2    numerous areas of the body -- the body was very brown.  It

3    was numerous areas of dark brown coloration.

4         I looked at the extremities, that is, the arms and

5    the legs for any evidence of injury.  What I did was I used

6    a scalpel to incise the area, dark brown areas of

7    coloration, to determine whether or not I could identify

8    any bruising.  It's difficult in a body that's this

9    decomposed, that's this decayed to determine whether or not

10   it's a change due to the decomposition itself, or whether

11   it was due to prior bruising.

12        I concluded that I couldn't -- could not

13   identify prior bruising on the body.  It may have been

14   there, but I could not identify for certain.

15        I looked at the wrist area for evidence of

16   ligature marks; and a body that's undergoing mummification,

17   it's difficult to identify that because the body swells and

18   then as it dries out it shrinks in size.   The only area I

19   could find of grooving was in the actual wrist joint, none

20   elsewhere.

21        I then looked at the internal organs of the body.

22   Again, the -- Camarena had had two prior autopsies because

23   there were sutures, that is, string had been used to sew up

24   the body at the first autopsy, and then at the second

25   autopsy they simply cut through those to open up the chest

260

1    and abdominal regions again.

2    Q    Dr. Spencer, were there still internal organs once you

3    got inside?

4    A    Yes.  The internal organs had not been dissected.

5    That is, they had not been examined individually.  The

6    organs had simply been cut loose from the chest and

7    abdominal regions and were pulled down into the pelvic

8    regions, and then when they finished the first autopsy or

9    second autopsy, they simply put them back up.  So the

10   internal organs had not been examined by dissection.

11   Q    Did you have an opportunity to examine the rib cage

12   area?

13   A    Yes.  That was what they essentially did, is just pull

14   the organs back so they could see the rib area.  There were

15   four fractures on the right side and four fractures of ribs

16   on the left side.  None of these fractured areas of the

17   ribs had any bruising evident.  I then proceeded to dissect

18   the internal organs.

19   Q    Very well.  Did you have an opportunity to examine the

20   lungs?

21   A    Yes.  The organs were all intact.  I looked at the

22   lungs.  Opened up the airway, the windpipe.  There was no

23   evidence of any foreign material or dirt in the airway.  I

24   opened up the heart and other organs.  The stomach was

25   empty.  The liver was very small and very -- all the

261

1   organs, like the liver, were very decomposed.

2               THE COURT:  Time for the morning recess.

3                      (Recess taken.)

4                      (Jury present.)

5               THE COURT:  You may continue.

6                   DIRECT EXAMINATION (Continued)

7   BY MR. MEDRANO:

8   Q    Dr. Spencer, I forgot to ask you one question.

9        The climate in Guadalajara, does that impact on

10  any way on insects and the decomposition of a body?

11  A    Yes.  Climate does make a difference as far as insects

12  causing changes to a human body after death.  If it's very

13  cold, there are no insects, so they don't feed on a human

14  body after death, but when I arrived in Guadalajara, it was

15  warm and in the 70's, and very dry.

16  Q    Now, let me take you to back to the autopsy.  You're

17  familiar with the term "toxicology"?

18  A    Yes.

19  Q    And just what is that?

20  A    Toxicology is, again, an area of specialization that

21  is involved with the identification of drugs and

22  medications, and the study of the effects of these

23  particular drugs and medications, so it both involves

24  identification using various scientific instruments and

25  also the effects.

262

1    Q    Dr. Spencer, was any toxicology performed on

2    Camarena's remains?

3    A    Toxicology specimens were not obtained on the remains

4    of Camarena for several reasons.  Number one, with the body

5    this decomposed, the specimens you would obtain would cause

6    artifacts, abnormal chemicals that would, for one thing,

7    interfere with the testing, and also would cause false

8    positives.  So in this type of -- with the body this

9    decomposed, you usually do not obtain specimens.  The liver

10   was almost gone.  There was no blood.

11          The second reason is in this particular case, the

12   cause of death was pretty obvious.  Severe head injuries,

13   and it would have been useless to attempt to do any

14   toxicology testing.

15   Q    Dr. Spencer, on the subject of the head injuries, why

16   don't you walk us through that.  What were your findings?

17   A    Yes.  The head was the -- although I looked at it

18   before on the external examination of the body, I spent a

19   great deal of time examining the head and the injuries.

20          There were multiple fractures or broken bones of

21   the face and skull regions.  Again, there was one fracture

22   on the left side of the face and the cheek bone area.  That

23   is referred to as the maxilla, M-A-X-I-L-L-A.  That

24   proceeded through the upper jaw and then proceeded on

25   around underneath the eyeball region through the bones that

263

1    are called orbital bones, and then progressed on up across

2    the forehead region and on back.

3         The bone in the forehead region is called the

4    frontal bone, and the top of the head the bone is called

5    the parietal bone, and the fracture line extended all the

6    way through the jaw, across the cheek bone or maxilla, and

7    then through the orbital bone, up across the frontal bone

8    and parietal bone.

9    Q    That's on the left side?

10   A    That's on the left side.

11        Likewise, there were two fractures through the

12   maxilla or cheek bone on the right side, again passing

13   through the entire jaw where the teeth are located, on

14   across the orbital bones, and up across the top of the

15   forehead, again the frontal bone, the parietal bone.

16        In addition, there were additional fractures of

17   the parietal bones on both sides.  Thereagain, severe skull

18   fractures.

19        On the top of the head, on the left side, just to

20   the left of the mid portion of the skull, was a round to

21   oval defect that passed through the skull.  My initial

22   impression was that this particular injury, this oval to

23   round defect, was a gunshot wound.  The reason I thought

24   that is because of the characteristics.  There was an

25   outside entrance.

264

1    Q    Dr. Spencer, let me interrupt you.  I want to come

2    back to that in a moment.  But before you explain that, let

3    me take you back.

4         You mentioned something called a "maxilla"?

5    A    Yes.  The maxilla or maxillary bone.

6    Q    That's the cheek bone?

7    A    Cheek bone, yes.

8    Q    That's the upper cheek bone?

9    A    Yes.  The upper jaw, there is a bone called the

10   maxilla that connects with another bone on around the side

11   of the face, but the maxilla is the bone where the teeth

12   are implanted in the human body.

13   Q    Dr. Spencer, regarding that maxilla bone, is it a thin

14   bone?  Is it a thick bone?

15   A    It's quite a thick bone.  It takes considerable force

16   to cause a fracture, particularly through the bone where

17   the teeth are located.

18   Q    Could a blow with your fist cause a break in that

19   cheek or maxilla bone?

20   A    It could, particularly on the outside -- on the side

21   of the face, but it's unusual with a fist.  I've seen it a

22   little bit more frequently with a kick, that is, with a

23   foot being swung through an arc, but most frequently it's

24   caused by a blunt object that is swung against the face.

25   Q    What type of object, for example?

265

1    A    A blunt object.  It would fit with the fractures all

2    the way across and up into the forehead.  It would be an

3    object like a tire iron or a crow bar or an iron pipe.

4    I've seen this type of object cause those types of injuries

5    all the way across the top of the head.

6    Q    Dr. Spencer, would the butt of a rifle also serve the

7    same purpose?

8    A    It could.  If it's long enough to cause all those

9    fractures in the line, yes.  Yes, they -- it would be a

10   blunt object that could cause those injuries.

11   Q    The skull area then, multiple fractures throughout?

12   A    Yes.  There were multiple fractures on both sides of

13   the face and both sides of the skull.

14   Q    Now, let me take you back to this wound that you

15   initially thought was a gunshot wound.

16        Why did you initially believe that?

17   A    I thought that it was a gunshot wound because of its

18   appearance.  The characteristics fit with a gunshot wound.

19        When a bullet passes through the skull, the skull

20   has basically two sides, and if you consider a pane of

21   glass being similar, there is one side where the bullet

22   goes in, and then it comes out on the other side.

23        What you see is a circular to oval defect where

24   the bullet goes in, and then when it comes out, it chips

25   little pieces of bone, or if you've seen a pane of glass

266

1   where a bullet has gone through, it chips little pieces of

2   glass off on the internal surface.

3       Those -- when it chips pieces of glass off, that's

4   called internal bevelling or it looks like kind of a

5   crater, and it's a characteristic appearance that can be

6   caused by a bullet passing through a skull.  So when the

7   bullet passes through, it causes internal bevelling on the

8   inside surface.

9   Q   Because the bullet has gone through?

10  A   Has gone through, goes through, and chips off little

11  pieces of bone causing internal bevelling.

12      So from when I first looked at this particular

13  injury, it looked just like a gunshot wound, and I've seen

14  it many, many, many times.

15      But the other characteristics were a little

16  different, in that there was also a few pieces of bone

17  chipped off the outside part of the skull, and sometimes we

18  refer to that as external bevelling.  So there was both

19  internal bevelling, which is what you usually see with a

20  gunshot wound, plus a few pieces chipped off the outside of

21  the skull, which is unusual for a gunshot wound.

22      So I looked at that more carefully, spent a lot of

23  time looking at it because --

24  Q   Why is this unusual, if it was a gunshot wound, both

25  the internal and external bevelling?

267

1  A    Well, you usually see internal bevelling at the

2  entrance site.  If a bullet went all the way through, you

3  would see external bevelling on the other side.  But this

4  bullet did not go anywhere, if it was a bullet.  Just

5  internal bevelling, and I was trying to find an exit.  A

6  bullet will not just go in.  It should go into bone or at

7  least strike bone inside the skull.

8        But another real problem was it was located such

9  that just to the left of the middle of the head, it would

10 have gone right down the spinal canal where the spinal cord

11 is located.  And if you have a gunshot wound, it is very

12 important to locate the bullet so it can be compared later

13 on.

14 Q    Did you search for a bullet?

15 A    Yes.  I looked for evidence of an exit and inside of

16 the skull.  I wanted to get X-rays in Guadalajara City

17 Hospital.  They said they had no X-ray facilities

18 available.  For that reason, when the body was transported

19 to San Diego the next day, I did get X-rays at the Naval

20 Hospital in San Diego.

21       But other characteristics of the particular

22 injury, the scalp had a large kind of "X" shaped

23 lacerations or tear that would fit with a contact gunshot

24 wound, but there was -- although there was a lot of

25 bruising around there, there was no powder residue that you

268

1    would see with a contact gunshot wound, such if the gun was

2    held right in contact with the head.

3        So I did additional studies later on when I got

4    back to my office in Washington, D.C.  I looked at the

5    scalp tissues with a light microscope, that is, got

6    sections of the tissue and looked at it under the

7    microscope, and found no evidence of powder residue.

8        In addition, we had done total body X-rays in San

9    Diego which did not show a bullet anywhere in the body.

10   And then also my office, we did a special study using an

11   electron microscope, where we looked at the surface of the

12   skull and did not find any evidence of metal particles or

13   powder residue.

14       So after all of those studies, I concluded that it

15   was not a gunshot wound.  In fact, it was an injury made by

16   an object, a blunt object, that had been passed through the

17   skull and then pulled back out.

18   Q    That would explain the internal and external

19   bevelling?

20   A    Yes.

21   Q    Based on your experience, sir, what type of object

22   would be responsible for that type of hole made in the

23   skull?

24   A    The type of object, of course, not a gunshot wound now

25   because of the other studies, but the type of object that

269

1    I've seen that would cause this injury, is a Phillip's

2    Screwdriver.  It would be pounded in or thrust into the

3    skull.  The top of the skull is fairly thick compared to

4    the side.  You could almost thrust it in on the side.  But

5    this is the top of the head.  I've seen a Phillip's

6    Screwdriver or a stiletto knife.  I've seen something

7    similar with an industrial hacksaw, but not circular like

8    this.  But I've seen it with a screwdriver that would cause

9    this type of injury.

10   Q    Let me move on now, Dr. Spencer.

11        The cause of death, based on your experience, sir?

12   A    The cause of death of Enrique Camarena was blunt

13   forced injuries of the head, and a penetrating injury of

14   the head, that is the circular shaped injury.

15        Blunt force injuries mean that the injuries are

16   made by a blunt object, as opposed to a sharp object.  If

17   it was a stab wound -- which he did not have, of course --

18   would be called a sharp forced injury.

19        Blunt forced injuries of the head and penetrating

20   injury were the cause of death of Enrique Camarena.

21   Q    So the manner of death?

22   A    Manner of death would be homicide.

23   Q    Not accidental?

24   A    Not accidental.  Not natural.  Not suicide, but

25   homicide.

270

Q    In terms of the degrees of forces that are inflicted, Dr. Spencer, based on your experience, are there different categories of the type of force that can be inflicted?

A    Yes.  Force or degree of force, sometimes categorized as mild, moderate or severe.  This would be a severe force that resulted in skull fractures.  Mild force might result in a bruise.  Moderate force, a laceration or tear in the skin.

But, severe force is the type of force that is required to cause fractures of bone.

Q    In addition, you mentioned previously some kind of depression in the wrist area?

A    Yes.  By the time I saw the body, the body had dried out, had been laying out for several hours in the dry environment of Guadalajara, and had shrunk, that is, decreased in size.  I could not identify actual ligature marks.  The only mark that I saw was a joint groove where the hands go back and forth.

Q    However, the mark that you did find, would that be consistent with a ligature or rope binding?

A    It could be.  Again, I could not say one way or another because of the condition of the body.

Q    Finally, sir, a decomposing body, does it produce a certain type of odor?

A    Yes, it does.  Animals and humans smell about the

271

1    same.   It's a -- it's been described as a kind of a sweet

2    smelling odor.   I think it doesn't -- I don't think it

3    smells sweet, but it's a characteristic odor due to

4    decomposition of fats and proteins in the body.   It's

5    different from that of garbage of plants decomposing.

6    Q    Can this odor, this decomposition odor, last a long

7    time?

8    A    Yes.   I have seen it last for years.

9    Q    When a body is decomposing and the body has clothes on

10   it, will this odor also attach to the clothing?

11   A    Yes.   What happens as part of the decomposition

12   process, fluids are produced as part of decomposition and

13   the fluids will soak out of the body and soak any clothing

14   or, in this case, ligatures that were on the body.

15   Q    Based on your experience, is it common for even years

16   after the fact for the clothes to also have this smell,

17   unique smell?

18   A    Yes.   It can persist for a very long time, even years.

19   Q    Would this saturation effect also apply to any

20   ligatures or bindings?

21   A    Yes, it could.

22   Q    Would the decomposition fluids also be found in an

23   area where a body's located?

24   A    Yes.   It would persist until it was washed away or the

25   chemicals that produced the odor were further broken down.

272

1  Q    I take it that assumes that the body's there for a

2  long time?

3  A    Yes.

4  Q    If the body is just briefly there, would there be any

5  long lasting odor of any sort?

6  A    If it's there for a period of days, or even a few

7  hours, such as the decomposition of fluid -- the

8  decomposition fluid is produced by decompensation of

9  fluids.  The fluid is produced by decompensation.  They

10  will continue to persist and be there for a while, even if

11  the body is there for only a few hours.  As long as the

12  body is decomposing and producing decomposition fluids,

13  there will be that odor.

14  Q    How long did your autopsy of Camarena last?

15  A    I spent probably an hour-and-a-half on the actual

16  autopsy.  As I recall, I started about 2:30 in the

17  afternoon, and probably spent an hour-and-a-half to two

18  hours.

19  Q    Finally, Dr. Spencer, you mentioned there was a second

20  body on the second slab?

21  A    Yes, there was.

22  Q    Could you tell us just briefly what injuries, if any,

23  you observed on that body?

24  A    After I finished the autopsy on Camarena, I --

25       MR. RUBIN:  Objection.

273

1          THE COURT:  Yes.  The objection is sustained.

2          MR. MEDRANO:  One moment, Your Honor.

3               (Government counsel confer)

4          MR. MEDRANO:  Thank you, Your Honor.

5          THE COURT:  You may cross-examine the witness.

6                    CROSS-EXAMINATION

7    BY MR. MEDVENE:

8    Q    Dr. Spencer, do you have any opinion based on your

9    examination of Enrique Camarena's body, how long he had

10   been buried at Primavera Park before being moved to the

11   Bravo Ranch area?

12   A    No, I have no opinion on that.  I can say that he was

13   dead for at least two weeks, with respect to my experience,

14   but I could not tell if he was buried once or twice or

15   three times.

16   Q    But is it correct, buried for the period of time prior

17   to being found at the Bravo Ranch area above the ground?

18   A    He was buried for a period of time such that no

19   insects could get to him; and I estimate, again, that he

20   had been dead for at least two weeks.

21        From the appearance of the body with no insect

22   infestation at all, it appeared that he would have been

23   pulled from the ground and delivered where he was found

24   such that no insects could get to him also, because there

25   was no fly larvae, no maggots at all.

274

1   Q    Are you aware whether or not the dirt found on the

2   body is identified with soil from Primavera Park?

3   A    I had no part in the investigation of that, that part

4   of the investigation.

5   Q    The gentlemen who did that were Mr. Collins and

6   Rawalt?

7   A    Yes.

8           MR. MEDVENE:  Thank you very much, sir.

9           THE COURT:  Do you have any questions?

10          MR. RUBIN:  Yes, Your Honor.

11                   CROSS-EXAMINATION

12  BY MR. RUBIN:

13  Q    Dr. Spencer, first of all, is this the only autopsy

14  you've ever performed of Enrique Camarena?

15  A    Yes.  I did the autopsy again in the city hospital in

16  Guadalajara.

17  Q    And to your knowledge, was any other autopsy done by

18  any other American officials after yours?

19  A    No.  I should add that, you know, my autopsy continued

20  with the examination in San Diego after the body was

21  returned.  We did full body X-rays.  I got additional

22  pictures at that time, again, looked over the body,

23  consulted with a friend of mine at the Naval Hospital, but

24  after that, the body was, to my knowledge, cremated.

25  Q    So the body is not available for autopsy now because

275

1  it's been cremated?

2  A    That was my understanding is the body was cremated

3  after my examination.

4  Q    Now, during your autopsy, you had the opportunity to

5  look at the internal organs of Agent Camarena?

6  A    Yes, I did.

7  Q    Now, first of all, they had been you said "cut away"?

8  A    The organs had been --

9       THE COURT:  Counsel, let's not have the witness

10  repeat all of his prior testimony.  If you have some

11  questions, let's get to it.

12  BY MR. RUBIN:

13  Q    The procedure of cutting away is a proper procedure so

14  that the Mexican doctors could look at the ribs?

15  A    Yes.  The organs were simply pulled down so that they

16  could look at the back region, yes.

17  Q    But the organs had not been destroyed in any way for

18  your examination?

19  A    They had not been dissected at all.  They were

20  severely decomposed.

21  Q    Okay.  Did you have an opportunity to -- and you

22  looked at them?

23  A    Yes.

24  Q    Did you look at the heart, specifically?

25  A    Yes.

276

1    Q    Did you notice any scaring in the heart?

2    A    No, I did not.  Again, scaring can be covered up by

3    decomposition pretty easily.

4    Q    But the fact is you didn't discover any scaring?

5    A    No.

6    Q    When you looked at the rest of the body, did you find

7    any evidences of injections into tissues?

8    A    No, I did not.  I did an examination, but again, there

9    was severe decomposition.

10    Q    So you have no evidence in that regard?

11    A    No.

12    Q    Now, turning to toxicology, it is true, is it not,

13    that a toxicologist can identify drugs that may be within a

14    body, true?

15    A    That is correct.

16    Q    And it's also true, is it not, that a drug that can be

17    identified by using the toxicological methods is the drug

18    Lidocaine, true?

19    A    Lidocaine can be determined if it's not broken down

20    into its constituent chemicals before the examination; that

21    is correct.

22    Q    But the D.E.A. has not done any -- or the government

23    has done any toxicological screens of Enrique Camarena;

24    correct?

25    A    That is correct, but I would have been the one that

1    obtained the specimens, and they were clearly inappropriate

2    for toxicology testing.

3    Q    Well, it would be true then, Dr. Spencer, is it not,

4    that there is no toxicological evidence whatsoever that

5    Enrique Camarena had Lidocaine in his body?

6    A    That is correct.   There is no toxicology specimens

7    obtained.

8    Q    Now, you talked about the decomposing and the

9    toxicological screen.   Was the hair decomposed?

10   A    The hair was largely absent from the scalp.   It comes

11   off in clumps as part of the decomposition change again.

12   Q    But the hair itself, was it decomposed?

13   A    It's not decomposed in the sense.   The hair was

14   present.   It does not actually decompose like the rest of

15   the body.

16   Q    So when you talk deposing, you are talking about the

17   tissue being decomposed, not his hair?

18   A    Right.

19   Q    And, in fact, isn't it true that a toxicological

20   screen can be done on people's hair, true?

21   A    I can't answer that because I haven't seen it used for

22   that particular substance.   In my particular office I know

23   we don't test hair for drugs and that type of thing.   There

24   may be laboratories where that is done.   I've not

25   personally seen it done on hair as a specimen.

278

1    Q    Okay.  I'm not talking about any particular drug or

2    practice in your office.  But based upon your scientific

3    knowledge, do you know that toxicological screens can be

4    done on people's hair to detect the presence of drugs?

5    A    Yes.  My understanding is that's a developing field.

6    I've been to meetings where I've heard that reported.

7    Again, I don't -- I couldn't tell you which laboratories

8    are doing that.

9    Q    And, in fact, drugs that do wind up in the hair can

10   stay there for years and still be discovered years later;

11   isn't that right?

12   A    That is correct.  Particularly arsonic and lead can be

13   found years and years later.

14            MR. RUBIN:  No further questions.

15            Thank you, Dr. Spencer.

16            Can I have one moment, Your Honor.  My client

17   wants -- no further questions, Your Honor.

18            Thank you, Doctor.

19            THE COURT:  Any redirect examination?

20            MR. MEDRANO:  Yes, Your Honor.  If I may have just

21   one moment.

22            (Government counsel confer.)

23                    REDIRECT EXAMINATION

24   BY MR. MEDRANO:

25   Q    Dr. Spencer, what period of time is necessary for

279

1    scaring to develop on the heart muscle?

2    A    Scaring of the heart would occur -- could occur for a

3    variety of reasons, usually from the most common by far is

4    a heart attack or someone who's had a myocardial infarct,

5    and it would generally be a week before you would see any

6    evidence of scaring where you'd look at it, or you could

7    determine under a microscope.  By gross examination, that

8    is, looking at the heart with the eye, I would say probably

9    a month, three weeks to a month anyhow.

10   Q    The field of toxicology, did you just say it was a

11   developing field?

12   A    No, no.  Toxicology has been around for a very long

13   time.  He asked a question regarding toxicology analysis of

14   hair, which to me is a developing area.

15   Q    A recently developing area?

16   A    Yes.

17   Q    Finally, Lidocaine, sir, does it last a long time in

18   the system?

19   A    No.  It usually does not.  It's broken down or

20   metabolized, changed chemically by the body when the person

21   is alive.

22        Generally, we look at -- use blood to

23   determine -- it can disappear fairly rapidly.  I can't tell

24   you what the half life is.  I would say in a living person

25   it's a few hours at most.

280

1       Lidocaine is used as a local anesthetic, most

2   commonly, and if it's used for that, for say where stitches

3   or sutures are put in to remove something from the skin, it

4   generally goes away after a couple of hours.  It's broken

5   down, metabolized or chemically changed.

6       MR. MEDRANO:  One moment, Your Honor.

7       That concludes redirect.  Thank you.

8       MR. RUBIN:  Can I have a moment, Your Honor?

9           (Counsel confers with client)

10                  RECROSS-EXAMINATION

11  BY MR. RUBIN:

12  Q    You indicated that Lidocaine is a local anesthetic; is

13  that correct?

14  A    That's one of the uses for Lidocaine.  It's also

15  used -- if someone has an abnormal heart rhythm, it's used

16  to control the rate of the heart.  Most common by far is

17  local anesthetic.

18  Q    And it's true, is it not, that Lidocaine may be used

19  in order to ease the pain of the injection of other types

20  of substances, true?

21  A    Yes, it can.

22  Q    So just the use, for example, if someone was getting a

23  painful injection of penicillin or some other drug or some

24  other solutions --

25  A    Yes.

281

1  Q    -- someone might use Lidocaine to ease the pain of the

2  injection?

3  A    Generally, what would be done in the process you are

4  referring to, is Lidocaine would be used as a local

5  anesthetic prior to putting the intravenous line in to give

6  other drugs.  So it's used to ease the pain of putting in

7  the intravenous or I.V. line.

8              MR. RUBIN:  No further questions.  Thank you.

9              THE COURT:  Anything further?

10             MR. MEDRANO:  One final question, Your Honor.

11                    FURTHER REDIRECT EXAMINATION

12  BY MR. MEDRANO:

13  Q    Lidocaine can also be injected to serve the same

14  purpose as a local anesthesia; correct?

15  A    Yes, it can.

16             MR. MEDRANO:  Thank you, Your Honor.

17             THE COURT:  You may step down.

18                    (Witness excused.)

19             THE COURT:  Call your next witness.

20             MR. MEDRANO:  Your Honor, the government calls

21  Carl Collins to the stand.

22             THE CLERK:  Please raise your right hand.

23             CARL COLLINS, PLAINTIFF'S WITNESS, SWORN

24             THE WITNESS:  Yes.

25             THE CLERK:  Please be seated.

282

1    State your full name for the record and spell your

2    last name.

3    THE WITNESS:  Carl E. Collins, Jr.  The last name

4    is spelled C-O-L-L-I-N-S.

5    DIRECT EXAMINATION

6    BY MR. MEDRANO:

7    Q    Who are you currently employed by?

8    A    I'm currently employed by the FBI in Washington, D.C.

9    Q    In what capacity, Mr. Collins?

10    A    Supervisory Fingerprint Specialist.

11    Q    Can you briefly tell us how you got started in the

12    field of fingerprint analysis?

13    A    Back in 1957, in fact, July 1st, I entered into duty

14    with the FBI as a fingerprint technician, and from that

15    point on I was taught by the more experienced, in fact,

16    world-known fingerprint experts, on how to compare

17    fingerprints with each other and determine whether they are

18    identified with each other.

19         This went on for several years, and finally in

20    June of 1967, I entered into what was called the Latent

21    Fingerprint Section as a Latent Fingerprint Examiner.

22    There I was also taught to compare and develop latent

23    prints on items of evidentiary value and compare those

24    latent prints with known prints of individuals to determine

25    whether those prints are identified with each other.

283

1       I am also a supervisory member of our FBI Disaster

2   Squad which helps aid in the identification of deceased

3   individuals in catastrophic-type disasters, such as

4   airplanes, hurricanes, et cetera.

5   Q     Mr. Collins, have you testified in Federal Court as an

6   expert before?

7   A     Yes, I have.

8   Q     Total State and Federal, how many times?

9   A     Approximately 200.

10  Q     So you have how many years of experience total in

11  fingerprint analysis?

12  A     It's over 35 years.

13  Q     Thank you.  Let me move on.

14      Can you just explain to us very briefly what an

15  ink fingerprint is and then what a latent fingerprint is?

16  A     Yes.  An ink fingerprint is the recording of the

17  friction ridges on the palmer sides of your hands.  This is

18  recorded by coding the ridges with a thin film of printer's

19  ink, and then placing those fingers on a white card to

20  transfer the ridges to that white card, leaving an outline

21  of those friction ridges.  This is usually done for record

22  purposes.

23      A latent fingerprint, with the word meaning

24  "latent" being hidden, not seen readily, these latent

25  fingerprints are prints that are developed on items of

284

1    evidentiary value, on various items, types of items, paper,

2    wood, glass, plastics, what have you, and these are

3    developed through either powders or chemical methods.

4    Q    Now, Mr. Collins, can you now briefly just explain how

5    you make or do a fingerprint analysis or comparison?

6    A    Yes.  When comparisons are made, one must observe the

7    ridge characteristic and their relationship to each other

8    in your fingers.  When you find two fingerprints that have

9    the same ridge arrangement, then those two fingerprints

10   will be -- will have been made by the same finger, in fact,

11   the same person.

12   Q    So a match unequivocally establishes that one -- that

13   they are one in the same person?

14   A    Yes.

15   Q    And, finally, what are some of the factors that you

16   use for purposes of fingerprint identification?

17   A    There are two basic factors in the use of fingerprints

18   as a means of identification.  One of those being that from

19   birth till decomposition sets in at death, after death,

20   that ridge arrangement on your fingers will not change, and

21   that throughout the history of fingerprints in the millions

22   of comparisons that have been made throughout the years,

23   that no two fingerprints made by different individuals have

24   ever been found to be the same.

25   Q    Mr. Collins, can you explain to us briefly now what

285

1 factors, if any, determine whether a person leaves a

2 fingerprint on any particular type of surface?

3 A    Those factors being that if an individual touches an

4 item, doesn't necessarily mean that that person will

5 actually leave his fingerprints or her fingerprints on that

6 item.  But through chemical, as well as mechanical methods,

7 we can process those items and determine whether there are

8 fingerprints on that item.  Then if we get fingerprints on

9 those items we can compare them with known prints of an

10 individual and determine whether that person left her or

11 his fingerprints on that item.

12 Q    Mr. Collins, will physiological factors affect whether

13 or not one leaves a print?

14 A    Yes.  Those being if you have too much moisture on

15 your fingers, you may leave your print there, but you will

16 not see any ridge detail because it would be blurred.  You

17 may be wearing gloves at the time.  Your fingers could be

18 dry.  Those are some of the factors which tend to not leave

19 your fingerprints or a fingerprint of value for

20 identification purposes.

21 Q    In addition, Mr. Collins, is the surface that's being

22 touched, will that affect in any way whether or not you can

23 develop a latent print?

24 A    Most of the time it will, on certain types of items.

25 Certain items it's hard to get a latent fingerprint from.

286

1    Such as, we have developed prints like on sheets, pillow

2    cases, and such, but it's very far and few between.

3    Certain types of plastics, such as made up like nalgen-type

4    plastics, which has sort of a rough surface to it, those

5    are types of surfaces that are kind of hard to get prints

6    off of.

7    Q    Mr. Collins, let me direct your attention to March of

8    1985.

9         Did you participate in any way in the

10   identification of the remains of Special Agent Camarena?

11   A    Yes, I did.

12   Q    Were you brought into Mexico?

13   A    Yes.

14   Q    From where, sir?

15   A    From our office in Washington, D.C.

16   Q    Where did you travel to specifically in Mexico?

17   A    To Guadalajara.  In fact, to the morgue in

18   Guadalajara.

19   Q    What happens when you arrived at the morgue in

20   Guadalajara?

21   A    Upon arriving at the morgue in Guadalajara, we had to

22   wait outside the morgue for approximately an

23   hour-and-a-half to two hours before they'd let me in to do

24   my examination.

25        At that time, when I was let in, I examined one of

287

1    the bodies there, and lifted prints from three of the

2    fingers of the body, and identified that body which we

3    called at that time Body Number 1, as that of Special Agent

4    Camarena.

5    Q    Can I direct you to Exhibit 99, which should be right

6    in front of you.  To your left, sir.  With regard to latent

7    prints lifted.  It should be in that box.

8    A    Is that in the folder?

9    Q    It's in that box, I believe.

10   A    In the box.  I'm sorry, but I don't see it.

11   Q    Check the book then to your right.  I'm sorry.

12        Tell me what Exhibit 99 is?

13   A    Exhibit Number 99 contains three white rubber lifts

14   containing ink prints I lifted from body of Number 1 at the

15   morgue in Guadalajara.

16   Q    For what specific fingers?

17   A    The right thumb, the right index, and the right middle

18   finger.

19        MR. MEDRANO:  Your Honor, we move in Exhibit 99.

20        THE COURT:  It may be admitted.

21        MR. MEDRANO:  Thank you, Your Honor.

22        (Plaintiff's Exhibit 99 received.)

23   BY MR. MEDRANO:

24   Q    Did you have an opportunity subsequently, Mr. Collins,

25   to compare those three latent prints you lifted from the

288

1   remains to actual known prints of Special Agent Camarena?

2   A    Yes.

3   Q    Okay.  If I can direct you now to look at Exhibit 26,

4   and that, I believe, is in the book as well.

5   A    Yes, it is here.

6   Q    Did you have an opportunity to compare -- well, tell

7   me what 26 is?  I'm sorry.

8   A    Exhibit 26 is the -- it's actually a photographic copy

9   of the Applicant Fingerprint Card bearing the name Enrique

10  Salazar Camarena.

11  Q    At any point, did you have an opportunity to compare

12  what you found there in Exhibit 26 with the three latent

13  prints you listed that are designated Exhibit Number 99?

14  A    Yes, I did.  The ink prints which appear on

15  Exhibit 99, I identified as those belonging to the

16  fingerprints on this fingerprint card of Enrique Salazar

17  Camarena.

18  Q    Now, if I can ask you to look in front of you in the

19  box should be Exhibit 100, a blowup.

20  A    Yes.

21  Q    Can you just hold that up, pointing it toward me, and

22  tell me what that is, sir?

23  A    This is the blowups of one of the identifications from

24  one of the ink prints on one of the lifts, as well as a

25  blowup of one of the fingerprints on the fingerprint card

289

1    of Camarena.

2    Q    And there's numbers in red, 1 through 12, on each

3    side; is that correct?

4    A    That is correct.

5    Q    Can you tell me what these numbers represent?

6    A    These numbers represent the characteristics which I

7    identified as laying in the same road to position in both

8    prints.   The print -- fingerprint marked Fingerprint Number

9    1 is from the inked fingerprint card of Camarena; and the

10   fingerprint marked Number 2 is the -- one of the ink prints

11   appearing on the -- one of the fingerprint lifts I used to

12   take from Body Number 1 in the morgue in Guadalajara.

13   Q    So are Numbers 1 through 12 points of comparison?

14   A    That's the only ones that I charted for demonstrated

15   purposes.   There are additional four characteristics in

16   these two prints that are also identified as being the

17   same.

18   Q    So --

19   A    Just 12 is an arbitrary figure I used to make my

20   comparison.

21   Q    Just briefly explain to us how, based on this

22   comparison, you concluded that they came from the same

23   individual?

24   A    Bear in mind that in order for these two prints to

25   have been made from the same person, the ridge

290

1    characteristics in each print must lie in the same relative

2    position, in which I found in these two prints here.  And

3    that's why I base my opinion that these two were made by

4    the same person.

5    Q    You can put that down.  Thank you.

6              Incidentally, what finger is blown up there?

7    A    This is the right middle finger from the body, as well

8    as from the fingerprint card.

9    Q    Now, sir, let me change directions here.

10             Are you familiar with the residence located at 881

11   Lope de Vega in Guadalajara?

12   A    Yes.

13   Q    Did you ever have an opportunity to go to that

14   residence in 1985?

15   A    Yes.

16   Q    On more than one occasion?

17   A    On more than one occasion.

18   Q    When was the first time that you were there?

19   A    First time was in April of 1985.

20   Q    For what purpose?

21   A    To process the residence for the presence of

22   fingerprints or palm prints to be compared with and find

23   out whose prints they are and who was there.

24   Q    Subsequently, did you ever go back to that house on a

25   different day?

291

1   A    Yes.

2   Q    When would that have been?

3   A    That would have been in June.  In fact, it was June

4   25th that I arrived back at the residence to complete my

5   examination of the residence.

6   Q    Now, can you tell us if while at the residence the

7   second time in June, did you find anything unusual on this

8   particular visit?

9   A    On this particular visit, while going through the

10  residence with another examiner, we found some plastic bags

11  on a shelf in one of the bedrooms, and we collected those

12  items and placed them in another bag and sealed that bag.

13  Then from that point on, after the other examiner was

14  finished with his work, then I completed my work in the

15  residence.

16  Q    Let me stop you there.

17       Well, first of all, how many bags where there?

18  A    There were eight plastic bags.

19  Q    What kind of bags where they?

20  A    They were the dry cleaner-type bags.

21  Q    Had you previously seen those bags before June 25?

22  A    Before June 25, in our first initial visit in April, I

23  noticed the same plastic bags being in the same location at

24  that time.

25  Q    Incidentally, what other agents, if any, were with you

292

1    in June of '85 at the house?

2    A    Agent Ron Rawalt.

3    Q    Now, once you find these eight bags, what do you do

4    with them?

5    A    We sealed them in one plastic bag, using evidence

6    tape, and marking the bag as where they came from, and

7    initialing the bag.

8    Q    Can I ask you to look right in front of you in the

9    box, Government's Exhibit 166.  That should be it.

10   A    Yes.

11   Q    Can you just hold that up and tell me what it is,

12   briefly?

13   A    This is the bag in which the eight plastic sheets were

14   placed into and sealed at that time in June of '85.

15   Q    Do you have any identifying handwriting on this?

16   A    Yes.  My -- I was the one that wrote "bedroom closet

17   shelf," and it has my initials on here.

18         MR. MEDRANO:  Your Honor, we move Exhibit 166 in

19   at this time.

20         THE COURT:  It may be admitted.

21         (Plaintiff's Exhibit 166 received.)

22   BY MR. MEDRANO:

23   Q    Sir, you said you found it on a closet shelf in the

24   bedroom?

25   A    Yes.

293

1   Q    What specific bedroom, if you recall?

2   A    That was the second bedroom from the front of the

3   house.

4   Q    What do you do once you have this Exhibit 166, large

5   bag, filled with eight smaller bags, what do you do with

6   it?

7   A    Well, at that point, we sealed it, and when we were

8   finished with our examinations, took it back to the

9   Consulate there in Guadalajara, and made arrangements to

10  have it shipped to us in Washington, D.C. to keep the chain

11  of evidence together.

12       THE COURT:  Did you at some point in time examine

13  those bags for latent fingerprints?

14       THE WITNESS:  Yes, I did.

15       THE COURT:  Can we get to the point?

16       MR. MEDRANO:  Yes, Your Honor, I will move to that

17  right now.

18  BY MR. MEDRANO:

19  Q    What date did you examine them or process the

20  evidence?

21  A    July 8th of '85 I received these bags from the --

22  Mr. Rawalt; and at that point, I started my examination of

23  these plastic bags.

24  Q    And when you processed these bags, was it with the

25  techniques available at that time?

294

1   A    Yes.

2   Q    Did you develop any latent prints on any of those

3   eight plastic bags?

4   A    Yes.  On six of the plastic bags I developed latent

5   prints.

6   Q    Now, can you tell us how many prints you found on each

7   bag?

8   A    At that time?

9   Q    Yes, sir.

10  A    There was 26 latent fingerprints and five latent palm

11  prints.

12  Q    Let me stop you there.  You don't need to tell me

13  where exactly you found them.  Let me move on.

14       After you did this initial analysis, what did you

15  end up doing with the exhibits?

16  A    After I finished that analysis and I repackaged the

17  plastic bags into this plastic bag, resealed it, and

18  returned it to Mr. Rawalt.

19  Q    Now, let me direct your attention, sir, to April 17 of

20  1990.

21       On this date, did you receive anything?

22  A    Yes.  I received the major case prints of one Humberto

23  Alvarez-Machain.

24  Q    Did you do anything with those prints of Machain?

25  A    Yes.  I used these ink prints to make comparisons

295

1    against the latent prints that I developed on the plastic

2    bags.

3    Q    And if you can look at -- is that Exhibit 51, the

4    Machain prints?

5    A    Yes.

6         MR. MEDRANO:  Your Honor, we move the admission of

7    51 at this time.

8         THE COURT:  It may be admitted.

9         (Plaintiff's Exhibit 51 received.)

10   BY MR. MEDRANO:

11   Q    What were the results of your comparison?

12   A    I identified Machain's prints on several of the

13   plastic bags.

14   Q    Total, how many did you find?

15   A    I'm trying to remember my total at that time.  Nine

16   fingerprints and two of the palm prints were identified as

17   the fingerprints of -- appearing on this fingerprint card,

18   as well as the major case prints, which includes the palm

19   prints of the individual.

20   Q    And you found nine fingerprints and two palms on the

21   various --

22   A    Several of the plastic bags, yes.

23   Q    Can you tell me what prints you found on what bag?

24   A    Without looking at my notes --

25        MR. MEDRANO:  Your Honor, may the witness peruse

296

1    his notes very quickly?

2            THE COURT:  Is it necessary to know that?

3            MR. MEDRANO:  I believe so, Your Honor.  It will

4    just take ten seconds just to --

5            THE COURT:  Well, if you have your notes --

6    BY MR. MEDRANO:

7    Q    Do you have your notes with you?

8    A    My notes are in the witness room right now.

9            MR. MEDRANO:  Your Honor, while I proceed, may I

10   ask Mr. Berrellez to go obtain those notes?

11           THE COURT:  Yes.

12           MR. MEDRANO:  Thank you.

13   BY MR. MEDRANO:

14   Q    Let me direct your attention now to on or about

15   October 16 of 1991.

16           At any point, do you have an opportunity to do an

17   additional analysis or comparison?

18   A    Yes.  In October of '91, the plastic bags were

19   resubmitted to my office in Washington, D.C. for further

20   processing because of additional techniques that were

21   developed since '85, and these additional techniques were

22   applied to the plastic bags, and additional latent prints

23   where developed on the plastic bags.

24   Q    Can you tell me how many more were developed in

25   October of '91?

297

1   A    I developed an additional six fingerprints and four

2   palm prints on the plastic bags at that time.

3   Q    Anything else besides six prints and four latent

4   palms?

5   A    Yes.  One -- I'm sorry -- one additional print which

6   we call an impression and which we call an impression

7   because it can either be a fingerprint or a palm print.

8   Q    After doing this analysis, and after finding the

9   additional latent prints, what did you end up doing with

10  the eight plastic bags?

11  A    I resealed them into these eight manila envelopes, and

12  returned them to the D.E.A. office here in Los Angeles.

13  Q    Are those manila envelopes Exhibits 48-A through H in

14  front of you?

15  A    Yes.

16  Q    Can you pull out 48-B, please, and show us the

17  contents very quickly.  What is that?

18  A    This is one of the plastic dry cleaner type bags that

19  was processed for latent prints.

20  Q    There are seven others like those in the remaining

21  envelopes?

22  A    Yes.

23  Q    These were the ones that you found at Lope de Vega in

24  June of 1985; is that correct?

25  A    That is correct.

298

1    MR. MEDRANO:  Your Honor, we move the admission of

2    these exhibits.

3    THE COURT:  That may be admitted.

4    (Plaintiff's Exhibits 48-A through 48-H received.)

5    BY MR. MEDRANO:

6    Q    Now, sir, did you ever have an opportunity to compare

7    the Machain prints once again to the additional latent

8    prints that you had found?

9    A    Yes.

10    Q    What were the results of that, sir?

11    A    The results of that, I found two additional

12    fingerprint identifications and two additional latent palm

13    print identifications with the fingerprints of Humberto

14    Alvarez-Machain.

15    Q    In essence, then, sir, were fingerprints of

16    Dr. Machain found on all of the eight bags?

17    A    Not all of the eight bags, no.

18    Q    All but how many?

19    A    On six of the plastic bags, I believe.  If I could

20    just check my notes one second I can tell you.

21    On five plastic bags.  I'm sorry.

22    Q    Now, Mr. Collins, finally, if you will pull out

23    Exhibit 102 in the box in front of you.  It should be a

24    blowup.  And tell us what that is.

25    Did you have -- well, again, tell us what that is.

299

1    I'm sorry.

2    A    This is also, as the last blowup, it is an enlargement

3    of an identification that I made off of one of the plastic

4    bags, and the other blowup is one of the ink fingerprints

5    on the major case prints that were submitted to me of

6    Machain.

7    Q    I noticed Numbers 1 through 15, each side.

8    A    Yes.

9    Q    Again, are these points of comparison?

10   A    These are points of what we call points of identity,

11   in which -- for demonstrative purposes is to show the jury

12   how comparisons are made by pointing out the

13   characteristics which match in both prints.

14        Although there are many more fingerprint

15   characteristics in these two prints that match, I just used

16   an arbitrary figure of 15, which I felt was well more than

17   enough to display showing the identification of these two

18   prints.

19   Q    All right.  You can put that down.  Thank you.

20        Finally, Mr. Collins, let me direct you to

21   Government's Exhibit 57 in the box.

22        Tell me what that is, sir?

23   A    This appears to be items that I processed initially

24   upon receipt of -- in late May and during the first few

25   days of June I processed these items for latent prints.

300

1    Q    And what were the results, sir?

2    A    On these particular items, no latent prints of value

3    were found for identification purposes.

4    Q    Was that unusual in light of the evidence you had in

5    front of you?

6    A    No, it's not unusual at all with -- given the -- what

7    we were processing at the time.  Tissue paper, just a small

8    piece of newspaper and a syringe.

9    Q    Was the material the syringe is made of, would that

10   impact on any way whether or not the person might leave

11   prints on that surface?

12   A    In my opinion, in all of the processes that I have

13   done and what I have observed and processed, you know, of

14   this type of evidence such as syringes, the latent prints

15   that are developed on this type item are very far and few

16   between.

17            MR. MEDRANO:  Thank you.  Your Honor, at this time

18   we move in Exhibit 57.

19            THE COURT:  It may be admitted.

20               (Plaintiff's Exhibit 57 received.)

21            MR. MEDRANO:  In addition, Your Honor, I forgot to

22   move in Exhibit 102, the blowup.

23            THE COURT:  That may be received.

24               (Plaintiff's Exhibit 102 received.)

25            MR. MEDRANO:  And finally -- pardon me, Exhibit

301

1    100 as well, the blowup regarding Camarena.

2            THE COURT:  It may be received.

3                (Plaintiff's Exhibit 100 received.)

4            MR. MEDRANO:  If I may have just one moment, Your

5    Honor.

6                (Government counsel confer.)

7            MR. MEDRANO:  That concludes direct.  Thank you,

8    Your Honor.

9            THE COURT:  Do you have any questions for this

10   witness?

11           MR. MEDVENE:  No, I don't, Your Honor.

12           MR. RUBIN:  Do you want me to start now?

13           THE COURT:  Yes.

14                      CROSS-EXAMINATION

15   BY MR. RUBIN:

16   Q    Mr. Collins, you were involved in the search of 881

17   Lope de Vega?

18   A    Yes.

19   Q    And you were the person in charge of trying to find

20   fingerprints in the entire area of 881 Lope de Vega, true?

21   A    Yes.

22   Q    And, in fact, isn't it true that other than on these

23   plastic bags -- we'll discuss those in a while -- but were

24   there latent fingerprints found in other areas of 881 Lope

25   de Vega?

302

1    A    Yes, there were.

2    Q    And where were they located?  What areas where they

3    located in?

4    A    They were located in a bedroom upstairs, in one of the

5    bathrooms upstairs, and in each one of the bedrooms

6    additional latent prints were developed.  There were latent

7    prints developed in a little guest house, as well as an

8    automobile that was on the premises, and on a piece of

9    paper that was found on the premises.

10   Q    Now, in total of all of those fingerprints,

11   approximately how many where there, other than the ones on

12   the plastic bags that you developed?

13   A    At this point in time, there's approximately 96 latent

14   fingerprints that I have not identified to date.

15   Q    You said that you have not identified to date?

16   A    Yes.

17   Q    What I'm asking is:  How many total latent

18   fingerprints, including the ones you may have identified to

19   other people, did you find at 881 Lope de Vega other than

20   those on the plastic bags?

21   A    Other than the plastic bags?

22   Q    Approximately?

23   A    Approximately 125.

24   Q    And, in fact, isn't it true that except for those

25   plastic bags, not one of those other fingerprints, in any

303

1  of those other rooms, bedrooms, guest houses, anywhere

2  else, have been identified as the fingerprints of Dr.

3  Machain?

4  A    That is correct.

5  Q    And, in fact, there were fingerprints found in the

6  room where Agent Camarena was questioned and interrogated

7  and held; correct?

8  A    Which room was that?

9  Q    Well, were you advised of which room it was that he

10  was questioned in?

11  A    If I was, I don't remember.

12  Q    Okay.  Where there latent fingerprints found in every

13  bedroom of that house?

14  A    I believe there were.

15  Q    And so if Mr. Camarena had been held in a bedroom, it

16  would be true, is it not, that of the fingerprints found in

17  the room he was held, none of them had been identified --

18         THE COURT:  Counsel, this question is asked and

19  answered.  When you asked this witness except for the

20  prints on the plastic bags, there were no other prints of

21  your client.

22  BY MR. RUBIN:

23  Q    Now, turning to the plastic bags, you found 26 latent

24  prints on the plastic bags?

25  A    All total there was 32 latent fingerprints, and nine

304

1   latent palm prints and one impression on the bags.

2   Q    And were any of those fingerprints on the plastic bags

3   those of Agent Camarena?

4   A    No.

5   Q    Have you ever been able to identify people whose --

6   other than Dr. Machain, whose fingerprints were on the

7   plastic bags?

8   A    No, I haven't.

9   Q    And did you make comparisons, for example, of the

10  fingerprints of Rafael Caro-Quintero?

11  A    Yes, I did.

12  Q    Were you able to identify his fingerprints on the

13  plastic bags?

14  A    No, sir.

15  Q    And did you look at the fingerprints of Miguel

16  Felix-Gallardo?

17  A    The only print that I had on Felix-Gallardo was a

18  right thumb print or a right index print -- I think it was

19  a right thumb print.  I have not received his complete

20  fingerprints or palm prints in this case.

21  Q    And I take it, then, that you didn't identify any of

22  his fingerprints on those plastic bags?

23  A    No.

24  Q    And Espino, Verdin-Espino, did you ever identify his

25  fingerprints on the plastic bags?

305

1   A    No.

2            THE COURT:  Have you told us all of the prints

3   that you were able to identify?

4            THE WITNESS:  That is correct.

5            THE COURT:  All right.  Let's not keep asking that

6   same question.

7   BY MR. RUBIN:

8   Q    Now, based on your 35 years of expertise, can you give

9   an opinion that the fingerprints Dr. Machain made on those

10  plastic bags was made during the period February 7th to

11  February 9th, 1985?

12  A    No, I can't.

13  Q    In fact, isn't it true that you are unable to tell in

14  the most modern methods when those fingerprints were made?

15  A    No, I can't.

16  Q    In fact, those fingerprints could have been made a

17  year before February 7th, 1985, true?

18  A    If those plastic bags were around at that time, yes.

19  Q    Now, it's also true, is it not, that those plastic

20  bags are transportable, are they not?  I mean, they can be

21  moved?

22  A    Yes.

23  Q    And so it is true, is it not, there is no way that you

24  can tell by your expertise the exact location where those

25  fingerprints where made?

306

1   A    You mean the location of where the plastic bags where

2   or the location on the plastic bags?

3   Q    It's true that you can tell where the plastic bags and

4   the fingerprints where found --

5   A    Yes.

6   Q    -- at 881 Lope de Vega; correct?

7   A    That's correct.

8   Q    But you cannot tell where the fingerprints where made;

9   isn't that true?

10       THE COURT:  He is talking about the site when the

11  fingerprint was applied to the --

12       THE WITNESS:  No, I can't tell that.

13  BY MR. RUBIN:

14  Q    And that's because they could have been brought from

15  another place, they could have been made in another place,

16  and then brought to 881 Lope de Vega?

17       MR. MEDRANO:  Objection; asked and answered.

18       THE COURT:  Sustained.

19  BY MR. RUBIN:

20  Q    And those are dry cleaner bags; isn't that right?

21  A    They are the dry cleaner type bags that I found.

22  Q    Those are bags that are typically used to protect

23  clothing from getting dirt on them; correct?

24  A    Correct.

25  Q    Those are the kinds of bags that people may put over

307

1     their clothing when they are moving from one location of

2     residence to another residence in order to protect them

3     from dirt; isn't that true?

4              MR. MEDRANO:  Objection; asked and answered.

5              THE COURT:  These are just arguments you are

6     making, Counsel.

7              The objection is sustained.

8     BY MR. RUBIN:

9     Q    Now, what was the technique you used to develop the

10    fingerprints on the plastic bags?

11    A    There were several techniques.  The first one being

12    with the Super Glue method that we used, by heating super

13    glue, actually cyanoacrylate in the Super Glue that you

14    heat, and it gives off a white residue, and this adheres to

15    any place where there may be moisture or oil or

16    fingerprints, and after that powders can be applied and

17    additional latent prints can be developed that way.

18              And then further on, the techniques I used in

19    1991, was techniques of a liquid form, a chemical process.

20    One of them being clodial gold [phonetic], which is a very

21    complicated type process, which I'm really not a chemist to

22    know exactly what is in there.  I do have some papers that

23    show what is in there, but that's just another method in

24    developing latent prints.

25    Q    There are certain methods that are better for plastics

308

1    than other methods; is that true?

2    A    Not really.  The best course -- the best method is

3    your cyanoacrylate fuming.  That is the best.

4    Q    And the syringe that you tested, that's also made of

5    plastic, is it not?

6    A    Yes.

7    Q    And it's true, isn't it, that on that syringe you did

8    not find any fingerprints of Dr. Humberto Alvarez-Machain?

9    A    I didn't find any fingerprints at all.

10   Q    Now, one of the factors in leaving fingerprints is the

11   amount of pressure that you may put on an object, true?

12   A    Not necessarily, no.

13   Q    Well, wouldn't the harder you press on an object leave

14   more oils to leave more fingerprints than if you touch it

15   lightly?

16   A    No.

17   Q    Now, where exactly in the search of 881 Lope de Vega

18   did you find the plastic bags?

19   A    This was in the second bedroom from the front of the

20   house.

21   Q    When you say the bedroom, it was in the closet?

22   A    Actually it was on a closet shelf.

23   Q    It was on a shelf up high?

24   A    Well, it wasn't up high to me.

25   Q    You may be taller than me.  It may be high to me.

309

1          It was on a shelf, was it not?

2     A    It was on a shelf, yes.

3     Q    And were they all just folded up?

4     A    They weren't folded up, no.  It was like they were

5     just jammed in there.

6     Q    Just rumpled up?

7     A    Yes.

8     Q    And stuffed on the shelf?

9          And you specifically recall these plastic sheets

10    from the first search in April?

11    A    Well, I can't say for sure that they are exactly the

12    same sheets, but they are in the same position as they were

13    from March to -- well, from April to June.

14    Q    And nobody took them or collected them as part of the

15    evidence at that time?

16    A    Not until June.

17    Q    Was there a reason why they were left there?

18    A    Yes, there was.

19    Q    What was that?

20    A    During our processing of 881 Lope de Vega in April,

21    after finding a certain piece of evidence in that

22    particular search, a Comandante from the Federalis came

23    over and told us to leave the residence.

24    Q    But you did find in June those same sheets in the same

25    spot?

310

1    A    Yes.

2            THE COURT:  That's been asked and answered.

3            Counsel, if it hasn't occurred to you, I'm trying

4    to finish with this witness before we adjourn.

5            MR. RUBIN:  I understand, Your Honor, but I

6    have --

7            THE COURT:  You have other questions?

8            MR. RUBIN:  I am checking my notes.

9            THE COURT:  You are now asking questions over and

10   over again.  You are catching this disease from

11   government's counsel.

12                        (Laughter.)

13   BY MR. RUBIN:

14   Q    The syringe that you examined is made of plastic; is

15   that correct?

16   A    Yes.

17           MR. RUBIN:  No further questions.  Thank you.

18           THE COURT:  Do you have any redirect?

19           MR. MEDRANO:  None whatsoever.

20           THE COURT:  All right, sir, you may step down.

21           THE WITNESS:  Thank you.

22                        (Witness excused.)

23           THE COURT:  We will take our noon recess and

24   reconvene at 1:30.

25                        (Luncheon recess had.)

311

1    LOS ANGELES, CALIF.; THURSDAY, DECEMBER 3, 1992; 1:30 P.M.

2                         (Jury in.)

3              THE COURT:  Call the next witness.

4              MR. MEDRANO:  Your Honor, at this time the

5    government calls Mr. Don Clements to the stand.

6              THE CLERK:  Please raise your right hand.

7              DONALD CLEMENTS, PLAINTIFF'S WITNESS, SWORN

8              THE WITNESS:  I do.

9              THE CLERK:  Please be seated.  State your full

10   name for the record and spell your last name.

11             THE WITNESS:  My name is Donald N. Clements,

12   C-L-E-M-E-N-T-S.

13                    DIRECT EXAMINATION

14   BY MR. MEDRANO:

15   Q    Mr. Clements, did you formerly serve with the Drug

16   Enforcement Administration?

17   A    Yes, sir, I did.

18   Q    Presently, though, tell me what you do now?

19   A    At the present time I'm Deputy Chief of Enforcement

20   for the Nevada Gaming Control Board in Las Vegas.

21             MR. RUBIN:  Excuse me, Your Honor.  I'm having

22   difficulty hearing him.

23             THE COURT:  What?

24             MR. RUBIN:  I'm having difficulty hearing him.

25             THE COURT:  You didn't hear that last answer?

312

1    MR. RUBIN:  No, I didn't.

2    MR. MEDRANO:  I didn't either, Your Honor,

3    actually.  I'm having trouble hearing as well.

4    THE COURT:  All right.  Restate your present

5    employment, please.

6    THE WITNESS:  At the present time, I'm Deputy

7    Chief of Enforcement with the Nevada Gaming Control Board

8    in Las Vegas, Nevada.

9    BY MR. MEDRANO:

10    Q    Could I just ask you to get just a tad closer to the

11    microphone.

12    A    All right.

13    Q    Just a little bit more.

14    THE COURT:  You may move your chair up a little.

15    THE WITNESS:  How's that?

16    MR. MEDRANO:  Thank you, Mr. Clements.

17    BY MR. MEDRANO:

18    Q    Now, before that, sir, were you with the D.E.A.?

19    A    Yes, I was.

20    Q    For how long?

21    A    Since April of 1986.  That was the predecessor to Drug

22    Enforcement Administration with U.S. Customs.  When Drug

23    Enforcement Administration was organized in July of 1973, I

24    became a D.E.A. agent.

25    Q    And any law enforcement experience before the D.E.A.?

313

1  A    Before that, I was in the United States Border Patrol

2  for a year and a half, and before that I was a South Dakota

3  Highway Patrol State Trooper for four years.

4  Q    Let me direct your attention to April of 1985.

5        At that point you were with the D.E.A.; correct?

6  A    Yes, sir.

7  Q    And your title and assignment, please.

8  A    I was -- my title was Country Attache.  My assignment

9  was D.E.A. Attache to the U.S. Embassy in San Jose, Costa

10 Rica.

11 Q    Were there any other agents from the D.E.A. also

12 assigned with you there?

13 A    Yes, sir.  In 1985 my assistant was Special Agent

14 Sandalio Gonzalez.

15 Q    Let me direct you now to on or about April 3 of 1985.

16        What happens on this particular day?

17 A    The significant thing that happened on April 3rd was I

18 was called from Puenta Renas, Costa Rico to return to the

19 United States Embassy to receive a telephone call from

20 D.E.A. Headquarters.

21 Q    Did you have this telephone call?

22 A    Yes, I did.  I returned to the Embassy and used a

23 secure telephone to have a discussion with Johnny Phelps

24 from D.E.A. Headquarters.

25 Q    And at that time were you advised about anything

314

1    concerning the Camarena investigation?

2    A    Yes, sir.  I was informed that D.E.A. Headquarters

3    believed that Rafael Caro-Quintero, Sara Cosio, who was

4    believed to be a kidnap victim, and some other people where

5    in Costa Rica.

6    Q    Armed with this information, what did you do next?

7    A    They provided me with a telephone number at which time

8    Costa Rican authorities assisted us in determining the

9    location to which the telephone number was registered.

10   Q    Were you able to ascertain the location?

11   A    Yes, sir, we were.  It came back to a house that was

12   located approximately a half mile from the Juan Santa Maria

13   International Airport in San Jose.

14   Q    Did this particular house have a name?

15   A    Subsequently I learned that it was called Quinta

16   California.  At that time I did not know that.

17   Q    What happens after you identified this house,

18   location?

19   A    A number of things.  After we located it, we conducted

20   an aerial surveillance.  We had numerous discussions with

21   neighbors, people in the area, to find out what type of

22   people were living there.  Physical surveillance was

23   conducted to determine what vehicles might be there.  And

24   subsequently we determined to seek a search warrant for the

25   house and conduct a raid of that house.

315

1    Q    And were you assisted by any local authorities in

2    preparation for this raid at this house?

3    A    Considerably.   Initially we were assisted by the

4    Dirrecion Control de Rogas [phonetic], which is the Costa

5    Rician Narcotics Force.   Subsequently, the Dirrecion

6    Intelligencia de Seguridad, which is known as D.I.S., which

7    is the security force, N.H.R. Security Force of Costa Rica,

8    we were assisted by the Organismo Investigacion Valista

9    which is similar to the U.S. FBI, the Minister of Public

10   Security, the Minister of Immigration, which would be

11   Immigration in the United States.

12   Q    Let me stop you there and let me move on.   Thank you.

13        Ultimately then, are plans made to raid or search

14   this particular residence?

15   A    Yes, sir.   At approximately 11:00 o'clock on the

16   evening of the 3rd, those plans were finalized.

17   Q    And where they ever actually carried out, sir?

18   A    Yes, sir, approximately 6:00, 6:15 in the morning of

19   April 4th.

20   Q    Well, the residence was raided?

21   A    Yes, sir.

22   Q    Were people arrested?

23   A    Yes, sir.   There were --

24        THE COURT:   You've answered.

25   BY MR. MEDRANO:

316

1    Q    Can you tell me who you arrested at that location?

2    A    Arrested five people.  The only one I know absolutely

3    his real name was Rafael Caro-Quintero.

4    Q    Where there other people with Caro-Quintero there?

5    A    Yes, sir, there were four males and one female, and

6    that female was identified as Sara Cosio.

7    Q    If I can ask you to look directly in front of you to

8    your right, there should be Exhibit 103.

9         At any point, sir, did you find anything besides

10   Caro-Quintero at this house?

11   A    Yes, sir.  We found weapons, jewelry, documents, a

12   number of items.

13   Q    Can I ask you to look at Exhibit 103 and tell me what

14   that is?

15   A    This is a semi-automatic pistol, which is one of the

16   weapons that were seized at the place.

17   Q    And is there anything unique about that weapon?

18   A    Well, it's significantly unique in that it has a

19   heavily jeweled handle.  I don't know what the jewels are,

20   but it has the initial "R" and the number "1" on it.

21   Q    You can put that down.

22        MR. MEDRANO:  Your Honor, we move the admission of

23   that exhibit.

24        MR. BLANCARTE:  Your Honor, we object to the

25   admission.  There is no relevance established as to these

317

1  defendants.   They admitted the bracelet with diamonds

2  already.

3         THE COURT:  Well, it's show biz, so we will admit

4  it.

5              (Plaintiff's Exhibit 103 received.)

6         MR. MEDRANO:  May I have just one moment, Your

7  Honor.

8                 (Government counsel confers.)

9         MR. MEDRANO:  Your Honor, that concludes direct.

10  Thank you.

11         THE COURT:  Do you have any questions?

12         MR. MEDVENE:  No, sir.

13         THE COURT:  Do you?

14         MR. RUBIN:  Just a couple questions.

15                    CROSS-EXAMINATION

16  BY MR. RUBIN:

17  Q    During the search of the house, did you find any

18  medicines or syringes or medical supplies of any type in

19  the house?

20  A    Not to my knowledge, sir.

21         MR. RUBIN:  No further questions.

22         THE COURT:  You may step down.

23         THE WITNESS:  Thank you, sir.

24                 (Witness excused.)

25         THE COURT:  Call your next witness.

318

1   MR. CARLTON:  Your Honor, the parties have entered

2   into several other stipulations which I would like to read

3   into the record at this time.

4   THE COURT:  Very well.  The jury will remember the

5   stipulations are agreements that you may accept as evidence

6   in this case.

7   MR. CARLTON:  Stipulation Number 2:  "If called

8   and sworn as a witness, the D.E.A. Special Agent Robert

9   Castillo would testify as follows:

10   "On September 10th, 1985, Agent Castillo collected

11   a sample of soil from a location in Primavera Park,

12   northwest of Guadalajara, Mexico.  The soil was taken at a

13   point approximately two feet below the surface of the

14   ground.  Agent Castillo sealed the soil in a container and

15   delivered it to the F.B.I. Laboratory for analysis.

16   Exhibit 43 consists of the soil sample collected by Agent

17   Castillo on September 10th, 1985, and the container in

18   which it was sealed."

19   Stipulation Number 3:  "If called and sworn as a

20   witness, D.E.A. Special Agent Wayne Schmidt would testify

21   as follows:

22   "On January 26, 1989, Agent Schmidt obtained hairs

23   from the head of Juan Ramon Matta-Ballesteros pursuant to a

24   search warrant.  These hairs were placed in bottles, each

25   of which Agent Schmidt labeled with the area of the head

319

1   from which they were obtained.  Agent Schmidt then sealed

2   the bottles in D.E.A. evidence bags.  On January 30th,

3   1989, he mailed the sealed bags containing the bottles and

4   the hairs to Federal Bureau of Investigation Special Agent

5   Michael Malone at the F.B.I. Laboratory via registered

6   mail, return receipt requested.  Exhibit 50 consists of the

7   hairs of Juan Ramon Matta-Ballesteros collected by Special

8   Agent Schmidt on January 26th, 1989.  The bottles into

9   which Agent Schmidt placed the hairs and the D.E.A.

10  evidence bags in which he sealed the bottles."

11          Stipulation Number 4:  "Exhibit 51 consists of

12  inked fingerprints and inked palm prints of Defendant

13  Humberto Alvarez-Machain obtained from him on April 10th,

14  1990."

15          Stipulation Number 5:  "If called and sworn as a

16  witness, D.E.A. Special Agent Robert Castillo would testify

17  as follows:

18          "On May 29, 1986, Agent Castillo collected hair

19  samples from the head of Serjio Espino-Verdin.  He placed

20  these hair samples into an envelope, sealed the envelope,

21  and placed the envelop into a plastic D.E.A. evidence bag,

22  which he also sealed.  Exhibit 161 consists of the head

23  hairs of Serjio Espino-Verdin obtained from him by Agent

24  Castillo on May 29th, 1986, along with the envelope and

25  D.E.A. evidence bag in which Agent Castillo sealed the

320

1   hairs."

2           Those are the stipulations.

3           THE COURT:  Very well.

4           Call your next witness.

5           MR. CARLTON:  Your Honor, the government calls

6   John Dillon.

7           THE COURT:  Let me tell the jury when I admonish

8   counsel for any reason, that is not anything that should

9   influence you.  It does not mean that I favor one side or

10  the other or what verdict you should receive.  That's

11  entirely up to you to decide, and you should decide that

12  and ignore anything I say or do.  I'm just trying to keep

13  things moving here.

14          JOHN DILLON, PLAINTIFF'S WITNESS, SWORN

15          THE WITNESS:  I do.

16          THE CLERK:  Please be seated.  State your full

17  name for the record and spell your last name.

18          THE WITNESS:  My name is John H. Dillon,

19  D-I-L-L-O-N, Jr.

20                  DIRECT EXAMINATION

21  BY MR. CARLTON:

22  Q    Mr. Dillon, what is your present employment?

23  A    I'm currently employed as a Special Agent for the

24  Federal Bureau of Investigation.

25  Q    How long have you been employed in that position?

321

1   A    I've been a special agent for the F.B.I. for 22 years.

2   Q    What is your present assignment?

3   A    I'm currently assigned as the Unit Chief of the

4   Firearms Toolmarks Unit in the F.B.I. Laboratory.  That

5   unit is the equivalent of a ballistics-type unit.

6   Q    How long have you been in that assignment?

7   A    I have been in that assignment for the last four and a

8   half years, approximately.

9   Q    What was your previous assignment?

10  A    Previous to that, from 1982 to 1988, I was assigned to

11  the Forensic Science Training Unit at the F.B.I. at

12  Quantico, Virginia, with the primary duty of instructing

13  D.E.A. and F.B.I. new agent trainees in the techniques of

14  crime scene search and the collection and preservation of

15  physical evidence.

16  Q    Now, you mentioned the term "Forensic Science".  Can

17  you explain what that term means?

18  A    Yes.  Forensic Science is simply the application of

19  scientific techniques to physical evidence or objects which

20  may have value in proving some elements of a case in an

21  investigative or prosecutive area.

22  Q    You also referred to the term "crime scene".  Does

23  that have a special meaning to you in your work?

24  A    Yes.  Crime scene is an area inside or outside where a

25  crime may have been committed.

322

1   Q    While you were assigned to the Forensic Science

2   Training Unit, did you participate in the investigation

3   into the kidnapping of D.E.A. Agent Enrique Camarena?

4   A    Yes, I did.

5   Q    When was your first involvement in that investigation?

6   A    I was called on March 6th of 1985, in the evening, by

7   the Assistant Director of the FBI in charge of the

8   Laboratory Division, and he directed me to proceed

9   immediately to Guadalajara in Mexico in connection with

10  that investigation.

11  Q    What was it you were supposed to do there?

12  A    The primary concern there was to, in company with a

13  representative from the Identification Division, Mr. Carl

14  Collins, proceed to Guadalajara, and the first part was to

15  identify the remains thought to be those of Agent Camarena

16  as those of Agent Camarena, and for me to gather physical

17  evidence from the body of Agent Camarena and another

18  individual at the Guadalajara City Morgue.

19  Q    When did you arrive in Guadalajara?

20  A    At first light on the 7th of March, 1985.

21  Q    And, in fact, did you go to the Guadalajara Morgue on

22  that date?

23  A    Yes, we did.

24  Q    And what did you do when you got there?

25  A    When we got to the morgue, we initially parked outside

323

1    the morgue, and unloaded our equipment to conduct our

2    search for evidence on the bodies, and we were directed by

3    the officials there at the morgue to put our equipment back

4    in the vehicle, to await their go-ahead to come into the

5    morgue.  About an hour later we were given permission to

6    actually enter the morgue shortly after noon.

7    Q    When you entered the morgue, were you shown any

8    bodies?

9    A    Yes.  We were brought into an examination room where

10   there were two bodies on steel tables, examination tables.

11   Q    Was Agent Collins able to identify one of those bodies

12   as being Agent Camarena?

13   A    Yes, he was.

14   Q    Did you conduct an examination of Agent Camarena's

15   body?

16   A    Yes, I did.  My purpose was to gather any forms of

17   evidence which could prove to be useful in making an

18   association later on with other items of physical evidence.

19   And the items that I gathered fell into the category of

20   hairs, fibers, soil, and fabric samples, rope or cordage,

21   tape in the shape of a blindfold, items such as this.

22   Q    Did you examine any other items at the morgue while

23   you were there, besides the body?

24   A    Yes.  While I was there examining the bodies for

25   various forms of evidence, I did notice on the floor of the

324

1  examination room two piles of clothing.  And on inquiry, I

2  asked the morgue officials, as best I could, what the piles

3  where, and it was indicated to me that these were

4  associated with the two bodies that were there on the

5  examination tables.

6  Q    And what did these items consist of?

7  A    These where clothing items and sheets, rope, parts of

8  ropes, and tape.

9  Q    Did you attempt to collect these items for evidentiary

10  purposes?

11  A    Yes, I did.  I -- after I saw these on the floor and

12  came to understand what they were, I requested of the

13  morgue officials if I could obtain these items for -- as

14  items of evidence, and they said that I could not.

15      My fall back position was to request permission to

16  scrape these items to preserve the material that would be

17  scraped off in the form typically of hairs, fibers, soil,

18  things like that, because of their potential value in

19  making associations later on.

20      They declined to give me permission to do that, so

21  I requested permission of them to make cuttings to obtain

22  samples of these items for retention, which they did allow

23  me to do.

24  Q    If you would look immediately to your right, I think

25  down on the floor is a bag of items.

325

1   A    Yes, sir.

2   Q    I believe there is an item in that bag labeled Number

3   28.  Could you please find that.

4   A    Yes, I have Exhibit 28.

5   Q    Do you recognize that?

6   A    Yes, I do.  It's a box here, a cardboard box, marked

7   with my initials, and the inscription on it is, "Soil

8   deposition from the right knee of Body Number 1."

9   Q    Is that soil you removed from the right knee of Agent

10  Camarena's corpse?

11  A    That is correct, yes.

12  Q    Please look at what has been marked as Exhibit 29.

13  A    Yes, I see in the package here a cardboard box with my

14  symbol on it.  The inscription on it is, "Soil sample from

15  shorts associated with Body Number 1."

16  Q    Body Number 1 is Agent Camarena; correct?

17  A    Being Agent Camarena, yes.

18  Q    And Exhibit Number 30, please, if you would look at

19  that.

20  A    Yes, I see in the package here a cardboard box with my

21  symbol on it.  The inscription, "Strip of adhesive

22  blindfold associated with Body Number 1," Agent Camarena.

23  Q    And Exhibit 31, if you would?

24  A    I see within the envelope here a paper bag and a piece

25  of cloth, both marked with my symbol, and on the paper bag

326

1    the inscription, "Soil fabric sample from shorts associated

2    with Body Number 1," being Agent Camarena's body.

3    Q    Would you please look at Exhibit 32.

4    A    I see a piece of cloth here within, and a container, a

5    paper bag, containing -- the piece of cloth has my mark on

6    it, "T.M.", and the bag marked Q-23, containing a fabric

7    sample.

8    Q    Do you recall what that fabric is a sample of?

9    A    Yes.  I would have to refer to my notes.  I see the

10    marking here is somewhat blotted.

11    Q    Did you take a sample of a sheet while you were at the

12    morgue?

13    A    Yes, a burial sheet.

14    Q    Does that appear to be a sample of the burial sheet?

15    A    Yes, it has the same design on it.

16    Q    If you would look at Exhibit 33.

17    A    I see within here a cardboard box with my symbol on it

18    with the caption, "Debris from burial sheet associated with

19    Body Number 1."  This is material that was loose material

20    on the burial sheet which I put into a box to preserve it.

21    Q    Do you have Exhibit 34 in front of you?

22    A    Yes, I do.

23    Q    And can you tell us what that is?

24    A    Yes.  It's a multi-colored piece of cloth here in a

25    container.  Indicates it's a portion of a multi-colored

327

1    shirt associated with Body Number 2, not that of Agent

2    Camarena.

3    Q    And Exhibit 35.

4    A    35 also contains a piece of cloth and a wrapper with a

5    caption on it, "Portion of a velour sweatshirt associated

6    with Body Number 2," not that of Agent Camarena.

7    Q    Do you have Exhibit 36 in front of you?

8    A    Yes, I do.

9    Q    Would you please examine that.

10    A    Yes.  This is a box also in the envelope here with my

11    symbol on it, and the caption, "Head hair sample from Body

12    Number 1," Agent Camarena's body.

13    Q    And do you recall from where you obtained that sample

14    of head hair?

15    A    Yes.  I obtained that at the morgue in the City of

16    Guadalajara.

17    Q    And Exhibit 37, if you would?

18    A    This is cordage that was associated with Body

19    Number 1.  In the container also the box that I placed it

20    in with my symbol on it.

21    Q    Was there a particular odor associated with these

22    materials?

23    A    Yes.  Typical of the decomposition of human tissue.

24    Q    Was there a particular texture to them as well?

25    A    Yes.  A kind of greasy or soapy appearance, consistent

328

1    with a decomposed body.

2    Q    Now, the next day did you continue your efforts in

3    this investigation?

4    A    Yes.  On the second day -- the first day the priority

5    was, of course, to identify the body and to move on beyond

6    that in that return of the body to the U.S. was the

7    concern.

8            The second day the priority was to move out to the

9    location where the bodies were found, to attempt to find

10   any forms of evidence out there that might prove useful in

11   making an association later on during the investigation.

12           MR. CARLTON:  Now if you would please -- may I

13   have a moment, Your Honor?

14           THE COURT:  Yes.

15               (Government counsel confer.)

16   BY MR. CARLTON:

17   Q    Look on the cart just to your right.  There should be

18   a photograph marked Exhibit 25.

19           Is that the location you went after your visit to

20   the morgue the following day?

21   A    Yes.  This is the location along a highway north of

22   the town of Zamora, looking towards the area where the

23   bodies were originally found as indicated to me by members

24   of the Mexican Federal Judicial Police.

25   Q    You can put that down, now.  Thank you.

329

1        Did you collect any soil samples from that site?

2   A    Yes, I did.  I did collect soil, among other things,

3   from that site against the possibility that comparisons

4   would be necessary later on.

5   Q    And do you have in front of you Exhibits 38-A and B?

6   A    Exhibit 38-A is a paper bag that was used to contain

7   three soil samples which are designated as Exhibit 38-B,

8   101-B and 35-B.

9   Q    Are those soil samples the samples that you obtained

10  from the location where the bodies were found?

11  A    Yes, they are.

12  Q    Now, what did you do with all of these items that you

13  have just described?

14  A    I kept them in my care and custody until my ultimate

15  return to the F.B.I. Laboratory.

16  Q    You took them back to the F.B.I. Laboratory yourself?

17  A    Yes, I did.

18  Q    What did you do with them when you got there?

19  A    On return to the laboratory, I turned these over to

20  the Evidence Control Center in the F.B.I. Laboratory.

21       MR. CARLTON:  Your Honor, I would move the

22  admission of these exhibits.

23       THE COURT:  They may be admitted.

24       (Plaintiff's Exhibits 28 through 37,

25          35-B, 38-A, 38-B, and 101-B received.)

330

MR. CARLTON:  That's all I have at this point.

THE COURT:  Do you have any questions?

MR. MEDVENE:  No.

MR. RUBIN:  Yes, sir, just briefly, Your Honor.

CROSS-EXAMINATION

BY MR. RUBIN:

Q    Mr. Dillon, are you familiar with the principles of a crime scene search?

A    Yes, I am.

Q    And what are those techniques?

A    In a crime scene search, the objective is to obtain any items that might be of use in -- for lead purposes or in the prosecution of a case.  In many instances, it's not possible to anticipate everything that might be of value, and so normally there is a broad spectrum look at a crime scene in order to obtain things that may be necessary for comparisons later on.

Q    You would agree, would you not, that one of the principles in crime scene search techniques is to try and preserve and protect the crime scene area so that it's not spoiled or so it remains pristine?

A    Normally in the administration of a crime scene search, a high priority is given to isolation of that scene to prevent contamination.

Q    When you say "contamination," that means so that

331

1  things that are not brought into that area at a later date

2  which may have nothing to do with evidence that you are

3  looking for at a previous time?

4  A     That is always a concern, yes.

5  Q     And at 881 Lope de Vega, do you know whether or not

6  the crime scene was preserved between February of 1985 and

7  April of 1985?

8            MR. CARLTON:  Objection, Your Honor, beyond the

9  scope.  No foundation.

10           THE COURT:  Sustained.

11           MR. RUBIN:  No further questions.  Thank you.

12           THE COURT:  You may step down.

13           THE WITNESS:  Thank you, Your Honor.

14                    (Witness excused.)

15           THE COURT:  Next witness.

16           MR. CARLTON:  Your Honor, the government calls

17  Wayne Oakes.

18           THE CLERK:  Please raise your right hand.

19            WAYNE OAKES, PLAINTIFF'S WITNESS, SWORN

20           THE WITNESS:  I do.

21           THE CLERK:  Please be seated.

22           State your full name for the record and spell your

23  last name.

24           THE WITNESS:  Yes.  My name is Wayne W. Oakes.

25  Last name is spelled O-A-K-E-S.

332

DIRECT EXAMINATION

BY MR. CARLTON:

Q    Mr. Oakes, what is your present employment?

A    I am a Supervisory Special Agent with the F.B.I.,
Federal Bureau of Investigation.

Q    How long have you been employed by the F.B.I.?

A    Approximately 15 years.

Q    How long have you been employed in the F.B.I.
Laboratory?

A    For a little over 11 years.

Q    Did you travel to Guadalajara in relation to the
investigation of the kidnapping of Enrique Camarena?

A    Yes, I did, in the spring of 1985.

Q    Was that on March 27th?

A    Yes.

Q    What was your purpose in going there at that time?

A    To conduct a search of a 1983 black Mercury Grand
Marquis.

Q    And when you arrived in Guadalajara, did you see this
Marquis?

A    Yes, I did.  I initially saw it on March 27th at the
M.F.J.P. Headquarters.  Subsequently saw it the following
day at the M.F.J.P. hanger at the Guadalajara Airport.
It's at that location that we actually conducted the search
of that vehicle.

333

1    Q    And what kind of a search were you there to perform?

2    A    To conduct an examination of that vehicle for trace

3    evidence which might consist of hairs, textile fibers,

4    paint chips, glass, soils, whatnot.

5    Q    And what did you do in relation to your search of this

6    vehicle?

7    A    Primarily my function was to remove any items from the

8    vehicle that were portable, in other words, paper items or

9    such, that might lend themselves to later on being examined

10   for fingerprints, and then to conduct an examination of

11   trace evidence by vacuum sweeping certain items and taking

12   that debris back to the F.B.I. Laboratory for further

13   examination.

14   Q    In conducting a vacuum sweep, do you use a special

15   kind of a vacuum cleaner?

16   A    Yes.  It's made by a company that services law

17   enforcement agencies, and it essentially looks like a

18   household canister vacuum cleaner, but it has a trapping

19   system that allows the trace evidence, which, again, might

20   be hairs or textile fibers, to be trapped, collected, so

21   they could be preserved and then later examined back at the

22   laboratory.

23   Q    Did you obtain any items of evidence from this

24   vehicle?

25   A    Yes, I did.

334

1   Q    What where they?  Can you describe them?

2   A    Number of paper items, again, that might lend

3   themselves to fingerprints.  Fabric samples from the

4   carpeting and the seats.  Vacuum sweepings from the

5   interior of the vehicle, as well as the trunk.  I removed

6   the floor mats.  That was essentially the items that I

7   removed.

8   Q    I believe in the box in front of you, you should find

9   an exhibit marked Number 40.

10  A    Yes, I have that item.

11  Q    Do you recognize that?

12  A    Yes, I do.  It bears my initials, "WWO," as well as

13  the number 15, which just means the 15th item that I

14  removed from the vehicle.  It also has the designation

15  Q-38, which just means question item Number 38, and that

16  designation was put on later back at the F.B.I. Laboratory.

17  Q    What is this?

18  A    It's a floormat which I removed from the right-rear

19  floor of the 1983 Mercury Grand Marquis.

20  Q    I believe in that same box you will see an exhibit

21  marked 41.

22  A    Yes.

23  Q    Do you recognize that?

24  A    Yes, I do.  It also has my initials on it "WWO", as

25  well as Item Number 30, again just the 30th item that I

335

1   removed.   It's vacuum sweepings from the front passenger

2   seat of the same vehicle.

3   Q    What did you do with these items after you completed

4   your search in Mexico?

5   A    I personally took them back to the F.B.I. Laboratory,

6   and at that time I turned them over to Special Agent Ron

7   Rawalt.

8        MR. CARLTON:  May I have just a moment, Your

9   Honor?

10  BY MR. CARLTON:

11  Q    Agent Oakes, if you would look on the cart to your

12  right.   I believe there's a photograph marked 11-C.

13  A    Yes.

14  Q    Do you recognize that?

15  A    Yes, I do.   It appears to be a photograph of the 1983

16  Mercury Marquis which I examined in Guadalajara in March of

17  1985.

18       MR. CARLTON:  Your Honor, I'd move the admission

19  of these exhibits.

20       THE COURT:  They may be admitted.

21       (Plaintiff's Exhibits 40 and 41 received.)

22       MR. CARLTON:  Nothing further.

23       THE COURT:  You may cross-examine.

24       MR. MEDVENE:  No questions, Your Honor.

25       MR. RUBIN:  No questions, Your Honor.

336

1       THE COURT:  You may step down.

2       THE WITNESS:  Thank you, Your Honor.

3                    (Witness excused).

4       THE COURT:  Next witness.

5       MR. CARLTON:  Your Honor, the government calls

6  Ronald Rawalt.

7       THE CLERK:  Please raise your right hand.

8       RONALD RAWALT, PLAINTIFF'S WITNESS, SWORN

9       THE WITNESS:  I do.

10      THE CLERK:  Please be seated.

11      State your full name for the record and spell your

12  last name.

13      THE WITNESS:  My name is Ronald Rawalt.  My last

14  name is spelled R-A-W-A-L-T.

15                   DIRECT EXAMINATION

16  BY MR. CARLTON:

17  Q    Mr. Rawalt, what is your present employment?

18  A    I'm a Special Agent with the Federal Bureau of

19  Investigation.

20  Q    How long have you employed by the F.B.I.?

21  A    Just over 20 years.

22  Q    What's your present assignment?

23  A    I'm a Criminal Investigator in the Omaha Field

24  Division.

25  Q    How long have you been in that assignment?

337

1    A    About four and three-quarter years.

2    Q    What was your assignment immediately prior to this?

3    A    I was assigned to the F.B.I. Laboratory, Mineralogy

4    Unit for approximately nine years prior to my assignment to

5    the Omaha Field Office.

6    Q    In the Mineralogy Unit what were your duties,

7    generally?

8    A    My duties where to conduct examinations of items of

9    evidence that were of naturally occurring or man-altered

10   material of geologic origin:  Soil, glass, building

11   materials, gemstones, and safe insulations.

12   Q    While you were assigned to the F.B.I. Laboratory, did

13   you participate into the investigation of the kidnapping of

14   Enrique Camarena?

15   A    Yes, sir, I did.

16   Q    In the course of that, did you travel to Guadalajara?

17   A    On several occasions, yes.

18   Q    When was the first time?

19   A    The first time was April 12th of 1985.

20   Q    What was the purpose in your visit at that time?

21   A    There were several purposes.  The first was to assist

22   in a crime scene examination of a residence located at 881

23   Lope de Vega in Guadalajara.  Do an on-site examination and

24   retrieve evidence from that site, and conduct a soil

25   analysis survey for possible burial sites in and around

338

1    Guadalajara, Mexico, to compare with the soil that had been

2    previously removed from Special Agent Camarena's body.

3    Q    When did you arrive in Guadalajara?

4    A    Late in the afternoon of the 12th of April --

5    Q    Did you --

6    A    -- 1985.

7    Q    Did you, in fact, go to 881 Lope de Vega?

8    A    Several hours after we arrived, we where allowed

9    entrance into that residence.

10   Q    About what time of the day was it?

11   A    It was late afternoon, before the sun went down.   I

12   believe we landed around 4:00, 4:30.   There was a short

13   meeting, and I did not take notes on the time, but it was

14   shortly thereafter, possibly 5:00, 5:30-ish.

15   Q    Was anyone else at the house when you arrived?

16   A    Yes, sir.

17   Q    Who was that?

18   A    There was a contingent of the Mexican Federal Judicial

19   Police, roughly eight to twelve officers that were present

20   at the residence when we arrived.

21   Q    Now, while you were at that location, did you notice

22   whether there was a swimming pool?

23   A    Yes, sir, I did.

24   Q    Was there something about the swimming pool that

25   struck you as significant to the investigation or possibly

339

1    significant?

2    A    Yes.

3    Q    What was that?

4    A    The location of the swimming pool within the yard

5    suggested to me a natural place to dispose of items.  So I

6    found the pool cleaning brush, which is on a long pole, and

7    pushed it through the swimming pool to determine if

8    anything was in the pool, if I could feel anything.  This

9    was necessary because the water was so fouled and dirty you

10   could not see into the water.  It had not been cleaned in a

11   long period of time.

12          And it was during this period of time I could feel

13   items on the bottom of the swimming pool.

14   Q    Could you tell by the feel how substantial these items

15   where?

16   A    Yes.  I could actually hook onto them with the brush

17   and start to push them, but I couldn't get them out of the

18   pool because of the slope of the side of the pool, and the

19   design of the brush, but I could feel them, I could move

20   them, but I could not remove them from the pool.

21   Q    Did you do anything else to try to retrieve these

22   items?

23   A    Yes.

24   Q    What was that?

25   A    I located two pumps, which are referred to as trash

340

1    pumps, attempted to get them to run.  One of them was

2    burned out and would not run.  The other one, when it was

3    hooked up, I was doing the electrical wiring on it, I

4    eventually hooked it up backwards because I burned it out,

5    also.

6    Q    Was a request made to the M.F.J.P. to try to get

7    another pump?

8    A    Yes, sir.

9    Q    And were you ever allowed to use another pump on this

10   pool?

11   A    I was not.

12   Q    Did you return to the house another time during this

13   trip to Guadalajara?

14   A    Yes, I did.

15   Q    What was the condition of the pool at that time?

16   A    It was early morning and it had been totally cleaned.

17   There was nothing in the pool.  There was no water and no

18   debris.

19   Q    Did you ask to be shown the debris?

20   A    Yes, I did.

21   Q    What were you shown?

22   A    I was shown a small pile of leaves and organic debris,

23   twigs, and such, about the -- about approximately 18 inches

24   long by maybe six to eight inches high.

25   Q    Was the substance of that debris consistent with the

341

1  substance of the debris you could feel in the pool several

2  days earlier?

3  A    No, sir.

4        MR. RUBIN:  Objection; calls for speculation.

5        THE COURT:  Overruled.

6        THE WITNESS:  No, sir.  The debris that I was

7  shown was the debris that was floating on top of the pool.

8  The loose leaves from the trees that had blown in.  I could

9  feel objects.  I could roll objects.  They had substance.

10  They were not the same as what I was shown.

11  BY MR. CARLTON:

12  Q    Did you come to some sort of conclusion as to whether

13  you were being shown all of the debris that was in the

14  pool?

15  A    Yes.

16  Q    What was that conclusion?

17  A    My conclusion was that the pool had been cleaned

18  outside of my presence, and that those items had been

19  removed.

20  Q    Now, returning to the evening of your first visit to

21  the house, in a general way, what was it you did that

22  evening?

23  A    The first thing that I did was assemble the

24  individuals that I had brought to Guadalajara or that I had

25  assigned to me in Guadalajara to formulate a plan of action

342

1  for the processing of the crime scene area, being the house

2  and the grounds.

3        I was the case agent for the Federal Bureau of

4  Investigation Laboratory.  I assigned responsibilities to

5  the individuals that were present, and asked people

6  generally to look around the crime scene for areas that

7  were logically present, that could have been utilized to

8  hold an individual, or that were obviously portions of a

9  crime scene.  Something may be disturbed, there may be

10  blood, broken furniture, anything where a fight might have

11  happened, and to identify those to me so that I could take

12  a look at them.  We could plan a course of action for the

13  crime scene.

14        This took approximately two hour's time to totally

15  look over the grounds and come forward with a plan of

16  action that would allow us to best attack the problem that

17  we had at hand.  I also did a little work on the house to

18  ensure that we had electricity available to us for the

19  processing.

20  Q    Now, I believe in front of you, you should see an

21  exhibit marked 57.

22  A    I don't see a 57.  Will it be in this book?

23  Q    No, it wouldn't be in that book.

24        MR. CARLTON:  May I have just a moment, Your

25  Honor?

343

1          We will move on just for a moment.

2    BY MR. CARLTON:

3    Q    After you completed your activities at the house on

4    this first evening, how much time passed before you

5    returned to the house?

6    A    Approximately nine, ten hours.

7    Q    And what was your object in returning to the house?

8    A    The object in returning to the house was to continue

9    processing the next morning those items or those rooms that

10   we had not completed processing the previous evening.

11   Q    And had you been able to process any of the bedrooms

12   on the first visit?

13   A    The bedroom referred to as the guest bedroom or the

14   guest house had been processed the previous evening, the

15   night of the day that I arrived in Guadalajara.  None of

16   the bedrooms of the main house had been processed.

17   Q    What was this guest house that you referred to?

18   A    This was a masonry adobe structure that was

19   immediately behind, but adjacent to the main house.  It was

20   a two-part structure, containing a bedroom and bathroom

21   combination, and a combination room that contained pumps

22   and filters for the swimming pool, with a small storage

23   room off of the pump filter room, and that pump filter

24   room, storage room, had its own access.

25          The bedroom-bathroom had an access on the opposite

344

1    side, and it appeared to be a small bungalow that guests

2    would stay at, because of the facilities that were present.

3    Q     You participated in processing that location?

4    A     I did.

5    Q     In the course of that work, did you encounter a

6    syringe?

7    A     Yes.

8    Q     Where was that?

9    A     The syringe was on the floor in the bathroom of the

10    guest house.  It's a plastic syringe that was readily

11    apparent as you walked in the bathroom, laying on the

12    floor.

13    Q     What did you do with that syringe?

14    A     That syringe was taken and placed into a plastic

15    ziplock bag.  It was taped shut and the bag was marked to

16    identify the location that the syringe had been picked up.

17           Also present in the same general area was a small

18    amount of paper debris, that was also picked up at the same

19    time because of its general proximity.  And that is

20    represented by --

21    Q     What do you have in your hand, for the record?

22    A     For the record, I am -- I have a heat sealed plastic

23    bag, Plaintiff's Exhibit 57, that contains within it the

24    ziplock bag that I marked in Guadalajara the night that the

25    examination took place, the processing.  That ziplock bag

345

contains the paper debris and the syringe, and this is all

placed in a container marked Exhibit 57.  Also attached is

a photograph that I took at the time that the syringe was

removed from the bathroom floor.

Q    Is that where the syringe was found?

A    Yes, sir.

Q    What did you do with this sealed bag containing the

syringe?

A    I labeled it, I initialed it.  Michael Malone, who was

also present with me, another Special Agent, initialed it,

and I placed it in a larger container that I was carrying

with me that I was going to either ship back or carry back

to Washington, D.C., and eventually it was removed from

that scene.

Q    Did you receive it in Washington, D.C.?

A    Yes, I did.

Q    And when you received it, was it still in the sealed

bag?

A    Yes, sir.

Q    And did you deliver it to someone in that condition?

A    It was delivered to two different individuals at the

laboratory.  The first individual it would have been

delivered to in the original sealed condition.  An

examination would have conducted necessitating the removal

of the seal.  It was returned to me, and then I delivered

346

1    it to a latent fingerprint specialist assigned to the

2    F.B.I. Headquarters.

3    Q    Who was the first person you delivered it to?  Was

4    that Drew Richardson?

5    A    Yes, sir.

6    Q    And who was the latent fingerprint specialist?

7    A    Carl Collins.

8    Q    Now, on the second visit that you made to 881 Lope de

9    Vega, were you able to process any of the bedrooms in the

10   house?

11   A    Yes.

12   Q    Which ones?

13   A    In the house itself, the processing took place of the

14   bedrooms on the main floor, which where the bedrooms

15   immediately to the right and adjacent to the front door,

16   running all the way along the right side of the house,

17   towards the back of the house.  They were all in a row.

18   Q    And when that was completed, did you walk the grounds?

19   A    The grounds were walked several times.  Both the first

20   time and the last time.  The subsequent processing, we had

21   already recovered everything from the grounds that we felt

22   was necessary, but, yes, I did walk the grounds.

23   Q    If you would look, please, I believe in the book in

24   front of you should be two exhibits marked 47-A and B.

25        Do you recognize those?

347

1    A    Yes, sir.

2    Q    And what are those?

3    A    May I demonstrate them or just --

4    Q    Please.

5         THE COURT:  Just a minute.  Just answer what they

6    are verbally.

7         THE WITNESS:  47-A and 47-B are photographs that I

8    took during the initial crime scene processing on the first

9    trip to Guadalajara, Mexico.

10   BY MR. CARLTON:

11   Q    What do they depict?

12   A    They depict the original location that a license plate

13   was found in the drain on the tennis courts which was on

14   the property, and that is 47-A.

15        47-B is a photograph of the actual license plate

16   once it has been retrieved from the drain and unfolded so

17   that all the letters are visible.

18   Q    How did you come to find this license plate?

19   A    It was during a search of the grounds.  I was walking

20   around, accompanied by Special Agent Malone, and we were

21   conducting a search to look for items of evidence or items

22   that we would believe would be evidence, and I was walking

23   down the edge of the tennis court.

24        The sun was almost straight overhead and I noticed

25   something gold and bright down in this drain, which is

348

1    about two-and-a-half feet down into the ground.   It turns

2    and goes under the tennis court.

3           And by repositioning myself, I can see that the

4    gold was a portion of a letter from a license plate from

5    Jalisco, Mexico, and the license plate is gold letters over

6    a blue background.

7           And by, again, repositioning myself, I could look

8    and see that there was actually a plate with a small corner

9    sticking out of the drain allowing it to be viewed.

10   Q    Were you able to retrieve this license plate?

11   A    Yes.

12   Q    How were you able to do that?

13   A    I had to remove the grate covering the drain, which

14   was poured in the concrete and macadam.  We did that

15   physically by pulling it out of the concrete, and then

16   reaching in with a gloved hand the plate was slid out,

17   photographed, and then removed, unfolded, and photographed.

18   Q    Well, when this happened were there M.F.J.P. agents on

19   the premises at 881 Lope de Vega?

20   A    Yes, there were.

21   Q    At some point were they informed that you had found

22   this license plate?

23   A    Yes.  Initially a request had been made to assist us

24   by providing us with a crow bar to remove the grate out of

25   the concrete and out of the macadam.

349

1    Q    What happened at that point?

2    A    The first M.F.J.P. officer came back to see what the

3    request actually entailed.  He immediately noticed the

4    license plate, called to another M.F.J.P. Officer, and they

5    began talking rapidly, very excited style of gesturing.  I

6    don't understand Spanish, but it was obvious that there was

7    something that they were excited about.

8         One of them then left on a run back towards the

9    house.  There was also a D.E.A. present -- a D.E.A. agent

10   present who interpreted for me what was going on, and I was

11   advised that the license plate that I had found would not

12   be allowed to be removed, that it was going to cause a

13   problem of some kind, and that a comandante or an assistant

14   comandante was being called for some type of advice

15   relative to that license plate.

16   Q    Were you then ordered off the property?

17   A    Not at this point in time.  That was about 20 minutes

18   later.

19   Q    Did that conclude your investigation at 881 Lope de

20   Vega during this trip?

21   A    The conclusion was about 20 minutes later when I

22   refused to turn the license plate over.  I was instructed

23   that I had to turn it over.  I was ordered to and I

24   complied, and at that point in time I was told I had to

25   leave Guadalajara -- 881 Lope de Vega and that my search

350

1   would no longer be allowed to continue at that location.

2   Q     Did you return to the Lope de Vega residence on

3   another occasion?

4   A     Yes, sir, I did.

5   Q     When was that?

6   A     June 24th of 1985, approximately two months and a week

7   or so later.

8   Q     What was the purpose of this return visit?

9   A     To continue processing portions of that residence that

10  I had not been allowed to complete on my first trip.

11  Q     I believe in front of you should be two exhibits

12  marked 44 and 45.

13  A     Yes.

14  Q     Do you recognize those?

15  A     I recognize the bags and the resulting items that were

16  removed, yes.

17  Q     All right.  What is Exhibit 44?

18  A     44 are items that were removed at the F.B.I.

19  Laboratory from vacuum sweepings which were represented by

20  45.

21  Q     Vacuum sweepings from what location?

22  A     Vacuum sweepings which are contained in this bag, Item

23  45, were removed during processing by myself from the back

24  bedroom of the residence located at 881 Lope de Vega.

25  Q     And 45 is what?

351

1    A    That's 45.

2    Q    Oh, I'm sorry.

3         44 consists of?

4    A    44 will be items that were ultimately removed from

5    this Item 45.

6    Q    What did you do with these materials after you

7    obtained them?

8    A    At the scene, the bag was labeled, signed and

9    initialed, and sealed.  This bag contains debris from a

10   certain portion of that bedroom.  I then took this bag,

11   placed it with other items that I had recovered at that

12   scene during that examination, returned to the American

13   Consulate in Guadalajara, placed these items in a box, and

14   ultimately sealed the box and arranged to have that box

15   transmitted back to Washington, D.C. to me, where I

16   received it at a later date.

17   Q    Is that what you did with all the items you recovered

18   at Lope de Vega on this occasion?

19   A    Yes, sir.

20   Q    Now, Agent Rawalt, would you please describe your

21   education, training, and experience in the field of soil

22   comparison, mineral analysis?

23   A    Yes, sir.  I graduated in 1971 from Nebraska State

24   College in Chadron, Nebraska -- that's C-H-A-D-R-O-N --

25   with a Bachelor's degree in Earth Science.

352

1    During the time that I studied the curriculum for

2    Earth Science, I took courses in mineralogy, which is the

3    study of the identification of individual minerals by their

4    optical and physical characteristics; Protology, which is

5    the study of rocks and the makeup of rocks, of their

6    mineral components, and geology.

7        Upon graduation, I attended graduate school at

8    Colorado State University in Ft. Collins, Colorado in

9    Geology for one term, and discontinued my formal education

10   because of an offer of employment by the Federal Bureau of

11   Investigation.

12       I was assigned to the Los Angeles Field Division

13   as a Criminal Investigator, and then because of my

14   background as it related to my formal training in Earth

15   Science and Geology, I was transferred back to the F.B.I.

16   Headquarters and assigned to the F.B.I. Laboratory to the

17   Mineralogy Unit.

18       Prior to being allowed to actually examine

19   evidence and conduct crime scene examinations, I underwent

20   a little over a year's training in the identification of

21   minerals by the techniques utilized by the laboratory,

22   which where somewhat more advanced than the techniques I

23   had learned in college because of the length of time that

24   had passed, and the development of instrumentation.

25       I refamiliarized myself with textbooks and

353

courses, and studied the identification of minerals in their various forms for a little over a year's period of time.

During this time the instruction was completed by qualified examiners within the laboratory system.

At the end of that period of time, I was assigned a case load and expected to conduct examinations as they related to those cases.

Q    In the course of your work with the F.B.I., have you ever testified in relation to soil examinations?

A    Yes, I have.

Q    About how many times?

A    With relationship to Forensic Mineralogy, which is the identification of the minerals in the soils and other areas, somewhere between 150 and 200 times.

Q    Have you ever taught any courses in this field?

A    Yes, I have.

Q    Where?

A    At the Forensic Science Research and Training Center in Quantico, Virginia.  I was an instructor for laboratory personnel from state and local laboratories on certain aspects of forensic mineralogy.

Q    Did you ever perform any soil comparisons and analyses in this case?

A    Yes, I did.

354

1    Q    If you would look before you at what has been marked

2    as Exhibits 28 and 29.  Do you see those?

3        Let me ask you this.  In the course of your soil

4    comparisons in the case, did you ever find two samples of

5    soil that matched one another?

6    A    I did.

7    Q    And what were the sources of those two items of soil?

8    A    One of the items was a item of soil that was removed,

9    that was represented to me by Special Agent Jack Dillon, as

10   having been removed from Special Agent Enrique Camarena's

11   body.  And the item that it matched was a known standard or

12   a soil taken from a specific location on the south side of

13   a park referred to as La Primavera, which is just outside

14   of Guadalajara, Mexico.

15   Q    Now, I believe you now have some additional exhibits

16   in front of you?

17   A    Yes, I do.

18   Q    What are those?

19   A    Exhibit 28 is a soil sample, a pillbox, that contains

20   a soil sample that was represented to me by Jack Dillon as

21   the soil removed from the right knee of a body that was

22   identified as Enrique Camarena.

23        29 is a soil sample removed from shorts or

24   underwear that was associated with Body Number 1 or the

25   body of Enrique Camarena.

355

1    Q    When you say the soil matched soil from another

2    location in Primavera Park, what do you mean by that?  How

3    did you come to that conclusion?

4    A    The conclusion was arrived at by the examination of

5    the soil for its component parts, the color of the soil,

6    the texture of the soil, the type of soil, and the

7    composition.  Each of those factors relate one to the

8    other.  And in the composition, you not only identify the

9    specific components in the soil, but the relationship and

10   their proportions, one to each other, and to the soil

11   itself.

12          This is done through the identification of all of

13   the specific minerals or small particles of rock matter

14   that make up the soil which are the direct components of

15   the soil and rock that is outcropping around a location as

16   they wash into it.

17          And a comparison is done through these components

18   to determine if they are the same.  If you can find

19   differences, you can conclude that they are not the same.

20          If they are the same at the end of your

21   examination, the logical conclusion is that the soil

22   originated from that source as represented by the known

23   standard.

24   Q    Did you have occasion to compare these soil samples,

25   Exhibit 28 and 29, with soil obtained from the location

356

1    where the bodies were found?

2    A    Yes, I did.

3    Q    What was your conclusion?

4    A    The soils where so different in their type, in their

5    texture, and in their mineralogy.  I could not only state

6    that the soil did not come from the source of soil as it

7    was represented, but did not even come from the same

8    depositional environment.  It was totally different soil.

9    It came from some other location, not even closely

10   resembling the source of those soils.

11            MR. CARLTON:  May I have just a moment, Your

12   Honor?

13            Nothing further, Your Honor.

14            THE COURT:  You may cross-examine the witness.

15            MR. MEDVENE:  Just a question or two.

16                     CROSS-EXAMINATION

17   BY MR. MEDVENE:

18   Q    Were soil samples 28 and 29 the samples that where

19   identified by Mr. Dillon as coming from Mr. Camarena's

20   right knee and shorts, where those represented to you as

21   coming from Primavera Park?

22   A    No, sir.  They were represented as coming from the --

23   removed from the knee of Camarena and from his shorts, his

24   underwear.

25   Q    Where he was found in the Bravo Ranch area?

357

1   A    No, sir.  Maybe I haven't been clear.  28 and 29 were

2   removed from the body.  They were represented to me as

3   adhering to the body itself when the body was recovered.

4   Q    And to your knowledge, just so we are clear, the body

5   was recovered in some area near something called Bravo

6   Ranch?

7   A    Yes.  The Bravo Ranch was the area represented by

8   38-B, which was the area I was just talking about, that was

9   so grossly dissimilar.  You could not only state that they

10  did not come from these soils, but the whole depositional

11  environment is different.  They're totally different types

12  of soils.  Could not even have come from the area that this

13  type of soil originates in.

14  Q    Were you able to match 28 and 29, that soil, to soil

15  from a particular location?

16  A    Yes, I was.

17  Q    Was that location Primavera Park?

18  A    The location was a pit area on the south side of

19  Primavera Park.  I'm not exactly sure where the boundary is

20  for the park.  It's a very primitive area.  It was

21  certainly on the south side of the main mountain of

22  Primavera Park just outside of Guadalajara.

23  Q    Now, could you correctly characterize that area as a

24  wilderness area?

25  A    If you would characterize that part of Mexico as a

358

1    wilderness area, yes.

2    Q    There are no houses around there of any kind?

3    A    Could you define "around"?  There were houses down the

4    road, yes.

5    Q    About how far away?

6    A    Five miles, seven miles possibly, down the same road.

7    Q    Nothing other than grass, trees, dirt, for that seven

8    miles or so around where you found that particular soil

9    sample?

10   A    I really can't state that.  We went in the road one

11   direction.  We passed houses, a village.  In fact, a little

12   area that I was led to believe was a resort that was within

13   a few miles, possibly five miles, of the burial site.  We

14   stopped at that burial site.  That road continued.  I don't

15   know if there was something further down the road or in

16   either direction from that, because I didn't go any

17   further.

18   Q    The closest houses that you know of were five to seven

19   miles away?

20        MR. CARLTON:  Objection, asked and answered.

21   Beyond the scope.

22        THE COURT:  Sustained.

23   BY MR. MEDVENE:

24   Q    The only soil samples then that you were advised that

25   were found on Agent Camarena were the soil sample that

1    matched this primitive area or wilderness area of Primavera

2    Park, and the samples from the Bravo Ranch area; is that

3    correct?

4            MR. CARLTON:  Objection.  Misstates the testimony,

5    Your Honor.

6            THE COURT:  Restate your question.

7    BY MR. MEDVENE:

8    Q    The soil samples that you analyzed, is it correct,

9    came from two different locations, one from the Bravo Ranch

10   area, and the other is the area of Primavera Park that you

11   have told us about?

12   A    I'm not sure exactly what you are asking.  The soil

13   standards that I have discussed represent two general

14   areas:  Primavera Park and this Bravo Ranch.  They are not

15   the only soil standards that I examined in the case.

16   They're actually a few hundred that there were examined.

17           I did draw a conclusion that the two soil samples

18   off of Camarena were examined and compared to a specific

19   location on the south side of Primavera Park.  That was the

20   identification, they matched.

21           They certainly did not match Bravo Ranch.  They're

22   grossly dissimilar.  There is no confusing it.  But I also

23   examined hundreds of other soil samples around the

24   Primavera Park, around Guadalajara, the north side of the

25   park, the south side of the park, in town, out of town,

1    trying to localize the area that Camarena's body had been

2    buried.

3    Q    And was it your conclusion that his body had been

4    buried or placed in two separate locations, one at

5    Primavera Park around the area that you described, and the

6    other in the Bravo Ranch area?

7    A    Yes, with qualifications.  That conclusion was not

8    reached just from the forensic mineralogy aspect.  The

9    forensic mineralogy aspect was borne up by the

10   identification of the soil at Primavera Park.

11         I had knowledge imparted to me by other FBI agents

12   that he had been found in Bravo Ranch, but there was

13   nothing to indicate, other than his physical presence, that

14   he had been buried down there.  He was found on top of the

15   ground, so I know he was there.  There is no evidence tying

16   him there from the soils.

17   Q    So in summary then, from what you --

18         THE COURT:  We don't need to summarize, Counsel.

19   The witness' answer is clear.  If you have another

20   question, you may ask it.

21         MR. MEDVENE:  Thank you very much.

22                       CROSS-EXAMINATION

23   BY MR. RUBIN:

24   Q    Agent Rawalt, first I'd like to clarify the dates of

25   your searches of 881 Lope de Vega.

361

1        The first time you searched it was on April 12th

2   of 1985; is that correct?

3   A    Yes.

4   Q    And then the next day you went back again, so you

5   searched on April 13th of 1985?

6   A    That is correct.

7   Q    And then the third time you searched it was on June

8   24th, 1985?

9   A    The actual search was on the 25th.  I went to

10  Guadalajara on the 24th, but the search commenced on the

11  25th.

12  Q    Those are the only searches that you did of that

13  location, those three dates?

14  A    I'm trying to remember if the second time we went back

15  the next morning to pick anything up.

16        There was a search conducted on the 26th also of

17  June.

18  Q    Okay.

19  A    Of 1985.

20  Q    Now, the syringe, could you look at Government's

21  Exhibit 57?

22  A    Yes, sir.

23  Q    And that's a syringe?

24  A    It's a syringe contained in a syringe container.

25  Q    Okay.

362

1   A    As well as some miscellaneous paper items.

2   Q    Now, that was found in the bathroom of the guest

3   house; is that correct?

4   A    As I identified the building as the guest house, yes.

5   Q    That residence has a guest house and a separate

6   residence, larger main house?

7   A    Among other structures, yes.

8   Q    Okay.  And those are completely detached units, the

9   guest house and the residence; is that correct?

10  A    That is correct.

11  Q    Now, during your searches, you also found another

12  syringe, did you not?

13  A    I did.

14  Q    That was out by the tennis court?

15  A    Yes.

16  Q    And as part of your search, did you pack up that

17  syringe and send it off to the laboratory?

18  A    I did.

19  Q    Now looking at Exhibit 45, the vacuum sweepings you

20  identified.

21  A    Yes, sir.

22  Q    You indicated that that was found in the back bedroom

23  of the residence at 881 Lope de Vega?

24  A    That is correct.  The residence that is farthest from

25  the front door, farthest from Lope de Vega Street.

363

Q     So now when you use the term "residence," you mean the main house?

A     That is correct.

Q     So Exhibit 45 was found in the main house and 57 was found in a separate guest house bathroom?

A     That is correct.

Q     Now during which search did that pool cleaning incident occur?

A     That was the initial search in April of 1985.  That would have been on the 12th.

Q     Was it your conclusion on the basis of that incident and what you were witnessing, that the Mexican Police and authorities were trying to mislead you or keep evidence from you?

A     It was my conclusion, yes.

Q     What was the day that you found the syringe in the guest house?  During which search?

A     That would have been April 12, 1985, the first night that we got there.

Q     And that syringe, was it opened and exposed in the guest bathroom on the floor?

A     Yes.  There is a photograph of where it was laying at the time that I found it.

Q     It wasn't difficult to find, was it?  It was right there as you walked in, you saw it?

364

1    A    It was laying against the wall.  Adjacent to the wall.

2    Q    Easy to see, though?

3    A    Yes.

4    Q    The license plate that you eventually obtained, what

5    was the number of the license plate?

6    A    May I read it from the photograph?  I don't have a

7    specific recollection of it.

8    Q    Would that help you refresh your memory?

9    A    It would.  The license plate bore the Jalisco, Mexico,

10   letters, 1984-1985, with the specific identifier of J as in

11   John, E as in Edward, M as in Mary, 786.  JEM786.

12   Q    Now, was it the April 12th or April 13th that you

13   searched the residence?

14   A    Both.

15   Q    During that period of time, do you recall seeing any

16   plastic bags in any of the rooms?

17   A    Yes.

18   Q    Where was that?

19   A    In one of the bedrooms of the main house, on a shelf.

20   Q    That was in the main house on a shelf?

21   A    Yes.

22   Q    And at that time on April 13th, did you also do a

23   search of a vehicle?

24   A    Yes, I assisted in the search of the vehicle.

25   Q    Okay.  How many vehicles did you search?

365

1    A    On that occasion, one.

2    Q    On other occasions?

3    A    On the second trip, the June trip, I was -- I assisted

4    in the removal of several items from a vehicle that had

5    been located at another place in Guadalajara, unrelated to

6    this vehicle at 881 Lope de Vega.

7    Q    At 881 Lope de Vega you only searched one vehicle?

8    A    That is correct.

9         MR. RUBIN:  No further questions.  Thank you.

10        THE COURT:  Any redirect?

11        MR. CARLTON:  Your Honor, I would move the

12   admission of Exhibits 47-A, B, 44 and 45.

13        THE COURT:  They may be admitted.

14      (Plaintiff's Exhibits 44, 45, 47-A, 47-B received.)

15                  REDIRECT EXAMINATION

16   BY MR. CARLTON:

17   Q    Agent Rawalt, did the soil samples obtained from Agent

18   Camarena's body match any of the other hundreds of samples

19   that you had available to you?

20   A    They did not.

21        MR. CARLTON:  Nothing further.

22        THE COURT:  You may step down.

23        MR. MEDVENE:  If the Court please, may I ask one

24   question?

25        THE COURT:  All right.

366

RECROSS-EXAMINATION

BY MR. MEDVENE:

Q    Did you check out who the license plate numbers

belonged to?

A    No, I did not.  I didn't have that type of contact.

Q    Fair to say, sir, that nothing from the forensic

evidence that you found, whether the sweepings, whatever,

tied to Ruben Zuno?

        MR. CARLTON:  Objection.  Lack of foundation.

Speculation.

        THE COURT:  The objection is sustained.  It's not

for the witness to characterize the effect of the evidence.

        You may step down.

        THE WITNESS:  Thank you, Your Honor.

        THE COURT:  We'll take our afternoon recess.

        THE CLERK:  Please rise.  This Court is now in

recess.

                    (Recess taken.)

        THE COURT:  Call the next witness.

        MR. CARLTON:  The government calls Michael Malone.

        THE COURT:  Swear the witness.

        THE CLERK:  Please raise your right hand.

    MICHAEL MALONE, PLAINTIFF'S WITNESS, SWORN

        THE WITNESS:  I do.

        THE CLERK:  Please be seated.

367

1    State your full name for the record and spell your

2    last name.

3        THE WITNESS:  It's Michael P. Malone.  That's

4    M-A-L-O-N-E.

5                    DIRECT EXAMINATION

6    BY MR. CARLTON:

7    Q    Mr. Malone, what is your present employment?

8    A    I'm a Special Agent of the Federal Bureau of

9    Investigation.

10    Q    What is your present assignment?

11    A    I'm the Senior Examiner of the Hairs and Fibers unit

12    of the F.B.I. Laboratory in Washington, D.C.

13    Q    How long have you been employed at the F.B.I.

14    Laboratory?

15    A    Eighteen years.

16    Q    How long have you been employed with the F.B.I.?

17    A    Twenty-two years.

18    Q    What positions have you held in the F.B.I.?

19    A    For the first four years I was a street agent in the

20    Cincinnati and New York Field Offices of the F.B.I.  Since

21    1974 I've been an Examiner in the Hairs and Fibers Unit at

22    the lab.

23    Q    What education have you had relative to the forensic

24    comparison of hairs and fibers and related materials?

25    A    I have a Bachelor of Science Degree in Biology from

368

Talson State University in Baltimore, Maryland.  A Master of Science Degree in Biology from James Madison University in Harrisonburg, Virginia.  And my first full year at the lab was training under the direct supervision of older experienced examiners, until they deemed me competent to handle cases on my own.

Q    When did you become qualified as a hair and fiber examiner with the F.B.I.?

A    In the fall of 1975.

Q    And since 1975, how many cases have you worked on in this capacity?

A    Probably around 4500.

Q    Now, you've mentioned hair and fibers and the term "related materials" has come up.  What does that mean in the course of your work?

A    The hair and fiber unit is -- well, we also work on trace evidence.  We also work on materials that are related to fibers, such as fabrics, which are composed of fibers; ropes, which are composed of fibers; and even things like adhesive tapes, which the underlying base are also composed of fibers.

Q    Have you ever published anything in this field?

A    Yes.  I have several articles published in the Law Enforcement Bulletin on this case, and other major serial murder cases that I have handled in the past.

369

1        I was selected by the National Institute of

2    Justice in 1985 to attend their conference when they were

3    putting together a manual on how to investigate a serial

4    murder crime.   I was their forensic consultant, and this

5    manual was eventually distributed to virtually every law

6    enforcement agency in the United States.

7        My articles or portions of my articles are

8    currently being used in a standard textbook of Forensic

9    Science called <u>CRIMINALISTICS, AN INTRODUCTION TO</u>

10   <u>FORENSIC SCIENCE</u>.

11   Q    Have you ever qualified to testify as an expert in

12   court in the area of comparison of hairs, fibers and

13   related materials?

14   A    To date, I've testified over 450 times in 45 states,

15   the District of Columbia, the U.S. Virgin Islands, and the

16   Island of Sipan.

17             MR. CARLTON:  Your Honor, at this time --

18             THE COURT:  It's not necessary.

19             MR. CARLTON:  All right.

20   BY MR. CARLTON:

21   Q    Agent Malone, at some point did you participate in the

22   investigation into the kidnapping of Agent Enrique

23   Camarena?

24   A    Yes, since March of '85.

25   Q    And in the course of that investigation, did you

370

1    travel to Guadalajara?

2    A    Yes, I did.

3    Q    When was the first time that you traveled to

4    Guadalajara in this investigation?

5    A    My first trip to Guadalajara was in April of '85.

6    Q    What was the purpose of that trip?

7    A    I was told that I would be processing a residence that

8    may have been used in the interrogation and torture of

9    Special Agent Camarena.

10   Q    What was that residence?

11   A    It was a residence located at 881 Lope de Vega in the

12   City of Guadalajara.

13   Q    When did you arrive in Guadalajara?

14   A    The afternoon of February 12, '85.

15   Q    Was that February or April?

16   A    I'm sorry.  April 12th, 1985.

17   Q    And when you arrived, did you go to this location, 881

18   Lope de Vega?

19   A    I briefly went by the D.E.A. Consulate to be briefed,

20   a very short briefing, and then after a short period of

21   time, I was allowed in 881 Lope de Vega.

22   Q    Did anyone accompany you?

23   A    Yes.  Special Agent Rawalt, a technician Collins, Carl

24   Collins, a fingerprint specialist, Al Rose, and agents of

25   the D.E.A.

371

Q    And what was your purpose in going there?

A    To process this residence for any evidence that might show that it may have been used to once torture or house Special Agent Camarena.

Q    What was the first thing you did when you got there?

A    The first thing I did, and it was just basically to look around.  In other words, I walked around the entire grounds and through the residence, and what I was doing was very simple.  I was just saying:  Well, if I was going to hold a prisoner, where would I do it?  And we surveyed the entire grounds, and I came up with what I called the primary site and then a secondary site.

Q    Now looking at the two charts here that are at the other end of the counsel table, do you recognize this chart here, as you look at it on the left, and I believe that's marked as Exhibit 81?

A    Yes, I had it prepared.

Q    What is that?

A    This is a chart showing the grounds, the entire grounds and main residence of 881 Lope de Vega

        MR. CARLTON:  Your Honor, Agent Malone has a laser pointer.  Can he use that to assist him?

        THE COURT:  Yes, he may.

        MR. CARLTON:  Thank you.

BY MR. CARLTON:

372

1  Q    And looking at the other chart, which is adjacent, I

2  believe this is Exhibit 82, do you recognize that?

3  A    Yes, I had it prepared.

4  Q    And what is it?

5  A    The smaller of the two charts shows just the main

6  residence at 881 Lope de Vega, the way the first floor is

7  laid out, the way the bedrooms are laid out, and the little

8  tiny chart in the upper-left corner is the top floor of the

9  residence.

10  Q    Using the laser pointer, can you please describe for

11  the ladies and gentlemen of the jury the various areas of

12  the grounds of Lope de Vega?

13          MR. RUBIN:  Your Honor, may I walk around.

14          THE COURT:  I think you will see better from there

15  when he uses the laser.  If you just wait for a minute.

16          Can't see the chart?

17          MR. RUBIN:  No.

18          THE COURT:  Turn it a little, please.

19          MR. RUBIN:  That's better.

20          THE COURT:  All right.  You can see then?

21          MR. RUBIN:  Yes.  Turn it a little bit more.

22          THE COURT:  Go ahead, please.

23          THE WITNESS:  The grounds at 881 Lope de Vega is a

24  complex of a main house, an out building, basically two

25  courtyards, and a rear area containing a tennis court.

373

1          The main house has bedrooms running along the

2    side, has the kitchen in the front, has a carport here.

3          Directly behind the main house to the rear is a

4    small out building that we labeled as the guest house.

5    Within the guest house is small enclosed rooms, and then

6    two larger storage rooms.

7          Again, to the rear of the main house is the

8    swimming pool and a patio area, and then a second covered

9    patio.   There is a walled archway separating the two

10   courtyards.   The rear grounds contain a carport right here,

11   an aviary that was supposed to hold birds, but there were

12   none when we were there.   And to the very rear of the

13   building is a tennis court here with a separate bathhouse

14   and spa.

15         And then around the entire area, right here, is a

16   wall.

17   BY MR. CARLTON:

18   Q    In the course of your work at this location, did you

19   also walk through the residence, the main residence itself?

20   A    Yes, I did.

21   Q    Did you become familiar with that?

22   A    Yes, I did.

23   Q    Using the pointer again, can you please describe for

24   the ladies and gentlemen of the jury, the various areas of

25   the main residence.

374

1   A    On the main residence there is four bedrooms down,

2   four bedrooms down, two bedrooms up.  All the bedrooms go

3   along the side of the residence.  They were numbered as

4   they start from the front door, Bedrooms 1, 2, 3, 4, being

5   four at the rear.

6        Directly opposite Bedroom 4 was a den.  There was

7   a formal dining room right at this location.  A small

8   living room here.  A hall which connected the den to the

9   rest of the house.

10        At the very front of the residence was a kitchen,

11   a very large kitchen.  To the left -- it shows on the left

12   chart better as a storage area with a carport that has a

13   gate in front.

14        The second story is basically two bedrooms here.

15   This bedroom you have to go up the stairs.  This is Bedroom

16   Number 6.  It's a bedroom, a bath, and a small landing.

17   The second bedroom cannot be accessed from the first

18   bedroom.  In other words, it's a solid wall between them.

19   To get to the second bedroom you have to go through a

20   separate set of stairs.  Up here there is Bedroom Number 5

21   which leads to an outdoor patio.

22   Q    Now, looking at this chart, Number 82, the diagram of

23   the residence, is it correct then that the front door is at

24   the bottom of the chart?

25   A    Yes.  The front door would be in this location right

375

1    here (indicating).

2    Q    I believe in the cart next to you are some photographs

3    labeled Exhibits 13-A through H.  Would you please look at

4    those.  And do you recognize those?

5    A    Yes, I do.

6    Q    What are they?

7    A    These are various photographs of Lope de Vega, 881

8    Lope de Vega.

9         MR. CARLTON:  Your Honor, may Agent Malone show

10   the first photograph to the jury?

11        THE COURT:  Yes.

12        THE WITNESS:  Government's Exhibit 13-A is a front

13   view of the residence at 881 Lope de Vega.  Of course, here

14   is the top bedroom, the top story.  To the left is the

15   carport.  Here would be the front door of the residence.

16   You're looking at a view straight on, straight on this way.

17   BY MR. CARLTON:

18   Q    Now, you mentioned that in the course of your initial

19   walk-through at this property, you identified a primary and

20   a secondary location?

21   A    Yes, we did.

22   Q    And in your opinion, these where noteworthy for what

23   reason?

24   A    Of course, being a trained investigator, I spent about

25   four years in the field, I was looking for a place, again,

376

1    that it would be logical to hold a prisoner.  To my way of

2    thinking you'd need an isolated place.  You'd need a place

3    with limited access that you could guard very easily.

4         The little out building to the rear fits those

5    criteria completely.  Again, it was isolated from the rest

6    of the house, from the rest of the grounds.

7         This room right here, labeled the guest room, has

8    very thick walls, which are completely enclosed.  The only

9    way in and out of the guest room is through the front.

10   There is a single door here and a very small window up

11   high.  The door is a heavy steel door with bars on it.

12        Again, you could hold a prisoner in there very

13   easily, and a lot of noise could go on within that room and

14   it wouldn't be heard from -- in the rest of the compound.

15        The second area that I located was the top floor

16   bedroom, labeled Bedroom Number 6.  It was locked the first

17   night that I got there, but the reason I'd like that,

18   again, is it had limited access.  The only way into that

19   room was through this one door here.  It had a landing.

20   You could put a guard here.  It would be very easy to

21   guard, and there is no exit, outside exit, from this

22   particular bedroom.

23        The one thing I did not like about it was that the

24   one window in this room overlooks the front street, 881

25   Lope de Vega, so that if there was any amount of noise in

377

1    that room it could be heard from the front street.

2    Q    Now, if you would look again to the cart to your

3    right, I believe there are some photographs marked 52-A

4    through J.

5        Do you recognize those?

6    A    Yes, I do.

7    Q    What are those?

8    A    Government's Exhibits 52-A through J are various shots

9    of both the interior and the exterior of 881 Lope de Vega.

10   Q    Would you please look specifically at 52-G and H.

11   A    Yes.

12   Q    What does 52-G depict?

13   A    52-G depicts the front of what is called the guest

14   building, that's the out building to the rear of 881 Lope

15   de Vega, showing basically the single door to the guest

16   house, the one small window there, and the storage area

17   just to the right of the guest room.

18   Q    Actually, if you would look now at 52-I and 52-J.

19        What does 52-I depict?

20   A    52-I shows the carport to the rear of the compound.

21   It's not on the diagram, but it would be located right

22   there where the pointer is.  It's a covered carport.  When

23   I arrived, a small light colored Volkswagon Atlantic was

24   parked in the carport.

25   Q    And 52-J?

1  A    52-J is just a closer shot of the Volkswagon Atlantic

2  that was parked in the carport.

3          MR. CARLTON:  All right.  Your Honor, I would move

4  the admission of 13-A through H and 52-A through J.

5          THE COURT:  They may be admitted.

6          (Plaintiff's Exhibits 13-A through H

7              and 52-A through J received.)

8  BY MR. CARLTON:

9  Q    Agent Malone, what did you do next after you completed

10 the grounds and the house at this location?

11 A    All my equipment was unloaded, and then basically I

12 started planning my crime scene search, how I was going to

13 proceed over the next couple of days.  Which area I was

14 going to do first, which area I was going to do last.  I

15 decided at that point that I would do the guest room first

16 and then proceed later on to the main residence.

17 Q    What equipment did you bring with you?

18 A    I had what is called a search vacuum.  It's a vacuum

19 cleaner especially designed to collect trace evidence, and

20 it's a very powerful hand vacuum with a canister between

21 the nozzle and the vacuum.  The canister has a filter so

22 anything collected into the vacuum is trapped in the

23 canister, and then the canister can be readily emptied and

24 a new filter can be put in.  I also had a standard crime

25 scene kit containing packaging materials, labeling

1  materials, scalpels, knives, flashlights, whatever I might

2  need to process a residence for trace evidence.

3  Q    So what was the first area you processed?

4  A    The very first area I processed was the guest room.

5  When I went in, what I did first was to remove all the

6  loose items from the guest house and the bathroom to the

7  rear, packaged those, then had one large carpet inside, so

8  large that I would not be able to vacuum it just one time,

9  I had to divide it into quadrants.  I estimated it would

10  take about four quadrants or four separate vacuumings to

11  cover the entire rug.

12  Q    What did the interior of this guest house look like?

13  A    The interior of the guest house was totally empty.  In

14  other words, there was no furniture in there at all.  It

15  had one single beige-colored carpet on the floor of the

16  guest room, which was very worn.  It was in stark contrast

17  to the walls on the interior of the guest room here, which

18  looked like they had been freshly painted.

19        The bathroom to the rear was a little unusual,

20  too, in that most of the bathroom was dirty, except for the

21  walls of the shower, which had been cleaned immaculately up

22  to a height of about, oh, six, six-and-a-half feet.

23  Q    Did you see a syringe of some sort in this bathroom?

24  A    Yes, I did.  I saw a syringe on the floor of the

25  bathroom next to one of the walls.

380

1  Q    Now, after you divided this room into quadrants, as

2  you described, what did you do next?

3  A    Vacuumed each quadrant and labeled each of these

4  vacuumings separately.

5  Q    Well, when you finish vacuuming a quadrant, what would

6  you do in order to preserve what you had vacuumed up?

7  A    What you do is, once I had, let's say the first

8  quadrant vacuumed, I would empty the canister, along with

9  the filter, into a ziplock bag, and then seal that bag, and

10 of course date and initial it.

11 Q    I believe you should find somewhere nearby Exhibits

12 53, 54 and 55.

13        MR. CARLTON:  May I have a moment, Your Honor?

14 BY MR. CARLTON:

15 Q    Looking at 53, what is that?

16 A    Government's Exhibit 53 is a small ziplock plastic bag

17 which contains the vacuum filter and vacuumings from the

18 first quadrant, Quadrant A.

19 Q    54, can you describe that?

20 A    Government's 54 is a second small ziplock bag,

21 containing again vacuum sweepings and filter from the

22 second quadrant, Quadrant B.

23 Q    And 55?

24 A    Government's Exhibit 55 is a third ziplock bag

25 containing the vacuum sweepings from the third quadrant,

381

Quadrant 52-C.

Q     Did you later have occasion to examine these vacuum sweepings for items of evidentiary value?

A     Yes, I did.

Q     Did you find anything in these exhibits?

A     Yes, I did.

Q     Find any hairs?

A     Yes, in all three.

Q     Now, did you continue after finishing your vacuuming of these quadrants, did you continue your search of the guest house and the adjoining bathroom?

A     Yes.  As I said earlier, I packaged all of the loose items in the bathroom and labeled them.

Q     After sweeping the guest house and packaging the loose items in the bathroom, what did you do next?

A     I then -- we proceeded up to the -- I proceeded up to the upper bedroom.  I was going to process that at this time, but I couldn't because the door was locked.  And I was a little cautious about opening that front door when it was locked.  I didn't know if it was going to be booby trapped or anything else.  So I decided to postpone the processing of the upper bedroom, Bedroom Number 6, but I went back and collected carpet samples that Friday night from every rug in the residence.

Q     When you say "carpet samples," did you just snip out

382

1    pieces?

2    A    Basically, yes.  I just took a carpet and cut out a

3    square of carpeting, just a few inches in area.

4    Q    Now, would you please look at what has been marked as

5    Exhibits 56 through 65 -- 56, I should say, and then 59

6    through 65.

7         Do you have 56 in front of you?

8    A    Yes, I do.

9    Q    Do you recognize that?

10   A    Yes, I do.

11   Q    What is it?

12   A    Government's Exhibit 56 is a ziplock bag.  Inside is a

13   square of carpet from the guest house rug.

14   Q    All right.  And Exhibit 59, do you recognize that?

15   A    59?

16   Q    Yes, 59.

17   A    Exhibit 59 is a small ziplock bag containing a square

18   of carpet from Bedroom Number 1, the front bedroom.

19   Q    Exhibit 60?

20   A    Exhibit 60 is a small ziplock bag containing a square

21   of carpet from the hallway of the main level.

22   Q    And Exhibit 61?

23   A    Exhibit 61 is a small ziplock bag containing a square

24   of carpet from the dining room-living room area.

25   Q    If you could just continue through Exhibit 65.

383

1    A    Government's Exhibit 62 is a small square of carpet

2    from the second bedroom on the right side, Bedroom Number

3    2.

4         Government's Exhibit 63 is a ziplock bag

5    containing a square of carpet, dark rose in color, from the

6    third bedroom, Bedroom Number 3.

7         Government's Exhibit 64 is a small pale rose

8    colored square of carpet from the last bedroom, Bedroom

9    Number 4.

10        Government's Exhibit 65 is a small square of

11   carpet from the rear den.

12   Q    What did you notice about these carpets as you were

13   obtaining the sample?

14   A    One of two things.  First of all, Bedrooms 1 and 2 had

15   the same color, a very light beige.  Three had the dark

16   rose.  Four had the light rose.

17        But the second thing I immediately noticed about

18   the rug was that they were brand new carpets.

19   Q    How could you tell that?

20   A    When you construct a carpet, basically what you are

21   doing is running the yarns, each one of the separate yarns

22   through the back and out through the backing, and then

23   eventually what you're going to do is you're going to shear

24   off the top loops of all of the carpeting to give you the

25   shear carpet.

384

1    Well, when you do that, you are going to have

2 literally millions of loose fibers on the carpeting, and

3 they usually come together in little tufts or little

4 bunches.  It will be loaded with them.  It's typical of

5 brand new carpeting, and there are so many of them that

6 normally the first couple of times you vacuum it will fill

7 your vacuum bag up immediately and you have to dump it.  So

8 it's a characteristic consistent with brand new carpeting.

9    MR. CARLTON:  Your Honor, I move the admission of

10 Exhibits 53 through 65.

11    THE COURT:  They may be admitted.

12    (Plaintiff's Exhibits 53 through 65 received.)

13 BY MR. CARLTON:

14 Q    After you collected these carpet samples, what did you

15 do next in relation to this investigation?

16 A    It was getting late in the evening about this time, so

17 we decided to knock off.

18 Q    And what did you do with these items that you had

19 collected?

20 A    They were taken by me back to the D.E.A. office in the

21 U.S. Consulate and put into the safe.

22 Q    Did you return to the Lope de Vega residence again?

23 A    Yes, early the next morning.

24 Q    Who were you accompanied by?

25 A    Again, this was a Saturday morning, I was accompanied

385

1    by Special Agent Rawalt, Technician Collins, Technician

2    Rose, Frank Fiatta, our F.B.I. Legal Attache was there also

3    at this time, as were several D.E.A. agents.

4    Q    What was the first thing you did when you arrived

5    back?

6    A    The first thing we did, or the first thing I did, was

7    I wanted to finish the processing of the upstairs bedroom,

8    that's Bedroom Number 6.  By the time I got to the

9    residence, the squad of Federalis that were housed in

10    the -- in the residence there had gotten the door to the

11    bedroom open so that we were able to process it.

12            As I entered the upstairs bedroom, I saw a single

13    rug, a single bed on the rug, with bed clothing, and a

14    pillow, and I also saw two entire walls covered with gun

15    racks.

16    Q    Did you seize any items of evidentiary value from this

17    location?

18    A    Yes.  The first thing I did was to seize all of the

19    bed clothing from the bed and from the pillow case and

20    package this.

21    Q    Now, if you would look at what has been marked as

22    Exhibits 66 and 67.  67 may be in that stack of photographs

23    that are just in front of you.  Agent Malone, in front of

24    you.

25    A    I'm sorry.

386

1   Q     The stack of photographs on the counter.

2         If not, let's just proceed with 66.  What is

3   Exhibit 66?

4   A     Government's Exhibit 66 is the pillow case from the

5   single bed from Bedroom Number 6, the upstairs bedroom.

6   It's basically a light blue pillow case with white polka

7   dots and a floral design of leaves and purple flowers.

8   Q     Now, after seizing this pillow case, what did you do

9   next in relation to your examination of this room?

10  A     I broke the rug from the upstairs bedroom into two

11  quadrants.  It was not nearly as big as the rug in the

12  guest room, so I could cover it with two vacuumings,

13  quadrants one and two, and proceeded to vacuum each

14  separately.

15  Q     At some point on this date, did you examine the

16  Volkswagon automobile again?

17  A     Yes.  After I had finished with Bedroom Number 6, my

18  next area of interest was the Volkswagon Atlantic parked

19  underneath the carport.

20  Q     What was it that you did with that automobile first?

21  A     Well, the first thing I had to do, it was parked

22  underneath the carport, located right here (indicating).

23  It was pretty dark.  Also, it was not near any source of

24  electricity.  We had rigged some electrical lines earlier.

25        So myself and several of the other agents

387

1    physically pushed the Volkswagon Atlantic from here to

2    about this area right here (indicating), where, first of

3    all, it was in the bright sunlight and we could see.

4    Second of all, it was close enough that I could hook up my

5    vacuum to the electrical line that we had rigged up.

6    Q    Now, I believe in the book of exhibits should be

7    Exhibits 68-A and B.    Perhaps those are on the cart.

8    A    Yes.

9    Q    Do you recognize those?

10   A    Yes, I do.

11   Q    What are they?

12   A    Government's Exhibit 68-A is the Volkswagon Atlantic,

13   which by this time had been pushed into the front of the

14   rear courtyard, and that's basically a photograph of myself

15   processing the Atlantic for hairs and fibers.

16   Q    And 68-B?

17   A    68-B is a closer shot of the Volkswagon Atlantic in

18   the rear courtyard.  By this time, I had finished my

19   processing and this is a photograph of the two fingerprint

20   technicians who are processing the Atlantic for

21   fingerprints.

22   Q    Now, what was it you did in relation to processing

23   this automobile?

24   A    When you do a residence, a car, or anything else, the

25   hair and fiber trace evidence work always has to be done

388

1    first.  The reason being you want to keep the contamination

2    down as low as possible.  So what I did was I went in,

3    opened all the doors of the car, opened the trunk, opened

4    the hood.  The first thing I did was remove all the loose

5    items from the interior of the car, from the trunk,

6    packaged these separately so that later on they could be

7    processed for fingerprints.

8              What I did then was I broke the car into, again,

9    five different areas that I was going to look at.  The

10   front floor, front seat, rear floor, rear seat, and trunk

11   area, and proceeded to vacuum each of these areas

12   separately and, of course, put the vacuum sweepings in

13   ziplock bags and seal them.

14   Q    Would you please look at what has been marked as

15   Exhibits 69 and 70.

16            Do you recognize those?

17   A    Yes, I do.

18   Q    What are they?  What is 69?

19   A    Government's Exhibit 69 is a small ziplock bag.  This

20   contains the filter and the vacuum sweepings from the front

21   floor of the Volkswagon.

22   Q    And 70?

23   A    Government's Exhibit 70 is a second small ziplock bag.

24   This contains the vacuum sweepings from the rear floor of

25   the Volkswagon.

389

1    Q    Now after completing your examination of the

2    Volkswagon automobile, what did you do next in relation to

3    your investigation?

4    A    I had to turn the car over to the fingerprint

5    specialist for them to finish.  I kind of observed them for

6    a while, and eventually it became late in the morning of

7    the second day, so I decided to -- we decided to break for

8    lunch.

9    Q    Did this automobile have a license plate on it?

10   A    No.  One of the first things we noticed is both plates

11   were gone, the front and back plates were gone, but there

12   were two wires on the front bumper that looked like maybe

13   the plate had been wired to the front.

14   Q    At some point during this day, did you take all of the

15   items of evidence that had been collected at this location

16   away?

17   A    About this time, I had four or five large clear

18   plastic bags of evidence, which where all placed on the

19   rear porch area here of Lope de Vega.  Eventually yes, they

20   would be taken away.

21   Q    How was your examination of Lope de Vega on this date

22   terminated?

23   A    Again, it was around noon.  We had broken for lunch,

24   but for the first time since we had been there in almost a

25   day and a half, we were by ourselves.  And when I say "we,"

390

1    I'm talking about Special Agent Rawalt and myself.

2          Previous to this, we had always had a contingent

3    of federalis kind of babysitting us.  I mean, right on us,

4    observing everything we were doing.  But by the morning of

5    the second day, you know, they got bored or whatever, but

6    they weren't around us anymore.  They kind of drifted away

7    up to the main residence.

8          So Special Agent Rawalt and myself for the first

9    time found us completely by ourselves.  We had not done a

10   real thorough ground search at this point because the

11   previous night it had gotten dark so we thought it was a

12   good chance for us to run around or walk around unimpeded

13   and do a thorough ground search of 881 Lope de Vega.

14   Q    Did you do that?

15   A    Yes.  We wandered all over the residence, looking

16   behind bushes, in the aviary, wherever we thought we might

17   find something, in the pool.  Ended up to the very rear of

18   the compound in the tennis court area, and began slowly

19   walking around the tennis court.

20   Q    Did you find something of interest and significance to

21   you there?

22   A    Yes, we did.  It was a very sunny day, and as we would

23   walk -- this tennis court had metal grates, drainage grates

24   or drains on each side of the tennis court.  Each drain had

25   a heavy metal grate over the top of it, and as we went by

391

1    we would look into the grates, and as we were walking by

2    one -- the grate on the left-hand -- upper left-hand side

3    of the tennis court, we kind of noticed a flash of color of

4    blue or gold.

5    Q    What did you do next?

6    A    What we did then was just go over and look straight

7    down through the metal grate, into the bottom of the drain

8    and observed what appeared to be a folded up license plate.

9    Q    Did you go to obtain assistance from the Mexican

10   Police to recover this license plate?

11   A    Well, first we tried to get the grate out, and it was,

12   of course, secured in the macadam, in the asphalt.  So I

13   said, "Well, maybe we are going to need something like a

14   crow bar."

15         So Special Agent Rawalt stayed there with the

16   plate and I wandered up to the main house here where all

17   the Federalis were, and through one of the D.E.A. agents

18   asked them for a crow bar.

19   Q    What was the response?

20   A    Well, first of all they wanted to know why I needed a

21   crow bar.  It kind of peaked their interest.  They said,

22   no, they don't have a crow bar.  I left the main residence,

23   went back to the tennis court, but by this time I had the

24   entire squad of Federalis following me back out to the

25   tennis court.  I guess they were interested in why I was

392

1    going to need a crow bar.

2    Q    At some point here, did you decide you'd better take

3    the evidence back to the D.E.A. office?

4    A    Well, at this particular point when I got back to the

5    tennis place, Rawalt, Special Agent Rawalt, had found a

6    heavy piece of wire, and by looping it under the grate, had

7    managed to actually pull the iron grate out of the macadam,

8    and was staring down into the bottom of the drain, and

9    there, indeed, was a folded up license plate.

10        At this point, the Federalis also observed the

11   license plate and became very, very agitated and upset.

12   And the D.E.A. agent told us one of them was going to phone

13   his boss.  Said not to take the plate, and not to do any

14   further searching.

15        Of course, by that time I had five, four or five

16   bags of evidence up on the covered patio.  I was kind of

17   having nightmares about losing that evidence.  So I kind of

18   came up with a little plan.

19   Q    Did you take the evidence back to the D.E.A. office at

20   that point?

21   A    Yes, I did.  While the Federalis were around the

22   license plate and Collins and Rawalt were processing it and

23   photographing it, myself and another agent, D.E.A. agent,

24   kind of snuck out from the tennis court up to the main

25   porch behind the main residence.

393

1       The D.E.A. agent went and got the D.E.A. pickup

2   truck, backed it into the carport area, at the same time I

3   grabbed the four or five bags of evidence, threw them into

4   the back of the pickup truck, and we sped away to the

5   D.E.A. office in the U.S. Consulate where we secured all of

6   the bags of evidence in the vault.

7   Q    Now, was this evidence eventually returned to the

8   F.B.I. Laboratory in Washington, D.C.?

9   A    Yes, it was.

10  Q    Did you receive it there?

11  A    Yes, I did.

12  Q    Was it in the same condition as you left it in

13  Guadalajara?

14  A    Absolutely.

15  Q    If you would, please, look at Exhibits 44 and 45.

16        Do you recognize those?

17  A    Yes, I do.

18  Q    What are they?

19  A    Exhibits 44 and 45 -- actually, it would be more

20  logical to start with 45.  Exhibit 45 is vacuum sweepings

21  from the rear-most bedroom, Bedroom Number 4, which are

22  secured in a ziplock plastic bag.

23        Government's Exhibit 44 contains all of the slides

24  of the hairs that were removed from Government's Exhibit

25  45.

394

1   Q    Now, did you have occasion to examine the contents of

2   Exhibit 45?

3   A    Yes, I did.

4   Q    Did you find in those contents hairs of evidentiary

5   significance to this case?

6   A    Yes, I did.

7   Q    Would you please look at what has been marked as

8   Exhibits 40 and 41.

9        Do you recognize those?

10  A    Yes, I do.

11  Q    Did you receive those at the FBI Laboratory?

12  A    Yes, I did.

13  Q    Did you collect hairs from them?

14  A    Yes, I did.

15  Q    Did you analyze those hairs relative to this

16  investigation?

17  A    Yes, I did.

18  Q    All right.  Now, at some point, did you return to

19  Guadalajara in November of 1985?

20  A    Yes, I did.

21  Q    What was the purpose of this return trip?

22  A    On the very first trip to Guadalajara back in April of

23  '85, several items of evidence had been removed from 881

24  Lope de Vega before we got to the residence.

25       Through a series of protracted negotiations, the

395

1    Mexican Government had agreed to turn over those items of

2    evidence to us so that we could at least look at them or

3    analyze them for trace evidence, and that was the purpose

4    of my trip in November, to go down there and either try and

5    take these items or at least process them.

6    Q    And did you arrive on November 26?

7    A    Yes, I did.

8    Q    Where did you go when you arrived?

9         THE COURT:  Counsel, let's just get him on to what

10   he ultimately did there.

11        Did you go examine this evidence at some point in

12   time, sir?

13        THE WITNESS:  Yes, Your Honor.

14        THE COURT:  Will you tell us about that.

15        THE WITNESS:  When I arrived at the Office of the

16   Federal Prosecutor, I was basically given four items of

17   evidence that had been seized previously by the Federalis.

18   I was given a small sample of a burial sheet.

19   BY MR. CARLTON:

20   Q    Well, why don't we look at some exhibits before we go

21   any farther.  Exhibits 71 through 75.

22        What is Exhibit 71?

23   A    Government's Exhibit 71 is a ziplock bag containing a

24   small sample, a very soiled sample of the Camarena burial

25   sheet.

396

1    Q    Did you recognize the pattern on that burial sheet?

2    A    Yes, I did.  It was -- I had recognized it from the

3    pillow case that I had seized previously.  It was exactly

4    the same pattern and design as the previous pillow case.

5    The only difference was there was a slight difference in

6    color.

7    Q    Was the odor and the texture of that piece of evidence

8    significant to you?

9    A    Yes.  The odor and the texture were significant of

10   decomposing body fluids.  I've smelled it hundreds of

11   times.  Nothing like it.  And it was just absolutely soaked

12   in it.

13   Q    Okay.  Exhibit 72, do you recognize that?

14   A    Yes.  Government's Exhibit 72 is a small ziplock bag.

15   This contains the debris from the burial sheet, Exhibit 71.

16   Q    And Exhibit 73?

17   A    Government's Exhibit 73 is a small piece of a pillow

18   case that was represented as coming out of Bedroom Number 3

19   of 881 Lope de Vega.

20   Q    Again, is the pattern on that piece of fabric familiar

21   to you?

22   A    The pattern on Government's Exhibit 73, the pillow

23   case from Bedroom 3, is exactly the same as the pillow case

24   I removed from Bedroom 6, as well as the design and the

25   color.

397

1    Q    And Exhibit 74?

2    A    Government's Exhibit 74 is a small piece of a rope

3    that I was given that was represented to come out of the

4    covered patio of 881 Lope de Vega.

5    Q    Did that rope have the same odor and texture as did

6    the piece of the sheet?

7    A    Yes.  Again, it was heavily stained and it had the

8    same texture and odor of decomposing body fluids.

9    Q    How about Exhibit 75?

10    A    Government's Exhibit 75 -- oh, I'm sorry --

11    Government's Exhibit 74 was represented as coming from

12    Special Agent Camarena.  This was the soiled rope.

13         The second rope I was given, Government's Exhibit

14    75, is the rope represented as coming from Bedroom 3.  This

15    was completely clean and wiped.

16    Q    Did you take custody of all of these items of

17    evidence?

18    A    Yes, I did.

19    Q    Did you return them to the FBI Laboratory in

20    Washington, D.C.?

21    A    Yes, I did.

22    Q    At some point, did you have occasion to meet with an

23    individual named Rene Verdugo?

24    A    Yes, I did.

25    Q    Do you recall when that was?

398

A    Yes.  I met Mr. Verdugo on January 31st, 1986.

Q    Where was that?

A    It was in the cell in the Marshal's Office in the U.S. District Court in Washington, D.C.

Q    What was your purpose in meeting with him then?

A    My purpose was to take head and pubic samples from Mr. Verdugo.

Q    Would you please look at what has been marked as Exhibit 76.

          Do you recognize that?

A    Yes.  Government's Exhibit 76 is the ziplock bag containing the portion of the head hair sample of Mr. Verdugo that I did not mount on slides.

Q    Now, at some point, did you receive some items connected with this investigation through the F.B.I. mail?

A    Yes, I did.

Q    Would you please look at Exhibits 42-A through G.

A    Yes.

Q    Looking at 42-A, what is that?

A    Government's Exhibit 42-A is the F.B.I. mailing envelope which initially contained the evidence.

Q    I should say:  Are all of these exhibits the items that you received in the mail?

A    Yes, they are.

Q    Okay.  42-B?

399

1    A    42-B is the D.E.A. envelope which was found inside

2    42-A.

3    Q    42-C?

4    A    42-C is a portion of the blindfold adhesive that was

5    inside of 42-A and B.

6    Q    And 42-D?

7    A    42-D is a sample of some of the literally hundreds of

8    dark head hairs that I removed from the blindfold.

9    Q    42-E?

10   A    42-E is a piece of cordage, heavily stained, and with

11   an odor that was in with the blindfold.

12   Q    42-F?

13   A    42-F is the remaining portion of the adhesive tape

14   blindfold.

15   Q    And did that blindfold also have the same

16   characteristic odor and texture?

17   A    Yes.  Very heavily stained, very strong odor.

18   Q    42-G?

19   A    42-G is a shopping -- plastic shopping bag that all of

20   the blindfold and rope had initially been in.

21   Q    Would you please look at what has been marked as

22   Exhibits 160 and 161.

23        Do you recognize those?

24        At some point during your investigation, Agent

25   Malone, did you receive through the F.B.I. mail head hairs

400

1  represented to be the head hairs of Serjio Espino-Verdin?

2  A    Yes, I did.

3  Q    And did you later analyze those hairs in relation to

4  this investigation?

5  A    Yes, I did.

6  Q    Do you have Exhibits 50-A through H?

7  A    Yes, I do.

8  Q    Do you recognize those?

9  A    Yes, I do.

10  Q    What are they?

11  A    Government's Exhibits 50-A through H is -- consists of

12  five heat sealed plastic bags -- let's see, one, two,

13  three, four, five, six, seven heat sealed plastic bags

14  which originally contained head hair samples from Mr.

15  Matta-Ballesteros.

16  Q    Now, with the exception of the head hairs of Mr.

17  Espino-Verdin, was all of this evidence that you've just

18  described, consist of all of the evidentiary items falling

19  within the category of hair, fibers and related materials

20  that are of significance to this case?

21  A    Yes.

22  Q    Now, can you describe for the ladies and gentlemen of

23  the jury what it is you do with the hair once you have

24  located it and want to examine it and compare it in an

25  investigation?

401

1    A    What you're having to do with a hair is very, very

2    simple.  It's the same thing you are trying to do with any

3    kind of Forensic Science.  You're taking an unknown

4    commodity, comparing it against the known commodity, and

5    you're trying to do one of two things.  Say either this

6    unknown is different from the known.  The unknown did not

7    come from the known.  Or the second thing is, this unknown

8    commodity is the same as or matches or has the same

9    characteristics as the known, and therefore, this unknown

10    is consistent with coming from the known.

11         The way you do that with hairs, with the state of

12    the art the way it is today, is a three-part microscopic

13    examination of those hairs.

14    Q    Now, what is it that you look for when you are

15    comparing one hair to another?

16    A    What you are looking for are individual microscopic

17    characteristics within the hair which are going to tell you

18    certain things about that hair.

19    Q    Now, you prepared a chart that describes these

20    characteristics or illustrates them?

21    A    Yes, I have.

22    Q    Is that chart on the easel just next to you?

23    A    Yes, it is.

24         MR. CARLTON:  Your Honor, may Mr. Malone step over

25    there and point to the chart as he describes the

402

1    characteristics of the hair?

2                THE COURT:  Yes.

3    BY MR. CARLTON:

4    Q    I believe that chart has been marked as Exhibit 78.

5    A    That is correct, yes.

6                I will try to give you the abbreviated version of

7    the -- what I do.  Okay.  What I'm doing is comparing an

8    unknown to a known, and I do it with three different

9    microscopes.

10               What I'm going to do is, I'm going to put the

11   entire hair on a low power stereoscope, look at the three

12   regions, the root, the shaft, and the tip, and basically

13   it's going to tell me certain things about the hair

14   immediately.  If it's animal hair or human.

15               THE COURT:  Will the witness stand on the other

16   side of the board so counsel can hear you also.

17               THE WITNESS:  From the low power scope, the first

18   thing I can tell is a human hair or an animal hair.  If

19   it's an animal hair, I can tell you what kind of an animal.

20               If it's human hair, I can tell you certain things.

21   First, race, one of the three major races.

22               Second thing I can tell you is body area, one of

23   the seven specific areas of your body:  Head hair, pubic

24   hair, et cetera.

25               Normally, I can look at the root end and tell you

403

1   how this hair came out, whether it came out naturally, as

2   result of shedding process, or whether force was applied to

3   remove the hair.

4        Look at the tip, tell you whether it's been cut,

5   broken or just natural tip.  I can look at the shaft and

6   tell you whether anything has been done to that hair.

7   Whether it's been bleached, dyed or permed or anything like

8   that.

9        The characteristics that are actually going to

10  make your hair different from mine are very tiny.  To see

11  them, I've got to use a much more powerful microscope, so I

12  take it off the first microscope, put it on a second

13  microscope, a high power research microscope, and then what

14  I'm going to do is look inside the hair shafts, so that's

15  what the bottom diagram is.  It's the cross section or

16  length-wise of the hair.

17       By looking at the three regions, the outer region,

18  the middle, and this third region, I'm going to identify

19  the characteristic in that hair.  It may be the scales on

20  the outside.  It might be what are called the medullary

21  cells on the inside, or the pigment in the area called the

22  cortex.

23       And, what I'm going to do is, I'm going to catalog

24  and identify all of the characteristics I can find.  I've

25  got to find at least 15 of these microscopic

1    characteristics, but if I can't find 15, I will say the

2    hair is no good.    Most normal or average hair will have

3    around 20.

4         Well, the reason these characteristics are so

5    important is because they are arranged slightly differently

6    in almost everybody's hair.  I don't want to mislead you.

7    It never goes to the point of a fingerprint.  I can never

8    take the person's hair and say it comes from this person

9    and nobody else in the world.

10         But in 18 years of doing this, I have looked at

11    literally thousands and thousands of hairs, I have only had

12    three occasions so far where I have had hair from two

13    different people I couldn't tell apart.

14         This is going to lead us to the third and last

15    step.  I'm going to put my unknown hair and compare it

16    against my known.  That is done on a third microscope

17    that's called a comparison microscope.  And really what I'm

18    doing is looking at the two hairs.  The characteristics and

19    how they are arranged of the two hairs.  When I do this, I

20    come up with one of two conclusions about the unknown hair.

21         First of all, if there is one significant

22    difference between the unknown hair and the known, I can

23    positively eliminate somebody.  So I can say, "Yes, this

24    hair did not come from this person."

25         Second conclusion would be, if all the

405

1   characteristics are the same, the same arrangement, so that

2   the two hairs are what we call microscopically

3   indistinguishable, cannot tell them apart, I then say the

4   unknown hair matches the hairs of this particular

5   individual and this hair is consistent with coming from

6   that person.

7   Q    Did you have occasion in the course of this

8   investigation to compare unknown hairs to the hairs of

9   Agent Camarena's?

10  A    Yes, I did.

11  Q    And, for instance, did you obtain some hairs from the

12  items recovered from a Mercury Marquis, Exhibit 40 and 41?

13  A    Yes, I did.

14  Q    Exhibit 40 was the floormat.  Did you subject that to

15  some process to obtain the hairs?

16  A    Yes, I did.  I removed the hairs and examined them.

17  Q    Were hairs identified in the vacuum sweepings as well?

18  A    Yes, they were.

19  Q    And those hairs were compared to the known hairs of

20  Agent Camarena?

21  A    Yes, they were.

22  Q    And did you come to some sort of conclusion as to

23  whether they were consistent?

24  A    Yes.  I actually found two hairs, one from the mat,

25  one from the vacuum sweepings, dark brown head hairs.

406

1    These head hairs exhibited exactly the same characteristics

2    as did the head hairs of Special Agent Camarena.  I

3    concluded that the two hairs from the mat and the vacuum

4    sweeping of the Mercury were consistent with coming from

5    Special Agent Camarena.

6    Q    Now, there is a chart up on the easel.  I believe

7    that's marked as Exhibit 79.

8    A    That is correct.

9    Q    And what does that chart represent?

10   A    Exhibit 79 is a chart showing some photographs of the

11   two hairs, the hair I examined from the Mercury, in

12   particular being from the floormat, and as compared to the

13   head hair sample of Special Agent Camarena.

14        We have three views of the same hair from the

15   floormat on the left, three views of Special Agent

16   Camarena's hairs.  They exhibited the exact same

17   characteristics in every case.  That's what led me to

18   conclude the hair from the mat was consistent with coming

19   from him.

20   Q    You arrived at the same conclusion in regard to a hair

21   from the vacuum sweepings?

22   A    Yes, sir, I did.

23   Q    Did you also obtain and compare from the vacuum

24   sweepings of the guest house hairs that you compared with

25   the known hairs of Agent Camarena?

407

1  A    Yes, I did.

2  Q    And did any of those hairs match the known hairs of

3  Agent Camarena?

4  A    Yes.  There were two hairs, one in Quadrant A and one

5  in Quadrant B.  This shows one of the two.  Again, I found

6  a brown head hair in the sweepings from the guest house,

7  compared it against the head hair of Special Agent

8  Camarena.  He had a large amount of variation in his head

9  hair.

10        Found that the two hairs from the guest house, and

11  again this is three views of one hair, compared against

12  three views of Special Agent Camarena's hair, found that

13  the hairs from the guest house exhibited the same

14  characteristics as did the head hairs of Special Agent

15  Camarena.  And the two hairs from the guest house were

16  consistent with coming from him.

17  Q    Was there anything unusual in either of these hairs

18  from the guest house?

19  A    Yes.  One of the hairs had been forcibly removed or

20  force had been applied to the hair.

21  Q    How could you tell that?

22  A    The basal end, and that's the end toward the root, had

23  no root.  The base was gone, had literally been snapped

24  off.  It had kind of a frayed appearance at the basal end

25  showing me that force had been applied to the hair.

408

1    Q    And did you find hairs in the vacuum sweepings from

2    the Volkswagon Atlantic, Exhibits 69 and 70, that you

3    compared to the hairs of Agent Camarena?

4    A    Yes, actually in two places.

5    Q    And did any of these hairs match?

6    A    Yes.  In two of the vacuum sweepings from the

7    Volkswagon Atlantic, one from the front and one from the

8    rear, one hair being in each set of vacuum sweepings, I

9    found a forcibly removed head hair.  Again, this is a head

10   hair which is a little bit different in that it has been

11   sun bleached.  It's the distal portion of the hair which

12   the sun has turned a kind of a reddish brown.

13          Again, it exhibited exactly the same

14   characteristics as the distal portion of Special Agent

15   Camarena's hairs.  And I concluded that the two forcibly

16   removed hairs from the Volkswagon were consistent with

17   coming from Special Agent Camarena.

18   Q    And the chart you've been pointing to is Exhibit 84-A,

19   I believe.

20   A    That is correct.

21   Q    Did you find hairs in the vacuum sweepings from the

22   bedroom four that matched the hairs of Agent Camarena?

23   A    Yes, I did.

24   Q    And the adjacent bathroom to bedroom four?

25   A    Only in the bedroom four.

409

1    Q    I'm sorry, yes.  How many?

2    A    In the vacuum sweepings from bedroom four, that's the

3    very rear bedroom, I found one, again, forcibly removed

4    dark brown head hair.  You can see the very base of the

5    root of this hair.  You can see how it's been literally

6    torn out of the follicle.

7         I looked at it.  It had exactly the same

8    microscopic characteristics as did a head hair in Special

9    Agent Camarena's sample and, therefore, I concluded that

10   the forcibly removed head hair from bedroom four was

11   consistent with coming from Special Agent Camarena.

12   Q    And, again, the chart you've been referring to has

13   been marked for identification as Exhibit 85A?

14   A    That is correct.

15   Q    Did you examine the sample of burial sheet obtained by

16   Special Agent Dillon from the Guadalajara morgue?

17   A    Yes, I did.

18   Q    Was this subjected to a scraping process?

19   A    Yes, it was.

20   Q    Did you find hairs as a result of that process that

21   you compared to the known hairs of Agent Camarena?

22   A    Yes.  On the burial sheet from the morgue, again,

23   there were dark brown head hairs which matched the hairs of

24   Special Agent Camarena.

25   Q    And, likewise, did you examine hairs found on the

410

1   blindfold Exhibit 42-C?

2   A    Yes, I did.

3   Q    And compare those to the known hairs of Agent

4   Camarena?

5   A    Yes, I did.

6   Q    Likewise, did you obtain any matches?

7   A    Yes.  On the blindfold there were literally hundreds

8   of dark brown head hairs.  I took a representative sample

9   of these hairs and all of them again matched the head hairs

10  of Special Agent Camarena.

11  Q    During the scraping process of these various items,

12  did you obtain in addition to hairs other items of

13  evidentiary value?

14  A    From the blindfold, yes.  I obtained carpet fibers.

15  Q    And were you able to compare these carpets fibers to

16  the carpet samples, the known fibers that you had obtained

17  from the location?

18  A    Yes, I did.

19  Q    Did any of those fibers match?

20  A    Yes, two different types did match.

21  Q    Can you briefly describe the process that you have to

22  go through in order to match carpet fibers?

23  A    Again, it's a microscopic examination of the carpet

24  fibers.  But we go one step further.  We have an instrument

25  that can also analyze the carpet fibers.

411

1        And very briefly, you are trying to do one of

2   three things with carpet fibers.  First of all, you are

3   trying to determine what do they look like, and you do that

4   with the microscope and just observing the microscopic

5   characteristics of the carpet fiber.

6        The second thing you can do, is determine what is

7   it made of or what kind of a fiber it is.  And I did this

8   two ways.  Basically, first of all, I did some tests, some

9   chemical tests, optical tests and identified one of the

10  fibers as a polyester and the other as a nylon.

11       And then I took it one step further.  I took both

12  of these fibers, samples of these fibers, to DuPont up in

13  Wilmington, Delaware, which probably knows more about

14  carpet fibers than anybody in the country, and they

15  identified the polyester carpet fiber as a Dacron and the

16  nylon fiber as unbranded DuPont nylon.

17       And, lastly, on one of the fibers, the polyester

18  fibers from the blindfold, it had enough dye in it, it was

19  kind of a dark rose color, that I was able to analyze the

20  dye in that fiber and compare it back to some of the fibers

21  from bedroom number three of 881 Lope de Vega.

22  Q    If we could lower that chart, and I believe there is

23  an Exhibit 87-A.  Do you recognize that?

24  A    Yes, I do.

25  Q    What does that depict?

412

1  A    Exhibit 87-A again is a chart with two columns.  On

2  the left-hand column is one of the unbranded DuPont nylon

3  carpet fibers taken off of the sweatshirt of Alfredo

4  Zavala.

5        And the right hand-column is four views of the

6  known sample of the unbranded DuPont nylon carpet fibers

7  out of the guest house carpet.

8        Again, I compared all the characteristics that I

9  could, found out that all of them matched, and concluded

10  that the fibers from the sweatshirt were consistent with

11  coming from the guest house carpet.

12  Q    If you would look at the next chart, Exhibit 88-A.

13  And what does that chart show?

14  A    Exhibit 88-A is a second fiber chart.  This shows one

15  of the light colored polyester, Dacron polyester fibers.

16  And this was taken off of the burial sheet of -- the

17  Camarena's burial sheet.

18        On the right hand column is three views of the

19  Dacron polyester fiber that would come out of Bedroom 4 and

20  the rear den area.

21        And, again, I was able to compare all of the

22  characteristics of light colored Dacron to the sheet to the

23  light colored Dacron in Bedroom 4 and the den.  And all the

24  characteristics where the same.

25        So, again, I concluded that the carpet fiber from

413

1    the sheet was consistent with coming from either Bedroom 4

2    or the rear den area.

3    Q    Looking at the next chart, Exhibit 89-B.  What does

4    that chart show?

5    A    Exhibit 89-B is the dark rose colored fiber that came

6    off of the blindfold, adhesive tape blindfold.  Again, it's

7    a Dacron polyester rose color.  It is compared against the

8    Dacron polyester from Bedroom 3 of 881 Lope de Vega.

9         I was able to do all of the microscopic

10   characteristics.  And, in addition, I was able to analyze

11   the dyes in both of the unknown and known carpet fibers,

12   and they all matched.

13        So basically I concluded that the rose colored

14   carpet fiber from the blindfold adhesive was consistent

15   with coming from Bedroom 3 of 881 Lope de Vega.

16   Q    Now, in the course of your investigation did you also

17   compare these various items of fabric that you've

18   described?

19   A    Yes, I did.

20   Q    That would be a sample of the burial sheet obtained

21   from the morgue, piece of the burial sheet obtained by you

22   from the Mexican police, a pillow case found by you in an

23   upstairs bedroom, and a sample of a pillow case obtained

24   from the Mexican police; correct?

25   A    That is correct.

414

1    Q    Now, what was it you did in comparing these samples of

2    fabric?

3    A    When you do a fabric exam, what you are doing is

4    basically four things.  You are determining the color of

5    the fabric, the composition, what it is made of, the

6    construction, how is it constructed, and finally the design

7    that's on the fabric, comparing all four of these.

8    Q    And what is the comparison process?  What do you do?

9         MR. BLANCARTE:  Your Honor, there is no dispute as

10   to any of this evidence.  I don't know if this is

11   necessary.

12        THE COURT:  Go ahead, Counsel.

13   BY MR. CARLTON:

14   Q    Well, in the course of your comparison what

15   conclusions did you arrive at?

16   A    Basically, that the pillow case from the upstairs

17   bedroom, the pillow case represented as Bedroom 3, and the

18   fabric from the burial sheet had exactly the same color,

19   that was the light blue with the white polka dots, had

20   exactly the same construction, had exactly the same

21   composition, and had exactly the same design.  I concluded

22   that the two pillow cases and the burial sheet where

23   consistent with coming from a common source, such as a set

24   that you might buy.

25   Q    Now did you also have occasion to compare the various

415

1    samples of rope bindings and rope that were obtained in

2    this investigation?

3    A    Yes, I did.

4    Q    And let me, just to point out for the record, that the

5    chart that you were referring to I believe is Exhibit 92-A;

6    is that correct?

7    A    Yes.

8    Q    And the samples of rope that you compared were several

9    samples of rope obtained by Agent Dillon in the morgue?

10   Sample of rope obtained by you from the Mexican police in

11   Guadalajara which was soiled, and then a cleaned sample of

12   rope; correct?

13   A    That is correct.

14   Q    And was there anything about these samples of rope

15   that was significant to you?

16   A    Yes.  The two soiled samples and the clean sample,

17   again, they had all the same construction, composition,

18   diameter and color.  But they had one very unusual feature

19   in that the tracer of the rope, and the tracer of the rope

20   is a fiber that you put right down the middle that you can

21   braid or wind your other pieces of rope around, was made of

22   a very highly unusual fiber called an undrawn polyester.

23   Q    Did you come to some conclusion as a result of your

24   comparison?

25   A    Yes.  The clean rope and the two soiled ropes were

416

1    consistent with coming from the same source.

2    Q    And did you also have occasion to compare various

3    items of tape that were obtained in the course of the

4    investigation?

5    A    Yes, I did.

6    Q    Those items being a sample obtained by Agent Dillon at

7    the morgue and then the blindfold received by you through

8    the F.B.I. mail?

9    A    Yes, I did.

10   Q    What did you compare?

11   A    The sample that was received by me from the adhesive

12   tape blindfold and the sample that Agent Dillon took at the

13   autopsy at the Guadalajara morgue were exactly the same in

14   color, composition, construction and diameter.  And I

15   concluded that the tape from the blindfold was consistent

16   with coming from the same source that Agent Dillon had

17   taken from the morgue.

18   Q    Now, based upon the analysis that you performed in

19   these five separate areas of forensic comparison analysis,

20   that's hairs, fibers, fabric, cordage and tape, did you

21   reach a conclusion as to the association of Special Agent

22   Camarena and the residence at 881 Lope de Vega?

23   A    Yes, I did.  I concluded that at some point in time

24   Special Agent Camarena was at 881 Lope de Vega.  And with

25   respect to the guest house and Bedroom 4, he was in a

417

1    position where his hairs could be forcibly removed.

2    Q    I believe you should have in front of you now what

3    were marked as Exhibits 170 and 171.

4    A    160 --

5    Q    160 and 161.  Do you recognize those?

6    A    Yes, I do.

7    Q    What are they?

8    A    Government's Exhibit 161 is a just folded piece of

9    paper that originally contained a head hair sample of Mr.

10   Espino-Verdin.  And Government's Exhibit 160 was the F.B.I.

11   mailing envelope which originally contained the hair

12   sample.

13   Q    Did you have occasion to compare those hairs with

14   Exhibit 55, which are the hairs obtained from the vacuum

15   sweepings of quadrant three of the guest house?

16   A    Yes, I did.

17   Q    And was there a match between any of those hairs?

18   A    Yes.  In quadrant number three from the guest house,

19   there was one dark brown head hair.  I compared it to the

20   head hairs of Mr. Espino-Verdin.  This was again very dark,

21   unusual head hair.  It had all the characteristics, as did

22   the head hairs of Mr. Espino-Verdin.  I concluded that the

23   single hair from quadrant three of the guest house was

24   consistent with coming from Mr. Espino-Verdin.

25   Q    Now did you also have occasion to compare the known

418

1    hairs of Rene Verdugo that you obtained with hairs obtained

2    from vacuum sweepings of the guest house in quadrant two?

3    A    Yes, I did.

4    Q    And as a result of that comparison, did you find any

5    matches?

6    A    Yes, I did.

7    Q    I should point out for the record that the chart you

8    were referring to in relation to the hair of Espino-Verdin

9    was 94-A.

10   A    That is correct.

11   Q    All right.  Now if you would look at chart 95-A.  What

12   does that chart depict?

13   A    Chart 95-A again is two views.  The view on the left

14   is the unknown hair coming from the guest house at 881 Lope

15   de Vega.  The right-hand chart is three views of one of Mr.

16   Rene Verdugo's head hairs.  And, again, all the

17   characteristics from the guest house Quadrant B matched all

18   of the characteristic of the head hairs of Mr. Verdugo, and

19   I concluded that this one head hair from Quadrant B was

20   consistent with coming from Mr. Verdugo.

21   Q    Now, was this quadrant where Mr. Verdugo's head hair

22   was found, the same quadrant as the forcibly removed hair

23   of Agent Camarena had been found?

24   A    Yes, it was.

25   Q    Now you also performed vacuum sweepings of quadrant

419

1    two of the guest house?

2    A    Yes, I did.

3    Q    Did you find any hairs there that you compared to the

4    known hairs of Juan Ramon Matta-Ballesteros?

5    A    Yes, I did.

6    Q    Did you make any matches in that comparison?

7    A    Yes.  In quadrant B, again, I found another dark brown

8    mixed race head hair.  On the left is three views of the

9    unknown hair from quadrant B, a second unknown hair from

10   quadrant B of the guest house.  The view on the right is

11   three views of the hairs of Mr. Matta-Ballesteros.

12            And, again, all of the characteristics from the

13   second unknown hair from quadrant B matched all of the

14   characteristics of the hairs of Mr. Matta-Ballesteros.

15            And, again, I concluded that this second hair from

16   quadrant B was consistent with coming from Mr.

17   Matta-Ballesteros.

18   Q    Did you also examine vacuum sweepings from the

19   bathroom adjacent to bedroom four of the main house?

20   A    Yes, I did.

21   Q    Did you find any hairs in those sweepings that you

22   compared to the known hairs of Juan Ramon

23   Matta-Ballesteros?

24   A    In addition to the hair from the guest house, from the

25   bathroom of bedroom four, I found a second dark brown head

420

1    hair which also matched Mr. Matta-Ballesteros.

2    Q    For the record, the chart that you were describing in

3    relation to the hair comparison of Juan Ramon

4    Matta-Ballesteros is 96-A; correct?

5    A    That is correct.

6    Q    Agent Malone, is there any correlation between the

7    length of time that a hair or fiber is deposited, say on a

8    piece of clothing, and how long the hair or fiber might

9    remain in that location?

10   A    There has been quite a bit of studies on the transfer

11   of hairs and fibers, mainly by the English, and what they

12   have shown is that after hairs and fibers are transferred,

13   they don't stay around very long.

14        In the case of fibers, within four hours you are

15   going to lose 80 percent of all the fibers which were

16   transferred, and within two days you are going to lose 96

17   percent.

18        With respect to hairs, the average life of a hair

19   after it has been transferred to an object, again, is about

20   two days.

21   Q    Is there any correlation between the length of time

22   that a person spends in a room or a particular location and

23   the chances of depositing hairs there?

24   A    Well, again, since you are losing about a hundred

25   hairs a day, every day of your life, common sense tells you

421

1   the longer you are there, the more hairs you are going to

2   deposit.  And the shorter time, the less.

3   . Q    Now, if you would look at what has been marked as

4   Exhibit 98, the large chart.

5           THE COURT:  I think we will save that until

6   tomorrow.

7           MR. CARLTON:  Your Honor, I can finish my direct

8   in two minutes.

9           THE COURT:  All right, then do so.

10  BY MR. CARLTON:

11  Q    What does that describe?

12  A    It's just a summary chart of all the types of evidence

13  that was found in the cars and 881 Lope de Vega and on the

14  items from Special Agent Camarena.

15          MR. CARLTON:  Now, Your Honor, Agent Malone has

16  small photographs of each of the hair comparison charts

17  that he described.  I would ask for permission for him to

18  put them on Exhibits 81 and 82, indicating the location

19  from which the items compared were obtained.

20          THE COURT:  Well, he can do that tomorrow.  I

21  assume these counsel want to cross-examine this witness; is

22  that correct?

23          MR. MEDVENE:  I have no questions for this

24  witness.

25          MR. RUBIN:  I have some brief questions.

422

1      THE COURT:  You have a few.

2      MR. RUBIN:  Very brief, five minutes.

3      THE COURT:  Well, why does he need to do it?  What

4  is it that you want?

5      MR. CARLTON:  If they can be put there, that's

6  fine.  He doesn't need to do it.

7      THE COURT:  Aren't they already marked?

8      MR. CARLTON:  These are velcro.

9      THE COURT:  I understand.  But those are where the

10  photographs will be placed?

11      MR. CARLTON:  That is correct.

12      THE COURT:  It doesn't need to be done now, does

13  it?

14      MR. CARLTON:  No.  We can do it in the morning, if

15  you prefer.

16      That's all I have.

17      THE COURT:  Can you finish in a few minutes here,

18  Counsel?

19      MR. RUBIN:  I'd rather wait until the morning,

20  Your Honor.

21      MR. CARLTON:  Your Honor, I move the admission of

22  all of the evidence that Agent Malone has discussed.

23      THE COURT:  They may be admitted.

24      (Exhibits 81, 82, 66, 67, 68A-B, 6, 70, 71-75,

25      76, 42A-G, 95A, 96A, 98 160, 161, 50A-H, 78, 79,

423

1        84A, 85A, 87A, 88A, 89B, 92A, 160 received.)

2            THE COURT:  We'll take our afternoon recess at

3    this time and reconvene this case tomorrow morning at 9:30.

4            The jury will please remember what I have told you

5    repeatedly about discussing the case or about exposing

6    yourself to any publicity about the case.  You are excused.

7            By the way, alternates one and two may sit on this

8    side tomorrow and in these two chairs that are available

9    here.

10           JUROR TWO:  Your Honor, I had a question during

11   the break but I didn't --

12           THE COURT:  You asked the clerk?

13           JUROR TWO:  I did ask the clerk.

14           THE COURT:  Just a moment.  You may be excused.

15           JUROR TWO:  It involves the jury.

16           THE COURT:  Just a moment, please.  I would

17   suggest you write it down, whatever it is you want to ask

18   me, sir, and bring it in in the morning.

19           JUROR TWO:  All right:  It involves --

20           THE COURT:  Well, I don't want you to say what it

21   involves, sir.  If it involves anything at all, I want you

22   to write it.

23           You are all excused.

24                (Proceedings adjourned.)

25   //

I, MARY TUCKER, CSR, do hereby certify that

the foregoing transcript is true and correct.

_Mary Tucker_                    6-17-93

MARY TUCKER, CSR                    DATE