HILARY POTASHNER (Bar No. 167060)
Federal Public Defender
GIA KIM (Bar No. 237326)
(E-Mail: Gia_Kim@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Petitioner
RAUL LOPEZ-ALVAREZ

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| RAUL LOPEZ-ALVAREZ,<br><br>        Petitioner,<br><br>    v.<br><br>UNITED STATES OF AMERICA.<br><br>        Respondent. | Case No. CV 19-3436<br>[CR 87-422-JAK-5]<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE SENTENCE UNDER 28 U.S.C. § 2255** |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................ 1

II. FACTUAL BACKGROUND .............................................................................. 1

      A.     The Evidence at Trial................................................................................ 1

             1.    Forensic Evidence ............................................................. 3

             2.    Witness Statements........................................................... 6

                    a.    Abel Reynoso ...................................................... 6

                    b.    Jose Reyes Garcia-Alvarez........................................ 7

             3.    Defense Case .................................................................... 8

             4.    Closing Argument ............................................................. 9

      B.     Procedural History.................................................................................. 9

      C.     The 2018 Wong Letter........................................................................... 10

III. ARGUMENT.................................................................................................. 12

      A.     Lopez-Alvarez's Section 2255 Motion Is Not Second or Successive. ...... 12

      B.     Lopez-Alvarez Is Entitled to Relief on His *Napue* Claim. ....................... 13

IV. CONCLUSION................................................................................................ 17

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Gonzalez v. Sherman,*
    873 F.3d 763 (9th Cir. 2017) .................................................................. 13

*Hall v. Dir. of Corrections,*
    343 F.3d 976 (9th Cir. 2003) .................................................................. 14

*Hayes v. Brown,*
    399 F.3d 972 (9th Cir. 2005) .................................................................. 14

*Jackson v. Brown,*
    513 F.3d 1057 (9th Cir. 2008) ................................................................ 14

*Magwood v. Patterson,*
    561 U.S. 320 (2010) ............................................................................... 12

*Maxwell v. Roe,*
    628 F.3d 486 (9th Cir. 2010) .................................................................. 14

*Napue v. Illinois,*
    360 U.S. 264 (1959) .......................................................................... 13, 14

*United States v. Agurs,*
    427 U.S 97 (1976) .................................................................................. 14

*United States v. Lopez-Alvarez,*
    970 F.2d 583 (9th Cir. 1992) ............................................................. 2, 10

*Wentzell v. Neven,*
    674 F.3d 1124 (9th Cir. 2012) .......................................................... 12, 13

**Federal Constitution, Statutes, and Rules**

18 U.S.C. § 3 ............................................................................................. 2

18 U.S.C. § 2 ............................................................................................. 1

18 U.S.C. § 1111 ....................................................................................... 1

18 U.S.C. § 1114 ....................................................................................... 1

18 U.S.C. § 1201 ....................................................................................... 1

18 U.S.C. § 1952B ..................................................................................... 1

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Constitution, Statutes, and Rules (cont'd)**

28 U.S.C. § 2254 ................................................................................................. 12

28 U.S.C. § 2255 ........................................................................................... *passim*

Ninth Cir. Rule 22-3 ......................................................................................... 13

U.S. Const., amend. XIV ............................................................................. 13, 14

# I. INTRODUCTION

More than thirty years ago, Raul Lopez-Alvarez was convicted of offenses stemming from the 1985 kidnappings and murders of DEA Agent Enrique Camarena and DEA informant Alfredo Zavala in Guadalajara, Mexico.  More than twenty-five years ago, the Ninth Circuit reversed two of those convictions — one for violent crimes against Zavala, the other for accessory after the fact — for lack of sufficient evidence. But the Ninth Circuit's decision did not result in an amended judgment until 2005.

This is the first Section 2255 motion challenging that amended judgment. Hence, the Antiterrorism and Effective Death Penalty Act's gatekeeping requirements for a "second or successive" motion do not apply, and this Court may reach the merits.

On the merits, this Court should vacate Lopez-Alvarez's sentence and grant a new trial, because the remaining convictions rested in significant part on the false testimony of FBI Agent Michael Malone, the prosecution's hair and fibers expert at trial.  The government has recently acknowledged that Malone's forensic hair testimony and evidence was false, and that it knew, or should have known, that Malone's testimony was false at the time of trial.

# II. FACTUAL BACKGROUND

## A.    The Evidence at Trial

Lopez-Alvarez was tried in 1988 with two co-defendants, Rene Martin Verdugo-Urquidez ("Verdugo") and Jesus Felix-Gutierrez.  He was convicted of violent crimes in aid of racketeering — the kidnappings and murders of Camarena and Zavala — in violation of 18 U.S.C. §§ 1952B, 2 (Counts One and Two); conspiracy to kidnap a federal agent, in violation of 18 U.S.C. § 1201(c) (Count Three); the substantive offense of kidnapping a federal agent, in violation of 18 U.S.C. §§ 1201(a)(5), 2 (Count Four), felony murder of Camarena in the course of the kidnapping, in violation of 18

U.S.C. §§ 1111, 1114 (Count Five), and accessory after the fact, in violation of 18 U.S.C. § 3 (Count Seven).[1]  CR 3701.

While the trial was lengthy and the evidence was wide-ranging, relatively little of the testimony and exhibits pertained directly to Lopez-Alvarez's role in the kidnappings and murders of Camarena and Zavala.  The government devoted much of its presentation to proving the existence of a large-scale international marijuana trafficking enterprise led by Rafael Caro-Quintero ("Caro"), and to establishing a motive for the kidnappings and murders — namely, the DEA's successful eradication and interception efforts that inflicted major losses on Caro's operations in Mexico and the United States.  4 RT 10-16;   Although Caro, the lead defendant, was not on trial, his presence loomed large: the government sought to prove that co-defendant Verdugo was Caro's "right-hand man" and "No. 2," and that co-defendant Felix-Gutierrez was a high-ranking Caro confidant who had taken concrete steps to help Caro escape to Costa Rica.  4 RT 17-18, 20-23.

The evidence against Lopez-Alvarez, by contrast, focused on his alleged participation in the violent crimes perpetrated against Camarena and Zavala.  Indeed, in its opening statement, the government indicated that Lopez-Alvarez's role "was one of muscle for the enterprise . . . he participated directly with the torture and interrogation of Special Agent Camarena."  4 RT 18.  The evidence against Lopez-Alvarez consisted of (1) testimonial and physical evidence regarding the abduction, beating, and interrogation of Camarena; and (2) Lopez-Alvarez's statements to two witnesses, Abel Reynoso and Jose Reyes Garcia-Alvarez ("Garcia").  Reynoso was an undercover DEA agent who recorded Lopez-Alvarez while posing as a criminal in 1987, and Garcia was a DEA informant who met Lopez-Alvarez in a Mexican prison in late 1985 or early 1986.  11 RT 69-72, 118; 12 RT 32.

---

[1] Because the accessory-after-the-fact conviction was reversed on direct appeal for lack of sufficient evidence, *see United States v. Lopez-Alvarez*, 970 F.2d 583, 598 (9th Cir. 1992). Lopez omits facts relating solely to that charge from this factual summary.

The government's case against Lopez-Alvarez depended on matching the details of Lopez-Alvarez's statements — the when, where, and how — to the forensic evidence and recordings of Camarena's interrogation. 4 RT 18-19. And FBI Agent Michael Malone, the government's expert hair and fiber examiner whose testimony has since been largely repudiated, was crucial to making that connection.

## 1. Forensic Evidence

On March 5, 1985, the bodies of Camarena and Zavala were found by the side of a road approximately 60 miles from Guadalajara. 5 RT 10; 9 RT 113-114. When U.S. authorities went to a morgue in Zamora, Mexico, to view the bodies, each body had a set of items associated with it. 5 RT 10-13. A bed sheet, jockey shorts, and rope bindings were associated with Camarena's body. 5 RT 12. Jeans, underwear, a sweatshirt, socks, and rope bindings were associated with Zavala's body. 5 RT 12.

A forensic pathologist testified that Camarena's cause of death was multiple blunt force injuries to the head and a perforated injury to the head, and that the manner of death was homicide. 5 RT 50, 65. The pathologist observed markings consistent with ligature or rope bindings as well as multiple rib fractures, which were consistent with postmortem injuries. 5 RT 58, 66, 70.

On March 28, 1985, FBI Agent Wayne Oakes collected forensic evidence, including hair evidence, from a black Grand Marquis sedan that had been recovered by the Mexican Federal Judicial Police ("MFJP") at a partially completed home on the outskirts of Guadalajara. 8 RT 136; 9 RT 128-135.

Soon thereafter, the DEA received a tip from the Mexican Attorney General's Office that a home located at 881 Lope de Vega in Guadalajara had been involved in Camarena's abduction. 8 RT 138. The Lope de Vega property featured a four-bedroom main residence, grounds containing a tennis court and pool, and a detached guest house. 10 RT 64-65, 69. On April 12 and April 13, 1985, Agent Malone and other members of the FBI forensics team conducted a search of the Lope de Vega

3

property.  8 RT 140-141.  By the time they arrived, Mexican authorities had already entered the home.  8 RT 140.

Malone testified that he personally vacuumed the guest house, an upstairs bedroom with a barred window and gun racks, and a Volkswagen parked at Lope de Vega to obtain forensic evidence for later analysis.  10 RT 74-75, 82-85.  He further testified about the process of microscopic hair comparison analysis, and its use in determining whether a hair of unknown origin had been forcibly removed, cut off, or shed naturally.  10 RT 139-154.  Malone claimed that if he could isolate fifteen "individual microscopic characteristics" of an unknown hair, he could match it to a known hair.  10 RT 143-145; 11 RT 3.  He also stated that if he matched a hair to a particular individual, "the chances of another individual of the same race having hairs exactly like the person you matched it to is about one in 5,000."  11 RT 3.

Malone then testified to the following "matches" he made between the unknown hairs and known hair samples:

- Two hairs recovered from the Mercury Marquis were "consistent with having originated from Special Agent Camarena" and were "the first two matches [he] actually made in the case."  10 RT 147.

- Malone "was able to match" two hairs from the Lope de Vega guest house to Camarena, one of which had been forcibly removed.  10 RT 149-152.

- Two hairs from the Volkswagen parked at the Lope de Vega property "perfectly matched the head hairs of Special Agent Camarena," and both had been forcibly removed.  10 RT 153-154.

- One hair from bedroom four at Lope de Vega had been forcibly removed and "perfectly matched the head hairs of Special Agent Camarena."  10 RT 155.

- One unknown hair from the guest house "microscopically matche[d]" the hairs of co-defendant Verdugo.  10 RT 192.

4

- One unknown hair from the guest house was "absolutely indistinguishable" from the head hairs of Sergio Espino-Verdin.  10 RT 190-191.  The government pegged Espino-Verdin as Camarena's primary interrogator.  4 RT 27.

Malone also testified regarding fiber evidence connecting Camarena and Zavala to Lope de Vega.  He testified that he collected fiber samples from every carpet at Lope de Vega.  10 RT 77.  Malone claimed that, through microscopic fiber analysis, he could determine the type of source fabric and whether an unknown fiber is "consistent with" a known carpet sample.  10 RT 163-164.  In addition, Malone testified that he could obtain a "spectral fingerprint" of a given fiber by using a microspectrophotometer machine.  10 RT 164.

- Carpet fibers from the sheet located with Camarena's body "could have originated from" multiple rooms in the main house at Lope de Vega.  10 RT 167.
- Carpet fibers on Camarena's adhesive blindfold were consistent with multiple rooms in the main house at Lope de Vega. 10 RT 168-170, 174.
- The ropes associated with Camarena's body were consistent with rope found by Mexican authorities at Lope de Vega.  10 RT 183.
- The sheet found with Camarena's body "was consistent with coming from the same set" of linens as two pillowcases from Lope de Vega, one collected by Malone and another provided by Mexican authorities.  10 RT 180-181, 186-187.
- Fibers on Zavala's sweatshirt were "could have come" from carpet fibers from Lope de Vega's living room and guest house.  10 RT 170-172.

Malone concluded that the forensic evidence not only placed Camarena in the Mercury Marquis, the Volkswagen, and at both houses at Lope de Vega, and that the hair evidence in particular strongly suggested that Camarena had been held against his will in most of those locations:

5

Based on the fact that I was able to associate Special Agent Enrique Camarena to 881 Lope de Vega in five different ways — hair, two types of fibers, fabric and rope, and that each of these are an independent event, independent of one another, in my opinion the only possible way this could have happened is if Special Agent Camarena would have been at 881 Lope de Vega and the Volkswagen and the Mercury and in a position with respect to the Volkswagen, the guest house, and bedroom 4 where his hairs could have been forcibly removed.

10 RT 189.  Malone confirmed this opinion as to Camarena's whereabouts on cross-examination:

Q:  You went further than giving an opinion about a match or no match.  Correct?

A:  In the case of Special Agent Camarena, yes.

Q:  Yes.  And part of your opinion was that either Camarena or other people were present at a certain location.  Correct?

A:  That's correct.

11 RT 40.  On redirect, Malone testified that, of the five forensic associations he mentioned, the hairs were "probably no. 1" in significance.  11 RT 45.  Malone also confirmed that those hairs were collected by him and other members of the FBI forensics team, and not by Mexican authorities.  11 RT 45-46.

### 2.    Witness Statements

#### a.    Abel Reynoso

DEA Agent Abel Reynoso testified regarding five meetings he had with Lopez-Alvarez in the fall of 1987 while working in an undercover capacity.  11 RT 69-72.  Reynoso testified that Lopez-Alvarez admitted working for drug traffickers Ernesto Fonseca and Caro.  11 RT 80-81.  Lopez-Alvarez also told Reynoso about the use of a black Marquis car in the Camarena kidnapping and showed Reynoso a tape of a popular

song about the case called "Band of the Black Marquis."  11 RT 82.  Lopez-Alvarez commented, "This song was written for us.  I was part of this band, from this gang of individuals who were in the Grand Marquis."  11 RT 82.  Lopez-Alvarez also told Reynoso that he had worked as a state police officer at the time of Camarena's death, and that he had been arrested while riding with two other state police officers in a black Marquis.  11 RT 87-90, 111-112.

Lopez-Alvarez told Reynoso that Camarena had been kidnapped in front of the U.S. consulate in Guadalajara by abductors bearing Mexican police credentials.  11 RT 83-84.  He stated that Camarena was then taken to "his bosses" at a nearby house in Guadalajara.  11 RT 84.  Lopez-Alvarez also stated that Camarena's interrogation had been recorded on tape, and that Camarena had been beaten with heated iron pipes.  11 RT 84-85.  Lopez-Alvarez gave conflicting stories about Camarena's death and burial. 11 RT 85-86.

On cross-examination, Reynoso acknowledged that he didn't believe everything Lopez-Alvarez told him.  11 RT 113.  Reynoso also admitted that Lopez-Alvarez did not give a detailed account of the abduction or beating.  11 RT 128, 136.  Some aspects of Lopez-Alvarez's account, such as how the abduction transpired or whether Zavala was shot in the head, turned out to be untrue.  11 RT 129, 145-146.  Lopez-Alvarez never told Reynoso that he personally kidnapped, tortured, interrogated, or killed Camarena.  11 RT 156-157.  In fact, Lopez-Alvarez initially told Reynoso that while his friend had been involved in the Camarena abduction, he had not been present.  11 RT 157.  Rather, he told Reynoso, he had arrived at Caro's house later with Fonseca, at a point when Camarena was already close to death, and witnessed an argument between Fonseca and Caro.  11 RT 156.

### b.    Jose Reyes Garcia-Alvarez

Jose Reyes Garcia-Alvarez ("Garcia") was a former MFJP officer and DEA informant.  12 RT 24, 38-39.  He had received approximately $30,000 for living expenses from the DEA in the nine months prior to trial.  12 RT 109.  As an MFJP

7

1   officer, Garcia and his supervisors helped protect trucks carrying Caro's loads of

2   marijuana.  12 RT 24-26.  Garcia was imprisoned in Mexico for his role in escorting the

3   marijuana loads and in cashing a 60-million peso check, reputedly from Caro.  12 RT

4   27-29.  In late 1985 or early 1986, Garcia was incarcerated in a Mexico City prison,

5   where he met Lopez-Alvarez.  12 RT 30, 32.

6        Garcia testified that, while in prison, Lopez-Alvarez told him that he and his

7   companions had kidnapped Camarena and taken him in a Volkswagen to Caro's house.

8   12 RT 34-35.  According to Garcia, Lopez-Alvarez said that he saw Camarena being

9   beaten, and that he and his companions remained at Caro's house for several days

10  looking after Camarena.  12 RT 36.  Lopez-Alvarez also told Garcia of an altercation

11  between Fonseca and Caro at Caro's house regarding Camarena, during which Fonseca

12  slapped Caro.  12 RT 36.  Lopez-Alvarez told Garcia that he worked for both Caro and

13  Fonseca.  12 RT 36-37.  After Lopez-Alvarez and Garcia were released from prison,

14  Lopez-Alvarez recounted the same information about Camarena to Garcia at Garcia's

15  home.  12 RT 37.

16              **3.    Defense Case**

17        Lopez-Alvarez's defense was that while he had made the statements reported by

18  Reynoso, they represented false bluster based on his reading of true-crime magazines

19  and information he had picked up in prison.  4 RT 56-62.  Lopez-Alvarez's mother

20  testified that, in September 1987, she had seen Lopez-Alvarez reading the April 24,

21  1985 edition of a magazine called *Alarma*, which contained an article about the

22  Camarena case.  24 RT 170-175.  DEA Agent James Kuykendall testified that the

23  Camarena case was intensely covered in Mexican magazines, newspapers, radio, and

24  television, and that the reporting sometimes included summaries of suspects'

25  declarations.  25 RT 18-22.  As for the more directly self-incriminating statements

26  reported by the informant, Garcia (sometimes referred to as "Reyes Garcia, "Reyes

27  Garcia-Alvarez," or "Reyes Alvarez"), the defense argued that Garcia was a witness of

28

8

1  dubious credibility who had a strong pecuniary motive for providing false evidence to

2  the DEA.  30 RT 60-70.

3  ### 4.  Closing Argument

4  In closing argument, the prosecutor characterized "881 Lope de Vega" as "the

5  residence where the government maintains and the evidence has shown was the site

6  where Special Agent Camarena and Alfredo Zavala were taken after they were

7  abducted"; he also referred to the guest house as "the torture chamber."  28 RT 78.

8  And when discussing the substantive kidnapping charge in Count Four, the prosecutor

9  "maintain[ed] that the evidence in this case has proven that Special Agent Camarena

10  was unlawfully held at 881 Lope de Vega, that he was unlawfully confined against his

11  will at 881 Lope de Vega . . . ."  28 RT 119.

12  The prosecutor then canvassed the forensic evidence provided by Malone to

13  paint a picture of Camarena being abducted in the Volkswagen, moved from room to

14  room within the main house at Lope de Vega, beaten in bedroom four and the guest

15  house, and removed from the home, deceased, in a burial sheet.  28 RT 137-141.

16  Malone's testimony regarding Camarena's forcibly removed hairs was central to this

17  narrative.  28 RT 139-140.

18  With respect to Lopez-Alvarez, the prosecutor argued that the admissions

19  regarding Camarena to Reynoso and Garcia were detailed and true.  28 RT 149-154.

20  Most of the prosecutor's closing argument geared specifically to Lopez-Alvarez

21  involved the separate accessory-after-the-fact charge.  28 RT 154-160.

22  In rebuttal closing, the prosecutor reiterated that the forensics "show[ed] that

23  Camarena was kept at this particular house," namely, 881 Lope de Vega.  32 RT 23.

24  The prosecutor argued that even though Lopez-Alvarez did not identify Lope de Vega

25  by name, his mention of Caro's house referred to Lope de Vega.  32 RT 59.

26  ### B.  Procedural History

27  On direct appeal, the Ninth Circuit concluded that there was insufficient evidence

28  to support Lopez-Alvarez's convictions on Counts Two (violent crimes against Zavala

1
2
3

in aid of racketeering) and Seven (accessory after the fact).  *United States v. Lopez-Alvarez*, 970 F.2d 583, 598 (9th Cir. 1992).  It affirmed this Court's judgment with respect to the other four counts of conviction.  *Id.*

4
5
6
7
8
9
10
11
12
13

This Court did not enter an amended judgment pursuant to the Ninth Circuit's mandate until over a decade later, on October 26, 2005.  CR 2439.  Whereas the original judgment listed six counts of conviction, the amended judgment listed only four counts of conviction.  CR 2439, 3701.  And the amended judgment reflected Lopez-Alvarez's new sentence: 180 years on Counts One, Three, and Four (60 years on each count, to run consecutively), to run concurrently to life imprisonment on Count Five, the felony murder conviction.[2]  CR 2439.  The original judgment had imposed 240 years on Counts One, Two, Three, and Four (60 years on each count, to run consecutively), to run concurrently to life imprisonment on Count Five and ten years on Count Seven.  CR 3701.

14
15
16
17

Meanwhile, Lopez-Alvarez had filed a Section 2255 motion in this Court on September 11, 1997, which was denied on July 23, 1999.  CR 3851, CR 2374.  This Court denied a certificate of appealability, as did the Ninth Circuit.  *See* Case No. CV 97-6776-ER (AIJ), CR 6; C.A. No. 99-56630, Dkt. No. 6.

18
19
20
21

On October 24, 2006, Lopez-Alvarez filed an application for leave to file a second or successive 28 U.S.C. § 2255 motion.  C.A. No. 06-75103, Dkt. No. 1.  The Ninth Circuit denied the application on October 23, 2007.  C.A. No. 06-75103, Dkt. No. 5.

22

**C.    The 2018 Wong Letter**

23
24
25

Lopez-Alvarez was represented by the Federal Public Defender's Office at his 1988 trial.  In a letter dated April 27, 2018, attorney Norman Wong, special counsel for the United States Department of Justice, advised Hilary Potashner, Federal Public

26

27
28

[2] The amended judgment erroneously lists the statutes of conviction for Counts Four (kidnapping) and Five (felony murder).  CR 2439 at 1.

10

Defender for the Central District of California, that it had completed a review of the hair evidence presented in the trial of Juan Jose Bernabe-Ramirez ("Bernabe"), a co-defendant who was convicted in a 1990 trial.[3]  Ex. A-1.  Wong enclosed a letter dated April 20, 2018, addressed to Nicola T. Hanna, United States Attorney for the Central District of California, stating that the DOJ and FBI had determined that Malone's microscopic hair comparison analysis testimony at the 1990 trial included statements "that exceeded the limits of science" and were therefore "invalid" in three ways.  Ex. A-3.  First, Malone's testimony falsely "stated or implied that the evidentiary hair could be associated with a specific individual to the exclusion of all others[.]"  Ex. A-3.  Second, Malone falsely "assigned to the positive association a statistical weight or probability or provided a likelihood that the questioned hair originated from a particular source, or an opinion as to the likelihood or rareness of the positive association that could lead the jury to believe that valid statistical weight can be assigned to a microscopic hair association[.]"  Ex. A-3.  Third, Malone improperly "cite[d] the number of cases or hair analyses worked in the laboratory and the number of samples from different individuals that could not be distinguished from one another as a predictive value to bolster the conclusion that a hair belongs to a specific individual[.]"  Ex. A-3.

Verdugo, as it turns out, had received a similar letter from Wong back in October 2014.  Ex. B.  In Verdugo's letter, the FBI had identified the first and second types of errors in Malone's trial testimony that rendered it "invalid": (1) stating or implying that an unknown hair could be associated with a specific individual to the exclusion of others; and (2) providing a likelihood that the questioned hair originated from a particular source, or an opinion as to the likelihood or rareness of the positive association.  Ex. B-3, B-7.  Because Verdugo and Lopez-Alvarez were jointly tried, the same errors taint the government's case against Lopez-Alvarez.

---

[3] The Federal Public Defender's Office had represented Bernabe in prior Section 2255 proceedings.  CR 2344.

### III. ARGUMENT

#### A.   Lopez-Alvarez's Section 2255 Motion Is Not Second or Successive.

As a threshold matter, this Court has jurisdiction to consider Lopez-Alvarez's new Section 2255 motion because it is not "second or successive" within the meaning of 28 U.S.C. § 2255(h).  Therefore, the gatekeeping conditions in Section 2255(h), which require either "newly discovered evidence" or "a new rule of constitutional law," do not apply, and Lopez-Alvarez need not seek authorization from the Ninth Circuit Court of Appeals before filing this motion.  It is true that this Section 2255 motion is second in time; Lopez-Alvarez filed a Section 2255 motion in 1997, which was denied in 1999.  CR 3851, 2374.  But Lopez-Alvarez's first Section 2255 motion challenged a judgment which is no longer in force.  The instant Section 2255 motion, while numerically second, is the first motion to challenge the amended judgment issued on October 26, 2005.

The Supreme Court has explained that the phrase "second or successive" in 28 U.S.C. § 2244 is a "term of art."  *Magwood v. Patterson*, 561 U.S. 320, 332 (2010).  For that reason, it is "well settled" that "second or successive" "does not simply 'refe[r] to all . . . applications filed second or successively in time[.]'"  *Id.* (quoting *Panetti v. Quarterman*, 551 U.S. 930, 944 (2007)).  In the context of a habeas petition filed by a state prisoner under 28 U.S.C. § 2254, the Ninth Circuit has held that "the latter of two petitions is not 'second or successive' if there is a 'new judgment intervening between the two habeas petitions.'"  *Wentzell v. Neven*, 674 F.3d 1124, 1127 (9th Cir. 2012).  Because the amended 2005 judgment intervened between Lopez-Alvarez's first and second 2255 motions, this second-in-time motion is not "second or successive."

The fact that the convictions and sentences on Counts One, Three, Four, and Five — the counts at issue in the new Section 2255 motion — were unaffected by the amended judgment does not make the new motion "second or successive."  The Ninth Circuit "treat[s] the judgment of conviction as one unit, rather than separately considering the judgment's components, *i.e.*, treating the conviction and sentence for

12

each count separately." *Wentzell*, 674 F.3d at 1127-28.  In *Wentzell*, the Ninth Circuit deemed an amended judgment a new judgment for "second or successive" purposes, even though the sentences on the remaining counts "remained the same as in the original judgment." *Id.* at 1125.  That is, *Wentzell* "held that an amended judgment constitutes a new, intervening judgment that renders a subsequent habeas petition not second or successive *even if* the petition challenges only undisturbed portions of the original judgment." *Gonzalez v. Sherman*, 873 F.3d 763, 768 (9th Cir. 2017).

Nor does the fact that Lopez-Alvarez sought leave from the Ninth Circuit to file a second-or-successive motion in 2006, after the amended judgment was issued, render this Section 2255 motion "second or successive." Ex. C.  Lopez-Alvarez was proceeding pro se at that time, Ex. C-1, and the denial of his application meant that his proposed Section 2255 motion postdating the 2005 amended judgment was never filed in this Court.  Further, the cases clarifying the meaning of "second or successive" in the context of amended judgments — *Magwood*, *Wentzell*, and *Gonzalez* — were decided after Lopez-Alvarez unsuccessfully sought leave to file a second or successive Section 2255 motion.  Now that the Supreme Court and Ninth Circuit have made clear that Lopez-Alvarez's new Section 2255 motion is not second or successive, Lopez-Alvarez should be permitted to file directly in this Court, without obtaining the certification that Section 2255(h) requires.  However, should this Court determine that Section 2255(h)'s gatekeeping requirements apply, Lopez-Alvarez requests that this filing be transferred to the Ninth Circuit "in the interests of justice." *See* Ninth Cir. Advisory Comm. Note to Cir. Rule 22-3.

## B.    Lopez-Alvarez Is Entitled to Relief on His *Napue* Claim.

In *Napue v. Illinois*, 360 U.S. 264 (1959), the Supreme Court made clear that the use of false evidence at a criminal trial can violate due process in two ways.  "First, it is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Id.* at 269.  Second, "[t]he same result obtains when the State, although not soliciting false

13

evidence, allows it to go uncorrected when it appears." *Id.*  Finally, "to permit a conviction based on uncorrected false material evidence to stand is a violation of a defendant's due process rights under the Fourteenth Amendment." *Maxwell v. Roe*, 628 F.3d 486, 507 (9th Cir. 2010).  A petitioner can prevail on a *Napue* claim when "(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material." *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc).

In the context of Verdugo's Section 2255 motion, the government has already conceded that Malone's testimony was false, and that the government should have known that the testimony was false at the time of trial.  CR 4184 at 16 n.7.  Therefore, the only disputed issue is whether Malone's false testimony was material to Lopez-Alvarez's convictions.  Significantly, the materiality standard for *Napue* violations "requires that the conviction be set aside if there is '*any* reasonable likelihood that the false testimony *could* have affected the judgment of the jury.'"  *Jackson v. Brown*, 513 F.3d 1057, 1076 (9th Cir. 2008) (quoting *Hayes*, 399 F.3d at 985).  This "strict standard of materiality" applies to *Napue* claims "not just because they involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process." *United States v. Agurs*, 427 U.S 97, 103 (1976).  "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'"  *Hall v. Dir. of Corrections*, 343 F.3d 976, 983-84 (9th Cir. 2003) (per curiam) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).  "Indeed, if it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic." *Hayes*, 399 F.3d at 978 (internal quotation marks and citation omitted).

This Court should grant Lopez-Alvarez's motion because there is a reasonable likelihood that Malone's false testimony could have affected the jury's verdict on all counts of conviction.  Although Malone's hair testimony did not directly place Lopez-

14

Alvarez at Lope de Vega, it connected the dots of the government's case nonetheless. First, the evidence of Camarena's forcibly removed hairs evidence helped establish Lope de Vega as the location where Camarena was held against his will and treated violently.  Because Lopez-Alvarez had referred to taking Camarena to "Caro's house," and Lope de Vega was one of Caro's houses, the government used the hair evidence to corroborate Lopez-Alvarez's story.  Second, the evidence of Camarena's hairs in a black Mercury Marquis bolstered the government's argument that Lopez-Alvarez was privy to specific details about Camarena's abduction: Reynoso testified that Lopez-Alvarez had discussed a song about a black Marquis as the abduction vehicle, and had mentioned being arrested while riding in a black Marquis. 11 RT 82, 87-90, 111-112. There was also evidence linking Lopez-Alvarez to another location that Malone identified as the site of Camarena's forcibly removed hairs — the Volkswagen parked at Lope de Vega — because Lopez-Alvarez told Garcia that Camarena had been transported in a Volkswagen.  12 RT 34-35.  Without the false testimony linking Camarena to the locations mentioned by Lopez-Alvarez, his bluster defense would have been much more compelling.

To be sure, the government introduced other forensic evidence to support its theory that Camarena had been held at Lope de Vega.  But this fibers and fabric evidence was also collected, analyzed, and/or presented by Malone, 10 RT 189, and therefore suffers from the same credibility problems as the rest of his testimony.  And, compared to the hair evidence, which was couched in precise terms of "perfect" "match[es]" to specific individuals, the fibers and fabric evidence was framed much more generally, in terms of "consistency" to various sheets and carpets.  In any event, the government made sure to elicit from Malone that the hair evidence was "probably no. 1," or first among equals, in terms of forensic significance.  11 RT 45.

Further, the remaining evidence against Lopez-Alvarez was far from overwhelming.  No eyewitnesses or untainted forensic evidence, such as fingerprints, placed either Lopez-Alvarez or Camarena at Lope de Vega, in the black Mercury

1    Marquis, or in the Volkswagen.  The defense presented evidence that the Camarena
2    case was extensively covered by the Mexican press, that Lopez-Alvarez was
3    imprisoned with others who discussed the case, and that the "details" Lopez-Alvarez
4    provided were otherwise unconfirmed (as in the case of using heated pipes as a
5    weapon), common knowledge (as in the case of the dispute between Caro and Fonseca
6    over Camarena's treatment), or simply untrue (as in the case of Zavala's supposed
7    gunshot wound to the head).  Even Agent Reynoso conceded that the Lopez-Alvarez's
8    accounts of the abduction and interrogation were not particularly detailed.  11 RT 128,
9    136.  Lopez-Alvarez's recorded statements to Reynoso were not clearly self-
10   incriminating: while he alluded to having inside information regarding Camarena's
11   kidnapping and interrogation, he did not confess to Reynoso.  11 RT 156-157.  While
12   Lopez-Alvarez's alleged statements to DEA informant Garcia were more directly
13   inculpatory, those statements were not recorded, and Garcia's credibility was highly
14   suspect.  Garcia had admitted to participating in drug trafficking while working as a
15   Mexican police officer, and his lapses of memory, delay in coming forward, and
16   financial motivation to assist the DEA cast doubt on his testimony.  12 RT 90-95, 109.

17          Finally, the prosecutor's statements to the jury and to the court highlight the
18   materiality of the hair evidence to the case as a whole.  The prosecution recognized that
19   whether Camarena was held at Lope de Vega was a significant fact in dispute.
20   Therefore, the government argued that it needed multiple charts displaying Malone's
21   evidence, because "it strengthens the government's position that this was the house
22   where they were taken because we find their hairs in different bedrooms as well and in
23   the car that was parked on the premises of Lope de Vega."  27 RT 130.  Similarly, the
24   prosecutor informed the district court that a photograph of the adhesive blindfold with
25   hair on it should be admitted because Malone's forensic hair testimony "is a critical
26   aspect of the government's case."  32 RT 66-67.  This Court should take the
27   government at its word as to the materiality of Malone's evidence and grant relief on
28   Lopez-Alvarez's *Napue* claim.

# IV. CONCLUSION

For the foregoing reasons, Lopez-Alvarez requests that this Court grant his

Section 2255 motion, vacate his convictions and sentence, and order a new trial.

Respectfully submitted,

HILARY POTASHNER
Federal Public Defender

DATED:  April 26, 2019          By  */s/ Gia Kim*
                                _____
                                GIA KIM
                                Deputy Federal Public Defender
                                Attorneys for Raul Lopez-Alvarez

17