UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV19-03436 JAK<br>LA CR87-00422 JAK | Date | February 23, 2023 |
| Title | Raul Lopez-Alvarez v. United States of America<br>United States of America v. Raul Lopez-Alvarez | | |

Present: The Honorable       JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE

| Patricia Kim | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:**       (IN CHAMBERS) ORDER RE MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255 (CV DKT. 1 1; CR DKT. 4420)

I.     **Introduction**

On September 22, 1988, Raul Lopez-Alvarez ("Petitioner") was convicted of the following: (i) violent crimes in aid of racketeering for the kidnapping and murder of DEA Special Agent Enrique Camarena-Salazar ("Camarena") in violation of 18 U.S.C. §§ 1952B; (ii) violent crimes in aid of racketeering for the kidnapping and murder of DEA informant Alfredo Zavala ("Zavala") in violation of 18 U.S.C. §§ 1952B; (iii) conspiracy to kidnap a federal agent in violation of 18 U.S.C. § 1202(c); (iv) kidnapping a federal agent in violation of 18 U.S.C. § 1201(a)(5); (v) felony murder of a federal agent in violation of 18 U.S.C. §§ 1111, 1114; and (vi) accessory after the fact in violation of 18 U.S.C. § 3. CR-00422, Dkt. 3863.[1] The convictions arose from the February 7, 1985, kidnapping and subsequent murder of Camarena and Zavala in Guadalajara, Mexico. CR-00422, Dkt. 62 ("Second Superseding Indictment").

On October 28, 1988, Petitioner was sentenced to four consecutive 60-year terms, plus one concurrent term of life and one term of ten years. CR-00422, Dkt. 3697. On November 7, 1988, Petitioner appealed. CR-00422, Dkt. 3584. On July 8, 1992, because of insufficient evidence, the Ninth Circuit reversed Petitioner's convictions for violent crimes in aid of racketeering for the kidnapping and murder of Zavala in violation of 18 U.S.C. §§ 1952B and of being an accessory after the fact in violation of 18

---

[1] "CR" refers to the Record in *United States v. Caro-Quintero*, et al, CR 87-422-JAK. "RT" refers to the Reporter's Transcript of proceedings in the 1988 jury trial, *United States v. Caro-Quintero*, CR 87-422-JAK, and includes the volume and page numbers. "CV" refers to the civil cases Petitioner has filed and is followed by the case number and docket entry.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-03436 JAK<br>LA CR87-00422 JAK | Date | February 23, 2023 |
|---|---|---|---|
| Title | Raul Lopez-Alvarez v. United States of America<br>United States of America v. Raul Lopez-Alvarez | | |

U.S.C. § 3. *United States v. Lopez-Alvarez*, 970 F.2d 583, 594–95 (9th Cir. 1992).

The present motion was filed on April 26, 2019 ("Motion"). CR-00422, Dkt. 4420; CV-03436, Dkt. 1-1. The Motion seeks relief based on a disclosure by the Office of the Inspector General of the Federal Bureau of Investigation ("FBI") that the trial testimony of FBI Special Agent Malone ("Malone") was unreliable. *See* CV-03436 Dkt. 1-1 at 5. Petitioner argues that his sentence should be vacated and that he should be granted a new trial because Malone's testimony was material to the remaining convictions. *Id*. at 18–19.[2]

On July 18, 2019, the government filed an opposition to the Motion ("Opposition"). CV-03436, Dkt. 10. Petitioner filed a reply on August 13, 2019 ("Reply"). *Id.*, Dkt. 11. The Motion was taken under submission, and on October 2, 2019, it was denied, without prejudice, because Petitioner had not obtained a certification by a panel of the Ninth Circuit showing "newly discovered evidence" establishing the Petitioner's innocence or a "new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." CV-03436, Dkt. 12.

Petitioner filed a direct appeal of the October 2, 2019, Order. CV-03436, Dkt. 13. The Ninth Circuit reversed and remanded because Petitioner's Motion was not "second or successive" within the meaning of 28 U.S.C. § 2255(g). CV-03436, Dkt. 17; *United States v. Lopez-Alvarez*, 842 Fed. App'x 167, 168 (9th Cir. 2021).

On June 28, 2021, this Court set a briefing schedule allowing the Government to file a further opposition to the Motion and Petitioner to file a further reply in support of the Motion. CV-03436, Dkt. 19. On July 28, 2021, the Government filed a Further Opposition to Plaintiff's Motion ("Further Opposition"). CV-03436, Dkt. 22. On August 18, 2021, Petitioner filed a Further Reply in Support of his Motion ("Further Reply"). CV-03436, Dkt. 23.

For the reasons stated in this Order, the Motion is **GRANTED**.

**II.     Background**

      A.     General Background

A detailed background about the drug trafficking activities that led to the kidnappings of Camarena and Zavala is provided in the May 22, 2017, order ("May 22, 2017 Order") granting a 28 U.S.C. § 2255 motion filed by one of Petitioner's co-defendants. Order re Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 at 3–5, *Verdugo-Urquidez v. United States*, No. 2:15-CV-09274-JAK, Dkt. 37 (C.D. Cal. May 22, 2017).

As noted in the May 22, 2017 Order, evidence was presented at trial that supported the allegation that Rafael Caro-Quintero ("Caro") was a significant figure in the trafficking of illegal narcotics. *See id.* at 2.

---

[2] A detailed background about the July 2014 Office of Inspector General for the Department of Justice report ("OIG Report") and letter from DOJ Special Counsel Norman Wong is provided in this Court's October 2, 2019, Order. CV-03436, Dkt. 12 at 4–6.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-03436 JAK<br>LA CR87-00422 JAK | Date | February 23, 2023 |
|---|---|---|---|
| Title | Raul Lopez-Alvarez v. United States of America<br>United States of America v. Raul Lopez-Alvarez | | |

DEA Agent James Kuykendall, who in 1985 oversaw the DEA Guadalajara office, described Caro as "one of the most influential and powerful traffickers that we had knowledge of, one of the wealthiest, and seemed to be probably the no. 1 exporter of marijuana into the United States." 5 RT 85.

Evidence was presented at trial that Camarena was involved in a DEA investigation of a marijuana cultivation operation in Zacatecas State, a region north of Guadalajara, and that Zavala was a pilot with the Mexico Department of Agriculture who was also an informant working for the DEA office in Guadalajara. 5 RT 75–78. In April and May of 1984, Camarena, along with Mexican authorities, participated in a raid on the Zacatecas operation. 5 RT 97–117. In November 1984, the DEA conducted a similar raid on a marijuana cultivation operation in Chihuahua state. 4 RT 15; 8 RT 15. At trial, the Government argued that these and other seizures showed a potential motive for the abduction and murder of Camarena and Zavala. 4 RT 13–16.

Camarena and Zavala were abducted on February 7, 1985. 4 RT 145–46. Their bodies were discovered on March 5, 1985. 9 RT 113. On April 4, 1985, Caro was arrested in Costa Rica. 25 RT 15. Others allegedly associated with Caro were arrested shortly thereafter in Puerto Vallarta, Mexico. 25 RT 24. On April 11, 1985, Ernesto Fonseca ("Fonseca") was also arrested. 25 RT 16. On April 11, 1985, an unidentified individual from among those arrested informed Mexican law enforcement officials that Camarena had been held at a property owned by Caro: 881 Lope de Vega, in Guadalajara ("Lope de Vega"). 25 RT 24. As explained below, Lope de Vega became a very significant part of the Government's investigation and subsequent prosecution of the Petitioner and his co-defendants.

    B.    Petitioner's Trial

        1.    Procedural Overview

On March 16, 1988, a Grand Jury returned a Second Superseding Indictment charging nine defendants, including Petitioner, associated with the Guadalajara Narcotics Cartel ("Cartel") with committing crimes in 1984 and 1985. CR-00422, Dkt. 62. Petitioner was charged and tried on six counts.

- <u>Count One</u>: Violent crimes in aid of racketeering for the kidnapping and murder of Camarena, in violation of 18 U.S.C. § 1952B; and <u>Count Two</u>: Violent crimes in aid of racketeering for the kidnapping and murder of Zavala, in violation of 18 U.S.C. § 1952B. With respect to these counts, the Second Superseding Indictment alleged that Petitioner willfully participated in the kidnapping and murder of Camarena, and these acts were taken to maintain and increase his position in the marijuana trafficking activities of the cartel. CR 87-00422, Dkt. 4200 at 5.

- <u>Count Three</u>: Conspiracy to kidnap a federal agent, in violation of 18 U.S.C. § 11202(c). As to this count, the Second Superseding Indictment alleged that Petitioner and others caused Camarena to be held against his will at Lope de Vega. CR 87-00422, Dkt. 4200 at 10. The Indictment also alleged as an overt act in furtherance of the conspiracy, that on February 8, 1985, Petitioner went to Lope de Vega. *Id.* at 11.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-03436 JAK<br>LA CR87-00422 JAK | Date | February 23, 2023 |
|---|---|---|---|
| Title | Raul Lopez-Alvarez v. United States of America<br>United States of America v. Raul Lopez-Alvarez | | |

- <u>Count Four</u>: Kidnapping a federal agent, in violation of 18 U.S.C. § 1201(a)(5); and <u>Count Five</u>: Felony Murder of Camarena during the course of a kidnapping, in violation of 18 U.S.C. §§ 1111, 1114. The Second Superseding Indictment alleged that Petitioner "willfully perpetrated the kidnapping and holding for interrogation of [Camarena]." CR 87-00422, Dkt. 4200 at 13. It further alleged that the murder of Camarena "took place in and during the course of the perpetration of his kidnapping." *Id.*

- <u>Count Seven</u>: Being an accessory after the fact, in violation of 18 U.S.C. § 3.

On July 22, 1988, the trial of Petitioner and two co-defendants -- Rene Martin Verdugo-Urquidez and Jesus Felix-Gutierrez -- commenced. CV-03436, Dkt. 10 at 6. District Judge Rafeedie presided at the trial. CR-00422, Dkt. 3359 at 1. The witnesses included federal agents, informants, forensic analysts, and lay persons. *See* CR-00422, Dkt. 4285. Extensive testimony was provided as to the nature and scope of the drug trafficking operation. Evidence was also presented concerning Petitioner's statements during the months and then years that followed the abduction of Camarena and Zavala.

       2.      Government's Evidence Related to Petitioner

To link Petitioner to the crimes against Camarena, the Government argues it relied only on certain testimony to support the allegation that Petitioner was directly involved in the kidnapping and interrogation of Camarena. Opposition at 18. The Government presented testimony from DEA Special Agent Abel Reynoso ("Reynoso") and DEA Informant Jose Reyes Garcia-Alvarez ("Reyes Garcia") about statements Petitioner made to each of them. *Id.* at 11–13. The Government also contends that Petitioner "was never connected to the offenses by forensic evidence." *Id.* at 18. Petitioner takes a contrary position. He claims that, in addition to the testimony that was presented at trial, physical evidence related to Camarena was presented that "connected the dots" for the Government's theory of the case. Motion at 19. In light of this disagreement between the parties, this Order discusses both the testimonial and forensic evidence presented at trial with respect to the Government's case against the Petitioner.

       a)      Testimony of Reynoso

The Government argued in its opening statement that Petitioner's role was as the "muscle," 4 RT 18, and presented evidence that Petitioner admitted to undercover DEA Agent Reynoso in the fall of 1987 that Petitioner had directly participated in the holding and interrogation of Camarena. 11 RT 83–84.

       (1)      Direct Examination

On direct examination, Reynoso testified that he was working undercover and investigating the kidnapping and murder of Camarena and Zavala. 11 RT 69–72. Reynoso testified that he met with Petitioner five times in the fall of 1987 in Los Angeles, California. *Id.* at 72. The first meeting was audio recorded, and the subsequent meetings were video and audio recorded. *Id.* at 72–78. The third meeting lasted more than two hours, and the Government played a portion of the corresponding video recording to the jury. *Id.* at 77–78, 105.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-03436 JAK<br>LA CR87-00422 JAK | Date | February 23, 2023 |
|---|---|---|---|
| Title | Raul Lopez-Alvarez v. United States of America<br>United States of America v. Raul Lopez-Alvarez | | |

Reynoso testified that Petitioner told him that Petitioner was working as a Jalisco state police officer at the time when Camarena was abducted and murdered. *Id.* at 87–88, 111–12. Petitioner told Reynoso that he was arrested with two other state police officers who had directly participated in the kidnapping of Camarena. *Id.* at 88. Petitioner told Reynoso that when he was arrested, he was in a black Mercury Grand Marquis. *Id.* at 89. Petitioner also told Reynoso that, at that time, the entire city of Guadalajara, as well as the state police there, were "controlled" by drug traffickers, and testified that it was "common procedure[] that state police in Guadalajara" provide "protection services for traffickers." *Id.* at 87–88.

Reynoso testified that Petitioner told him that Petitioner was "present at several times during the events that took place," referring to the kidnapping and murder of Camarena. *Id.* at 80. Reynoso also testified that Petitioner told Reynoso that he "worked for Fonseca,"[3] and had been arrested due to his involvement in the Camarena case. *Id.* Petitioner told Reynoso that he was Fonseca's "man, but from time to time" would "serve" Caro's needs, and "whatever business he would take, he would first request permission to do whatever he was going to do" from both Fonseca and Caro. *Id.* at 81. Petitioner also told Reynoso that he was very loyal to Caro. *Id.*

Petitioner gave Reynoso an audio tape with a song on it called the "Band of the Black Marquis" and told Reynoso that the "song was written for us" and that he "was part of this band, from this gang of individuals who were in the Grand Marquis." 11 RT 82. Petitioner said that a black Mercury Grand Marquis was a car used in the Camarena case. *Id.*

Reynoso also testified that Petitioner told him that "Camarena was kidnapped in front of the U.S. Consulate in Guadalajara" on February 7, 1985. *Id.* at 83.[4] He also testified that Petitioner told him that the "individuals that kidnapped [Camarena] . . . used Mexican Federal Police Credentials to identify themselves and to approach [Camarena] to go with them" stating that "Comandante wanted to talk to him." *Id.* at 84. However, he also testified that actually "Camarena was taken to a house nearby in Guadalajara" which was "referred to as [Petitioner's] bosses[']" house. *Id.* In closing arguments, the Government argued that the use of Mexican police identification was "how [Camarena's] abductors were able to entice him or coerce him into the vehicle." 28 RT 153.

Reynoso testified that Petitioner told him that Petitioner's "bosses wanted to know what [Camarena] knew about them" and that during the interrogation "there were tape recordings."[5] 11 RT 84–85.

---

[3] Reynoso testified that Fonseca, also referred to as "Don Neto" was "a well-known kingpin in Mexico involved in trafficking narcotics" and partners in the business of narcotics trafficking with Caro (also referred to as "Rafa"). 11 RT 80–81, 109.

[4] Initially, Petitioner told Reynoso that Camarena was kidnapped on March 7, but "then he retracted and corrected himself and said it was February 7, 1985." 11 RT 83.

[5] A DEA agent testified that the Mexican Attorney General's office turned over tape recordings of the interrogation of Camarena to the DEA. 8B RT 146. Some played at trial, and it was stipulated that one of the voices on the recordings was that of Camarena. 9 RT 3–4. Testimony was introduced that also suggested that Caro and Sergio Espino-Verdin ("Espino") (a former comandante of the Mexican federal judicial police) were those whose voices were heard questioning Camarena. 8A RT 61–66, 78. Petitioner was not mentioned in the recordings, and his voice was not identified in them. The Government relied on the fact that Petitioner knew that the interrogation

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-03436 JAK<br>LA CR87-00422 JAK | Date | February 23, 2023 |
|---|---|---|---|
| Title | Raul Lopez-Alvarez v. United States of America<br>United States of America v. Raul Lopez-Alvarez | | |

Petitioner told Reynoso that Camarena had been beaten with iron pipes, and that Petitioner also said, "We even heated the iron pipes to beat Camarena." *Id.* at 85. Petitioner told Reynoso that Camarena had been "tortured a whole day and part of the night" for "approximately 24 hours." *Id.* at 87. Petitioner also told Reynoso that he witnessed an argument between Fonseca and Caro at Lope de Vega when Camarena was being held there. *Id.* at 91.

Reynoso testified that Petitioner told him that Camarena "was removed from the house where he was taken to be tortured and was still alive" but that at another time Petitioner said that Camarena "died from the beatings." *Id.* at 85–86. Reynoso further testified that Petitioner told him that Zavala was buried alive, but that Camarena had died when he was buried, and referred to both Camarena and Zavala "as being buried at the house." *Id.* at 86.

When asked if Reynoso ever inquired if Petitioner was guilty of being involved in the kidnapping and murder of Camarena, Reynoso responded, "I recall asking [Petitioner] in these particular words, 'were you guilty or not?' and [Petitioner] very candidly says, 'Yes, I was guilty . . . but I never said anything,'" referring to when he was arrested by Mexican authorities. *Id.* at 89. Petitioner told Reynoso that after he was arrested by Mexican authorities, he was tortured for information related to the Camarena abduction, but that he "held his ground and never said anything to them." *Id.*

Reynoso also testified about the detailed information Petitioner had provided to him with respect to an incident at the Guadalajara airport on February 9, 1985. *See id.* at 91–99. Petitioner said that originally Fonseca had asked him to bring Petitioner's father -- who was a justice of the peace in Guadalajara -- to the airport on February 9 to be the officiant of the marriage of Caro and his girlfriend. *Id.* at 92. However, he was later told to disregard that request and that his father was not needed. *Id.* Petitioner told Reynoso that he was then instructed to go to the airport by his Comandante because the state police had been asked to assist the Mexican Federal Judicial Police in their investigation related to the Camarena case. *Id.* at 93–94. Petitioner told Reynoso that he realized Caro was at the airport and that he tried to contact Fonseca, so that Fonseca would warn Caro that the federal police were going to the airport to arrest him. *Id.* at 95–96.

Petitioner also told Reynoso that there was an encounter in the hangar among Caro's "entourage," DEA Agents and Mexican federal police officers. *Id.* at 97. Petitioner said he observed Caro's group pointing guns at the Mexican federal judicial police and DEA agents, who had their guns drawn. *Id.* at 98. Petitioner said he made eye contact with Caro who recognized him, and that the state police placed themselves behind the Mexican federal police and DEA agents, pointing their guns in the direction of Caro, to place the Mexican federal police and DEA agents "between two fires." *Id.* at 98.

(2)    Cross-Examination

On cross-examination, Reynoso testified that he was acting undercover and pretending to be a criminal when he spoke with Petitioner. 11 RT 118. Reynoso acknowledged that he did not believe everything that Petitioner had told him, *id.* At 113, and learned that some of what Petitioner stated was not true.

---

was tape recorded as evidence to show that Petitioner was present at Camarena's interrogation. 28 RT 151.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-03436 JAK<br>LA CR87-00422 JAK | Date | February 23, 2023 |
|---|---|---|---|
| Title | Raul Lopez-Alvarez v. United States of America<br>United States of America v. Raul Lopez-Alvarez | | |

For example, Petitioner said Zavala was shot in the head, which was not true. *Id.* At 145–46. Petitioner also said that the reason Camarena was abducted was because Camarena had gone undercover as a drug buyer while attending a party on February 4, 1985, but that the drug traffickers had "called Colombia" and discovered that Camarena was not a drug buyer. *Id.* At 130. Reynoso acknowledged that he learned Camarena had never gone undercover for a party on February 4, 1985. *Id.* At 131–32. Reynoso also acknowledged other conflicts in the evidence. For example, in their first meeting Petitioner said that his friend was involved but that "luck simply had it that [Petitioner] was not there." *Id.* at 157. Reynoso also acknowledged that Petitioner did not tell Reynoso that Petitioner abducted, kidnapped, tortured or interrogated Camarena:

> Q    [Petitioner] did not tell you that he abducted or kidnapped [Camarena], did he?
> A    I never asked him.
> Q    He did not tell you that, did he?
> A    No, Ma'am.

*Id.* at 156.

> Q    And he did not say that he tortured [Camarena], did he?
> A    No, he never said that.
> Q    And he never told you that he interrogated [Camarena], did he?
> A    That's correct. He never said that.
> Q    And he did not tell you that he killed [Camarena], did he?
> A    That's correct.

*Id.* At 157.

>               b)    Testimony of Informant Reyes Garcia

Reyes Garcia testified that he was a former Mexican Federal Judicial Police Officer. 12A RT 24. He testified that, in this position, he would help protect trucks carrying narcotics for the benefit of drug traffickers, including Caro. *Id.* At 25. He was eventually imprisoned "toward the end" of 1985 for cashing a check related to the trafficking enterprise, which suggested that he had accepted a bribe. *Id.* At 29; *see id.* at 27–29.

Reyes Garcia testified that "about a month and a half or two months" after he was imprisoned, he started talking with the Petitioner who was also detained. *Id.* At 30–33. Reyes Garcia testified that he first spoke with Petitioner in the prison "entry hall or room" and that there were several other inmates present. *Id.* At 32–33. Reyes Garcia testified that Petitioner told him that "he and his companions had kidnapped" Camarena. *Id.* At 34. He also testified that Petitioner told him that "they had gone to the embassy in Guadalajara and that they had gone there with their companions and that they had showed him their credentials." *Id.* Petitioner told him that "they [then] asked for [Camarena,] . . . and a little while later he" came out and they told him "they had a job for him." *Id.* Reyes Garcia testified that Petitioner told him that that they then took Camarena "in a car to a house belonging to" Caro. *Id.* At 35. This colloquy then followed:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-03436 JAK<br>LA CR87-00422 JAK | Date | February 23, 2023 |
|---|---|---|---|
| Title | Raul Lopez-Alvarez v. United States of America<br>United States of America v. Raul Lopez-Alvarez | | |

> Q     Did he tell you what kind of car was used?
> A     It was a Caribe.
> Q     Is that a Volkswagen, sir?
> A     Yes, a Volkswagen.

*Id.*

Reyes Garcia further testified that Petitioner told him that he watched Camarena being beaten, but that he did not participate. *Id.* At 36. Reyes Garcia also testified that Petitioner told him that he remained at Caro's house for "several days looking after" Camarena. *Id.* Petitioner also told Reyes Garcia about observing an argument between Fonseca and Caro where he saw Fonseca slap Caro. *Id.* Reyes Garcia also stated that Petitioner visited him at this house several months after they were both released from prison, sometime in "late 1986", and that Petitioner made the "same" statements to him. *Id.* At 37–38.

Several months after being released, Reyes Garcia told a friend, whose name he could not remember, about what Petitioner had said to him, and eventually spoke to the DEA. *Id.* At 38, 90–93. Reyes Garcia also admitted to receiving approximately $30,000 for living expenses from the DEA, over the course of the year prior to the trial. *Id.* At 39, 109.

> c)     Forensic Evidence

On or about March 5, 1985, two bodies were found near a road approximately 60 miles south of Guadalajara. 5 RT 10, 53; 9 RT 113–14. At trial, it was stipulated that the bodies were Camarena and Zavala. 4 RT 159–60, 5 RT 48. Their bodies were taken to a morgue in Zamora, Mexico, where United States officials were permitted to view them and collect evidence. 5 RT 10–13. Items were found next to each body. *Id.* Next to Camarena's body were jockey shorts, rope bindings and a light blue sheet with a floral pattern and an adhesive blindfold. 5 RT 12, 19; 9 RT 81; 10 RT 84, 134, 156–57. Next to Zavala's body were jeans, a sweatshirt, socks and rope bindings. 5 RT 12.

The bodies were photographed, and a United States Naval physician performed an autopsy of Camarena. *Id.* at 5, 57. Mexican authorities performed an autopsy of Zavala. *See id.* at 57. The Naval physician determined that Camarena died from multiple blunt force injuries to the head and a perforated skull. *Id.* at 65. According to the physician's testimony, the absence of maggots or maggot flies on the bodies suggested they had been buried prior to their being placed on the side of the road. *Id.* at 56. Fiber evidence was also gathered from the bodies and from the items associated with them. This included evidence from the sheet found with Camarena and the sweatshirt found with Zavala. 10 RT 6–7, 51, 126.

At trial, Agent Kuykendall testified that, on March 26, 1985, following an anonymous tip, Mexican authorities and DEA agents found a "black Ford Grand Marquis" walled-up inside the room of a partially completed home on the western outskirts of Guadalajara. 8B RT 135–36. Forensic evidence, including hair follicles, was collected from the vehicle. *Id.* at 128–37. As noted above, around April 11 or 12,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-03436 JAK<br>LA CR87-00422 JAK | Date | February 23, 2023 |
|----------|----------------------------------------|------|-------------------|
| Title | Raul Lopez-Alvarez v. United States of America<br>United States of America v. Raul Lopez-Alvarez | | |

1985, an unidentified individual from among those arrested for alleged involvement, informed Mexican law enforcement officials that Camarena had been held at Lope de Vega. 25 RT 24.

Mexican and United States forensic investigation teams went to Lope de Vega on different days. The residence was described as a two-story main house surrounded by a walled area that included a tennis court, swimming pool and an external guest house. 10 RT 64–65, 69. The main house had four bedrooms downstairs, a living room, a dining room and a kitchen, with two additional bedrooms upstairs. *Id.* at 65. The property also had a guest house, which was described as being small, secure and virtually soundproof. *Id.* at 31, 65. A Volkswagen Atlantic was also found on the property. 8B RT 141; 10 RT 115. A vacuum device was used to collect debris from the various rooms and the Volkswagen Atlantic, and samples were cut from the carpets. 10 RT 40, 77, 87.

Malone testified that microscopic hair examination in the FBI laboratory could be used to determine whether a hair whose origin was unknown had been forcibly removed, cut off or shed naturally. *See id.* at 142–154. Malone also testified that if he could isolate 15 "individual microscopic characteristics" on such an unknown hair, he could determine whether that unknown hair matched another known hair. *Id.* at 145. He also testified that if there is such a match, the probability that the unknown hair came from another person was one in 5000. 11 RT 3. Malone also testified that he could use microscopic analysis of fibers to determine the nature of the source fabric. 10 RT 162–65. This method included determining whether an "unknown carpet fiber [was] consistent with coming from" a known carpet. *Id.* at 164–65. Malone also testified that he could obtain a "spectral fingerprint of the fibers dyed" using a "machine called a microspectrophotometer." *Id.* at 164.

Malone testified that the first hair match to Camarena that he made was from hairs found in the black Mercury Grand Marquis. *Id.* at 146–47. Malone testified that hairs found in the black Mercury Grand Marquis were "consistent with having originated from" Camarena. *Id.* at 147.

Malone also testified that he was "able to find a forcibly-removed hair from" the Volkswagen Atlantic parked at Lope de Vega, which "perfectly matched the head hairs" of Camarena. *Id.* at 153–54.

Malone later testified that he "was able to match" two hairs from Lope de Vega guest house to Camarena, one of which was forcibly removed. *Id.* at 149–152. Malone also identified a hair from a downstairs bedroom at Lope de Vega as a match to Camarena. *Id.* at 153–55. Malone then testified that an unknown hair from the guest house matched Petitioner's co-defendant, Verdugo, and another hair from the guest house matched non-party Espino-Verdin. *Id.* at 190–92. Malone also testified to certain fiber evidence connecting Camarena to Lope de Vega. *Id.* at 163–72.

Based on these and other forensic observations, Malone testified at trial about the following conclusions that he had reached:

> Based on the fact that I was able to associate [Camarena] to 881 Lope de Vega in five different ways – hair, two types of fibers, fabric and rope, and that each of these are an independent event, independent of one another, in my opinion the only possible way this could have happened is if [Camarena] would have been at 881 Lope de Vega and the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-03436 JAK<br>LA CR87-00422 JAK | Date | February 23, 2023 |
|---|---|---|---|
| Title | Raul Lopez-Alvarez v. United States of America<br>United States of America v. Raul Lopez-Alvarez | | |

Volkswagen and the Mercury and in a position with respect to the Volkswagen, the guest house, and bedroom 4 where his hairs could have been forcibly removed.

*Id.* at 189. Malone also testified that of the independent events which he based his opinion, "in terms of significance relative to the other independent events," the hair sample evidence was "probably No. 1" in significance. 11 RT 45.

No physical evidence*, e.g.,* hair, fiber or fingerprints, was provided to show that Petitioner was ever at Lope de Vega, in the Volkswagen, or black Mercury Grand Marquis. *See also* 28 RT 69–70 (stipulation that no fingerprints analyzed in these areas matched Petitioner's).

       d)     Testimony of DEA Agent Salvador Leyva

DEA Agent Salvador Leyva ("Leyva") testified that, on February 9, 1985, together with several Mexican Federal Judicial Police officers, he travelled to the private hangar area of the Guadalajara airport. 11 RT 198, 229. There, they encountered Caro, who asked who was in charge among the law enforcement personnel. *Id.* at 206–07. The Mexican Federal Judicial Police senior officer announced that he was in charge, and then conferred with Caro. *Id.* The two reportedly smiled, laughed and then shook hands. *Id.* The senior officer of the Mexican Federal Judicial Police then made a telephone call. *Id.* at 208–09. Caro then departed by plane, having been permitted to leave at the direction of the leader of the Mexican Federal Judicial Police. *Id.* at 213.

Leyva also testified that, in 1987, he was present when Petitioner was arrested in the United States. *Id.* at 215. Leyva testified that he asked Petitioner if Petitioner recognized him, and Petitioner said "No." *Id.* at 216. Leyva then asked Petitioner, "Do you remember when [Caro] escaped from . . . Guadalajara at the airport?," in response to which Petitioner looked at him and said "Oh, yes. You were with Comandante Brisolo, and a yellow car that day." *Id.* at 216. Leyva testified that he was in a yellow car at the airport on February 9, 1985. *Id.* at 214.

       e)     Government's Closing and Rebuttal Arguments

During its closing argument, the Government argued that Lope de Vega was "the residence where the Government maintains and the evidence has shown was the site where [Camarena] and [Zavala] were taken after they were abducted," and that, specifically, they were taken to "the guest house at the residence of [Caro] and tortured in the guest house," referring to the guest house at Lope de Vega as "the torture chamber." 28 RT 78.

The Government also argued that March 26, 1985, was a "significant date" because that is when DEA received a tip to find bricked in a garage the black Mercury Grand Marquis. *Id.* at 85. The Government argued that "two of Camarena's hairs [were] found in the vehicle" and that the car "definitely had a connection with the kidnapping[,] . . . [*i.e.*, that] it was the vehicle that was used at some point during the kidnapping." *Id.*

While discussing the evidence as to co-defendant Verdugo, the Government addressed "the evidence

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-03436 JAK<br>LA CR87-00422 JAK | Date | February 23, 2023 |
|---|---|---|---|
| Title | Raul Lopez-Alvarez v. United States of America<br>United States of America v. Raul Lopez-Alvarez | | |

that put[] [Camarena] at" Lope de Vega. *Id.* at 137. The Government presented the following argument:

> Now, it is interesting at this point because [Malone] testified that some of the hairs that he found, I believe at least the one in the bedroom number four, had been forcibly removed. He talked about the tearing and the ripping and the breaking of the hair and distinguished between forcibly removed hairs and naturally removed hairs. It was forcibly removed, and the reason it was forcibly removed was because force was used, violence was used on [Camarena] while he was held in bedroom number four.
>
> . . .
>
> Also, as you will recall, on the premises was the Volkswagen Atlantic, a small, kind of like a Jetta, tan-colored vehicle. Inside that vehicle were found Camarena's hair, and inside that vehicle were also found hair that had been forcibly removed from [Camarena], again indicating that this vehicle was used, and possible – very possibly – used initially in the abduction of [Camarena]; and when he was placed in that vehicle, force was used to keep him there, to push him down, to push his head down, so that he would not be seen or heard from passerby. And during that struggle with his captors was how his hair was forcibly removed and deposited in the Volkswagen Atlantic.

*Id.* at 145–46. Citing the forensic evidence, the Government also argued that Camarena's "presence at Lope de Vega is proven there beyond any doubt by the sheet, by the carpet fibers, by the evidence of the hairs, [and] by the evidence of the bindings." *Id.* at 141.

After addressing the evidence against co-defendant Verdugo, the Government turned to the evidence against Petitioner. *See id.* at 149. The Government focused on the statements Petitioner made to Agent Reynoso and Informant Reyes Garcia. *Id.* at 150–54. The Government highlighted the detailed information that Petitioner provided to Reynoso or Reyes Garcia according to the testimony that each provided: Petitioner said heated pipes were used to beat Camarena and used the term "we"; Petitioner knew there was at least one tape-recording of the interrogation; Camarena was abducted in front of the U.S. Consulate or "embassy"; Mexican police credentials were shown to coerce Camarena to go with them; Petitioner went to Caro's residence -- which the Government asserted was Lope de Vega -- "where Camarena was being held" and "returned to Lope de Vega . . . with Fonseca" and gave a "very detailed description of" the Fonseca and Caro altercation. *Id.* at 151–53. The Government also stated in its rebuttal that Petitioner "went over to one of the residences of [Caro], and that was to 881 Lope de Vega" despite Petitioner not specifically mentioning Lope de Vega. 32 RT 59.

      3.      Petitioner's Defense and Evidence at Trial

           a)      Petitioner's Opening Statements

At trial, during opening statements, Petitioner's counsel stated that Petitioner made the statements to Reynoso, but that the purpose of those statements was to impress Reynoso. Petitioner wanted Reynoso to believe that he "was involved with large-scale drug trafficking" and wanted to get money from Reynoso, whom he believed was a narcotics buyer. 4 RT 57. Petitioner's counsel also stated that Petitioner learned specific details about the abductions and murders by reading newspapers that

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-03436 JAK<br>LA CR87-00422 JAK | Date | February 23, 2023 |
|----------|----------------------------------------|------|-------------------|
| Title | Raul Lopez-Alvarez v. United States of America<br>United States of America v. Raul Lopez-Alvarez | | |

covered the Camarena case, and from hearing others discuss the case while he was detained in prison. *Id.* at 60.

        b)      Testimony of Petitioner's Mother, Ofelia Padilla

At trial, Petitioner's mother, Ofelia Padilla ("Padilla") was called as a witness by Petitioner. 24B RT 167–191. Padilla testified that, during the fall of 1987, Petitioner returned to the United States and visited her at her home. *Id.* at 170. She testified that during one such visit, she observed Petitioner reading several magazines. *Id.* at 171–77. Padilla testified that she specially observed Petitioner reading a magazine named "*Alarma*," which was published around April 24, 1985, and which had an article with information related to the Camarena case. *Id.* at 170–75.

        c)      Testimony of Agent Kuykendall

At trial, DEA Agent James Kuykendall ("Kuykendall") was also called as a witness by Petitioner. 25 RT 14–25. Kuykendall testified that he was in Guadalajara when Camarena disappeared, and that his job was to gather information about drug traffickers. *Id.* at 14–16. As part of his job, Kuykendall testified that he would sometimes gather information from various news sources, including magazines like *Alarma*. *Id.* at 17. The reason for this, he testified, was to find leads. *Id.* at 23. Kuykendall testified that *Alarma* was a news magazine with many color photographs, and that its "main theme" was to report on "crime or police action or national disasters, sensational-type news." *Id.* at 17. He testified that the Camarena case was widely reported in major newspapers, magazines, including *Alarma*, on television, and on the radio. *Id.* at 18. Kuykendall also testified that sometimes "condensed versions" of declarations obtained by individuals interrogated by the Mexican Federal Judicial Police would be published in these magazines. *Id.* at 21.

On cross-examination, Kuykendall testified that, between February 7, 1985, which is when Camarena and Zavala were abducted, and March 5, 1985, which is when Camarena's and Zavala's bodies were found, there was little news coverage of the case. *Id.* at 27. Kuykendall also testified that he did not think that magazines, like *Alarma*, had information regarding the details of Camarena's torture or interrogation. *Id.* at 29. This included information about the methods or techniques used, or that the interrogation of Camarena was tape recorded. *Id.* at 30. Nor did Kuykendall believe that the magazines reported on the details of what happened at the Guadalajara airport on February 9, 1985. *Id.* On redirect examination, Kuykendall acknowledged a story had been published that included a quotation from a supposed declaration about the airport incident. 25 RT 36. Also on redirect, Kuykendall testified that the cover of one magazine featured disputes between Fonseca and Caro, and the lede line made a reference to "a fight between the evil ones." *Id.* at 39, 41.

On recross-examination, Kuykendall testified that the magazines did not report specific details of events. *See id.* at 43–45. For example, they did not include that Petitioner contacted his father-in-law to perform a wedding, that state police took a position behind the DEA agents prepared to shoot them at the airport, or that Camarena was tortured with heated iron. *Id.*

        C.      Petitioner's Direct Appeal

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-03436 JAK<br>LA CR87-00422 JAK | Date | February 23, 2023 |
|---|---|---|---|
| Title | Raul Lopez-Alvarez v. United States of America<br>United States of America v. Raul Lopez-Alvarez | | |

As noted, on August 22, 1988, Petitioner was convicted on Counts One, Two, Three, Four, Five and Seven. On November 7, 1988, Petitioner appealed. CR-00422, Dkt. 3584; *Lopez-Alvarez*, 970 F.2d at 586. The issues on appeal included the following: (i) whether the trial court improperly limited the cross-examination of Garcia; (ii) whether Petitioner's convictions were supported by sufficient evidence; (iii) whether the prosecutor impermissibly referred to Petitioner's failure to testify; (iv) whether the trial court lacked subject-matter jurisdiction; (v) whether the felony-murder indictment was insufficient; (vi) whether the trial court erroneously rejected Petitioner's proposed jury instructions; (vii) whether the prosecutor made improper, prejudicial remarks to the jury; and (viii) whether the prosecution failed to disclose exculpatory evidence to the defense. *Lopez-Alvarez*, 970 F.2d at 587.

With respect to Petitioner's convictions, on July 8, 1992, the Ninth Circuit affirmed in part and reversed in part. *Id.* at 598–99. It reversed the convictions as to Counts Two and Seven, holding that the evidence corresponding to these counts was insufficient. *Id.* at 593–96. However, it affirmed the convictions as to Counts One, Three, Four and Five, concluding that there was sufficient evidence as to the kidnapping and murder of Camarena. *Id.* at 593. In making these determinations, the opinion addressed whether there was sufficient corroboration for Petitioner's admissions to support his convictions. *Id.* at 589–93. The opinion stated:

> Four of the six counts on which [Petitioner] was convicted involved crimes against Camarena. The primary evidence supporting these counts is the defendant's admissions that he helped to kidnap and torture the agent. There is substantial independent evidence supporting the trustworthiness of these admissions. Preliminarily, we note that there is no doubt that the crimes were committed—that Camarena was kidnapped, severely beaten, and then killed and that the violent acts were committed to further the Caro–Quintero drug enterprise. There is sufficient independent evidence of these occurrences. As to the reliability of the admissions, the details of the crimes provided by the defendant are verified by independent evidence. For example, [Petitioner] described using heated iron pipes to beat Camarena; this is consistent with the condition of the body, which had suffered broken ribs and a blow to the skull with a blunt instrument. In addition, [Petitioner] stated that a tape recording existed in which several men questioned Camarena regarding the DEA's knowledge of Caro–Quintero's drug enterprise. This tape recording was introduced, and its contents matched the defendant's general description. (The tape also constitutes circumstantial evidence of a conspiracy to kidnap Camarena and that the kidnapping and murder were committed in aid of Caro–Quintero's racketeering activities.) Although the Camarena affair was well publicized, there is no indication that these specific details were so widely disseminated that the defendant's knowledge of them would not constitute evidence of his participation in the crimes. The jury was free to reject the explanation that he learned of them from his cellmates. The erroneous limitation on cross-examination did not constitute reversible error. Accordingly, we believe that the admissions were supported by credible evidence, that a jury would be substantially justified in believing them, and that they were therefore sufficiently reliable to support a conviction. With the independent evidence regarding the existence of a crime and with the evidence of trustworthiness of the defendant's admissions, the *Opper–Wong Sun* test is met. [Petitioner]'s inculpatory

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-03436 JAK<br>LA CR87-00422 JAK | Date | February 23, 2023 |
|----------|----------------------------------------|------|-------------------|
| Title | Raul Lopez-Alvarez v. United States of America<br>United States of America v. Raul Lopez-Alvarez | | |

statements along with the evidence supporting their admission, are sufficient to support his convictions on the four counts involving Camarena: that the defendant committed violent crimes against the agent in aid of racketeering, that the defendant conspired to kidnap the agent, that he did kidnap the agent, and that he is guilty of the subsequent felony murder.

*Id.* at 593.

Although the Ninth Circuit issued the opinion on July 8, 1992, an amended judgment was not entered until October 26, 2005. CR-00422, Dkt. 2439. The amended judgment modified Petitioner's sentence to three consecutive 60-year terms on Counts One, Three and Four, and one concurrent sentence of life on Count Five. *Id.* at 1–2.

III.   **Analysis**

    A.   Legal Standards

To prevail on a motion to vacate a conviction due to the presentation of false evidence by the Government, a petitioner is required to show all of the following: (i) the evidence was actually false; (ii) the prosecution knew or should have known that it was actually false when it was presented at trial; and (iii) the false testimony or evidence was material to the conviction. *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *see also Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005).

In a *Napue* analysis, evidence is material if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976); *United States v. Bagley*, 473 U.S. 667, 679-80 (1985). "[I]f it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic." *Hayes*, 399 F.3d at 978 (citation omitted). This standard is very different from a sufficiency-of-the-evidence analysis. The Ninth Circuit has emphasized that a conclusion that evidence was not material requires a finding that the remaining, unchallenged evidence was so "overwhelming" that the petitioner "cannot demonstrate that the alleged errors had a substantial and injurious effect or influence in determining the jury's verdict." *Jackson v. Brown*, 513 F.3d 1057, 1079 (9th Cir. 2008) (internal quotation marks omitted) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

The purpose of the materiality inquiry is to ensure that the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Jones v. Ryan*, 691 F.3d 1093, 1102 (9th Cir. 2012) (quoting *Hayes*, 399 F.3d at 984). Because the determination of this question depends upon an assessment of the effect of the disputed evidence on the jury, materiality is to "be evaluated in the total context of the events at trial." *United States v. Frady*, 456 U.S. 152, 169 (1982).

    B.   Application

The Government does not dispute the first two requirements under *Napue* -- that Malone's testimony was actually false, and the prosecution knew or should have known that it was actually false when it

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-03436 JAK<br>LA CR87-00422 JAK | Date | February 23, 2023 |
|----------|----------------------------------------|------|-------------------|
| Title | Raul Lopez-Alvarez v. United States of America<br>United States of America v. Raul Lopez-Alvarez | | |

was presented at trial. Opposition at 16. Therefore, the only issue is whether Malone's testimony was material to Petitioner's conviction.

      1.     Petitioner's Convictions

As noted, Petitioner was convicted on the following counts.

Count One: Violent crimes in Aid of Racketeering, Aiding, and Abetting in violation of 18 U.S.C. §§ 1952B, 2. The indictment as to this charge alleged that Petitioner willfully participated in the kidnapping and murder of Camarena, and these acts were taken to maintain and increase his position in the marijuana trafficking activities of the cartel. CR 87-00422, Dkt. 62 at 5. With respect to Count One, the jury was instructed that four essential elements must be established beyond a reasonable doubt: First, "[t]hat a kidna[p]ping or murder occurred;" second, "[t]hat the purpose of the kidna[p]ping or murder was for obtaining anything of pecuniary value or was to maintain or increase the position of certain individuals in an enterprise engaged in racketeering activity;" third, "[t]hat the enterprise was engaged in, or that the activities affected, interstate or foreign commerce;" and fourth, "[t]hat the defendant willfully participated or willfully aided and abetted the commission of the kidna[p]ping or murder for the purposes specified." CR 87-00422, Dkt. 3872, Instruction No. 42.

Count Three: Conspiracy to Kidnap a Federal Agent in violation of 18 U.S.C. § 1201(c). The Indictment as to this charge alleged that Petitioner and others caused Camarena to be held against his will at Lope de Vega. CR 87-00422, Dkt. 62 at 11–12. The Indictment also alleges as an overt act in furtherance of the conspiracy, that on February 8, 1985, Petitioner went to Lope de Vega. *Id.* at 13. With respect to Count Three, the jury was instructed that the government must prove four elements beyond a reasonable doubt: First, "that there was an agreement to commit the offense or objects alleged in count three: to kidnap and hold for interrogation" a DEA agent; second "that the defendants joined the conspiracy sometime on or before February 7, 1985;" third, "that one of the members of the conspiracy committed one of the so-called overt . . . acts described in the indictment[;]" and fourth, "that the overt act which you found was committed by one of the members of the conspiracy was committed for the purpose of carrying out the conspiracy." CR 87-00422, Dkt. 3872, Instruction No. 45.

Count Four: Participating in the abduction and holding of a DEA agent for the purpose of interrogation in violation of 18 U.S.C. §§ 1201(a)(5), 2. The jury was instructed that "three essential elements are required to be proved" as to Count Four. CR 87-00422, Dkt. 3872, Instruction No. 50. First, that a United States officer "was unlawfully seized or confined or inveigled or kidna[p]ped or carried away;" second, that this act was done while the officer "was engaged in, or on account of, the performance of official duties;" and third, "that the defendant willfully

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-03436 JAK<br>LA CR87-00422 JAK | Date | February 23, 2023 |
|---|---|---|---|
| Title | Raul Lopez-Alvarez v. United States of America<br>United States of America v. Raul Lopez-Alvarez | | |

participated or willfully aided and abetted such act against the officer." *Id.*

Count Five: Felony Murder of Camarena, committed during and in the course of the kidnapping, in violation of 18 U.S.C. §§ 1111(a), 1114, 2. The indictment alleges that this charge is based on the claim that Petitioner "willfully perpetrated the kidnapping and holding for interrogation of [Camarena]." CR 87-00422, Dkt. 62 at 15. It further alleges that the murder of Camarena "took place in and during the course of the perpetration of his kidnapping." *Id.* at 16.

The issue at trial was Petitioner's "connection to, and furtherance of" the conspiracy to kidnap and murder Camarena. *See* Further Opposition at 5. The Government's theory was that Petitioner acted as "muscle" and was a direct participant in the kidnapping and interrogation. *See* 4 RT at 18 (Government arguing in opening statements that Petitioner assumed the role of "muscle for the enterprise; that he participated directly with the torture and interrogation of [Camarena]") Thus, the evidence relied upon to support Petitioner's conspiracy conviction is the same as that on which the Government relied to support Petitioner's convictions for violent crimes in aid of racketeering, kidnapping and felony murder.

    2.      Unchallenged Evidence Supporting Convictions

          a)      Relevance of Petitioner's Argument at Trial About the Lack of Forensic Evidence that Showed That the Hair Matched Petitioner

The Government argues that, at trial, Petitioner argued that there was no forensic evidence that supported the contention that he was at Lope de Vega. Opposition at 19. It contends that Petitioner cited this absence to support the assertion that he did not participate in the kidnapping or interrogation of Camarena. *See* Further Opposition at 19. Thus, the Government argues, "[f]or [Petitioner] to argue now that it was the forensic hair testimony that resulted in [his] conviction is to turn what he argued at trial on its head." Opposition at 19.

During closing arguments, Petitioner's counsel highlighted the absence of forensic evidence to link Petitioner to the alleged crimes:

> Above everything else that was introduced in this case, the forensics did more to prove [Petitioner's] innocence than anything else.

> How about the hair? This was by far the most important forensics evidence with regards to [Petitioner]. . . . We know that over 500 significant hairs with significant characteristics were found at the house of Lope de Vega, and we know that [Petitioner] gave a sample . . . and it was compared with those 500 significant hairs, and we don't know how many matches there might be of other individuals, but we know one thing: [Petitioner's] hair was not -- was not -- at Lope de Vega. 31 RT 27–28.

Notwithstanding this argument at trial, the Government did place significant reliance on the forensic hair testimony to link Camarena to Lope de Vega in support of its case. In its opening statements, the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-03436 JAK<br>LA CR87-00422 JAK | Date | February 23, 2023 |
|---|---|---|---|
| Title | Raul Lopez-Alvarez v. United States of America<br>United States of America v. Raul Lopez-Alvarez | | |

Government stated what the evidence would show, and asked the jury to "pay close attention" to certain forensic testimony. 4 RT 8–9. The Government specifically called attention to "[t]he significance . . . of the hair samples." *Id.* After addressing each defendant, the Government returned to the forensic evidence. 4 RT 23–27. The Government stated that the jury was going to "hear evidence frequently through the trial regarding the residence of Lope de Vega" which it argued was Caro's residence, and where fabrics, hair samples and other forensic evidence was located and later tested. 4 RT 24. The Government noted that the evidence would show that hair samples taken from several rooms at Lope de Vega matched Camarena, Petitioner's co-defendant, Verdugo, and another individual not a party to the case, but who was alleged to have participated in the interrogation. 4 RT 25–26. The Government also highlighted certain forensic evidence located in a "Volkswagen Atlantic," noting that the jury would "hear that name mentioned frequently" and "[t]hat in this vehicle . . . agents found . . . hair samples matching" Camarena, and that "at least one hair . . . had been forcibly removed." 4 RT 25.

The importance of forensic evidence discovered at Lope de Vega was reemphasized during the Government's closing and rebuttal arguments. The Government argued that Lope de Vega was "the residence where . . . the evidence has shown was the site where [Camarena] and [Zavala] were taken after they were abducted" and that "the guest house at the residence of [Caro]," labeled "the torture chamber," was where they were "tortured." 28 RT 78.

That the Government could not offer forensic hair evidence linking Petitioner to Lope de Vega supported Petitioner's defense that he did not participate in the kidnapping or interrogation of Camarena and was simply exaggerating when speaking to Reynoso. Highlighting the absence of such forensic evidence was a logical defense strategy as part of its effort to show that the Government had not met its burden to prove "beyond a reasonable doubt" the elements of the claims against Petitioner. Moreover, the question is not whether Malone's testimony "resulted in" Petitioner's conviction (Opposition at 18), but whether Malone's "false testimony could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103. For these reasons, that Petitioner's counsel argued at trial about the lack of forensic evidence does not sufficiently show that the now-challenged evidence was *per se* not material to the decision by the jury.

b)  Testimonial Evidence

The Government relied on testimony to support the allegation that Petitioner committed violent crimes against Camarena in aid of racketeering, conspired to kidnap Camarena, kidnapped Camarena and that he was guilty of felony murder.

*First*, the Government presented evidence that Petitioner was a State Judicial Police Officer at the time Camarena was abducted. 11 RT 87–88, 111–12. The Government also presented evidence suggesting that the State Judicial Police Officers were controlled by drug traffickers. *Id.* at 87–88. The Government presented Petitioner's own admissions that he worked for Fonseca and at times, Caro, who were known drug traffickers who had a motive to harm Camarena and Zavala. *Id.* at 80–81; 4 RT 13–16.

*Second*, the Government presented evidence that, at the time Petitioner was originally arrested in Guadalajara, he was with other State Judicial Police Officers, and all were arrested because of an

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-03436 JAK<br>LA CR87-00422 JAK | Date | February 23, 2023 |
|----------|----------------------------------------|------|-------------------|
| Title | Raul Lopez-Alvarez v. United States of America<br>United States of America v. Raul Lopez-Alvarez | | |

alleged involvement in the Camarena abduction. 11 RT 88. On direct examination, Reynoso testified that Petitioner told him he was arrested with two other individuals who "were . . . direct participant[s] in the kidnapping of" Camarena. *Id.* at 88. Part of Petitioner's defense was that he was arrested with those who directly participated in the abduction of Camarena. Petitioner's counsel in closing argument highlighted that Petitioner first told Reynoso that he was not there, but that he was arrested because he was with people who were watching over Camarena. 11 RT 146; 31 RT 48–59. Neither party disputed that Petitioner was arrested with those suspected of being involved. This provided support for Petitioner's defense that he heard certain details about the crimes while detained.

*Fourth*, the Government presented Petitioner's own statements about how Petitioner claimed Camarena was abducted. 11 RT 83–84. Reynoso testified that Petitioner told him that "Camarena was kidnapped in front of the U.S. Consulate in Guadalajara" on February 7, 1985. *Id.* at 83. He also testified that Petitioner said the "individuals that kidnapped Agent Camarena . . . used Mexican Federal Police Credential to identify themselves and to approach Agent Camarena to go with them because Comandante wanted to talk to him." *Id.* at 84. Reynoso also testified that Camarena said "[he] was taken to a house nearby in Guadalajara" which was "referred to as [Petitioner's] bosses[']." *Id.*

Reyes Garcia's testimony generally corroborated some portions of Reynoso's testimony. Reyes Garcia testified that, at some point in late 1985, Petitioner told him that "he and his companions had kidnapped" Camarena. 12A RT 34. He also testified that Petitioner told him that "they had gone to the embassy in Guadalajara . . . with their companions and . . . showed . . . their credentials" and asked for Camarena. *Id.* Reyes Garcia further testified that Petitioner told him that they took Camarena "in a car to a house belonging to" Caro. *Id.* at 35. When asked whether Petitioner told him what kind of car was used, Reyes Garcia responded as follows:

> A    It was a Caribe.
> Q    Is that a Volkswagen, sir?
> A    Yes, a Volkswagen.

*Id.*

*Fifth*, the Government presented Petitioner's conflicting admissions about why he believed Camarena was abducted. Reynoso initially testified that, in the fall of 1987, Petitioner told him that Camarena was abducted because his "bosses wanted to know what Agent Camarena knew about them." 11 RT 84–85. On cross-examination, Reynoso testified that Petitioner also told him that, on February 4, 1985, Camarena went to a party in an undercover role as a drug buyer with drug traffickers, and that the drug traffickers later "called Colombia" and found out Camarena was not a drug buyer. *Id.* at 130. Petitioner told Reynoso this was a reason why Camarena was later abducted. *Id.* Reynoso admitted that he did not believe this story about Camarena being undercover at a party and acknowledged that Camarena had not gone undercover to attend a party on February 4, 1985. *Id.* at 131–32.

*Sixth*, the Government presented Petitioner's own admissions about what he claimed occurred while Camarena was at Caro's residence. Reynoso testified that Petitioner told him that Camarena had been beaten with iron pipes, and that at one time Petitioner said "'[w]e even heated the iron pipes to beat

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-03436 JAK<br>LA CR87-00422 JAK | Date | February 23, 2023 |
|---|---|---|---|
| Title | Raul Lopez-Alvarez v. United States of America<br>United States of America v. Raul Lopez-Alvarez | | |

Camarena.'" *Id.* at 85. Petitioner told Reynoso that Camarena had been "tortured a whole day and part of the night" for "approximately 24 hours." *Id.* at 87. Reyes Garcia's testimony conflicted with these points. Reyes Garcia testified that Petitioner told him that he watched others slap and hit Camarena, but that he did not beat Camarena. 12A RT 36; 12B RT 84. Reyes Garcia also testified that Petitioner told him that he remained at Caro's house for "several days looking after" Camarena. 12A RT 36; 12B RT 85. Reynoso testified that Petitioner told him that Petitioner and Fonseca went to Caro's house at a later time:

> Q   . . . Isn't it true, Mr. Reynoso, that what [Petitioner] told you was that he wasn't at the house when [Camarena] had been tortured, that he was not at the house?
> A   Well, he said he was present. Yes.
> Q   What he told you was he arrived at the house with [Fonseca]. Right?
> A   In that particular event, yes, ma'am.
> Q   What do you mean about that particular event? Do you mean that particular story?
> A   For that particular event he was referring to.
> Q   He did tell you, did he not, that she showed up to the house with [Fonseca]?
> A   Yes, he did.
> Q   He told you that by the time he and [Fonseca] and all the other men that he claimed were with him showed up that [Camarena] was dying. Right?
> A   He said that, yes.

11 RT 155–56.

On cross-examination, Reynoso also acknowledged that Petitioner did not tell him that Petitioner abducted, kidnapped, tortured or interrogated Camarena:

> Q   [Petitioner] did not tell you that he abducted or kidnapped [Camarena], did he?
> A   I never asked him.
> Q   He did not tell you that, did he?
> A   No, Ma'am.

*Id.* at 156.

> Q   And he did not say that he tortured [Camarena], did he?
> A   No, he never said that.
> Q   And he never told you that he interrogated [Camarena], did he?
> A   That's correct. He never said that.
> Q   And he did not tell you that he killed [Camarena], did he?
> A   That's correct.

*Id.* at 157.

Reynoso also testified that, during the fall of 1987, Petitioner told him that he witnessed an argument between Fonseca and Caro at Lope de Vega when Camarena was detained there. *Id.* at 91. This

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-03436 JAK<br>LA CR87-00422 JAK | Date | February 23, 2023 |
|----------|----------------------------------------|------|-------------------|
| Title | Raul Lopez-Alvarez v. United States of America<br>United States of America v. Raul Lopez-Alvarez | | |

information was corroborated by Reyes Garcia; he testified that Petitioner told him that he saw Fonseca slap Caro during an argument between the two of them. 12A RT 36. Agent Kuykendall testified, however, that there was a publication that reported a dispute between Fonseca and Caro related to the Camarena incidents, with the lede line, "[F]ight between the evil ones." *See* 25 RT 39. Thus, Petitioner's counsel argued in closing that it was widely known that Fonseca and Caro had quarreled. 31 RT 51.[6]

        3.      Whether Forensic Testimony was Material to Petitioner's Convictions

Malone's testimony was material to Counts One, Three, Four and Five. The remaining, unchallenged evidence was not so "overwhelming" that Petitioner "cannot demonstrate that the alleged errors had a substantial and injurious effect or influence in determining the jury's verdict." *Jackson*, 513 F.3d at 1079.

The Government argues that, because at trial it argued that the primary evidence linking Petitioner to the offenses charged were his 1987 recorded confessions to Reynoso, the testimony of Reyes Garcia corroborating some statements Petitioner made to Reynoso, and Leyva's identification of Petitioner at the Guadalajara airport on February 9, 1985, there is no reasonable probability that the false testimony affected the jury in reaching its verdict. Opposition at 19; Further Opposition at 19–20. However, this position presents a narrow view of what evidence was presented to the jury. Materiality is to "be evaluated in the total context of the events at trial." *Frady*, 456 U.S. at 169. Petitioner argues that Malone's false testimony about hair samples "connected the dots" of the Government's case. Motion at 19. This position is persuasive. The Government presented evidence that linked Camarena to certain significant locations: the Volkswagen Atlantic, the black Grand Mercury Marquis and Lope de Vega. This provided the jury with substantial evidence to support the inference that Petitioner's statements to Reynoso and Reyes Garcia were true, and that Petitioner knew this information because he was personally involved.

        a)      Volkswagen Atlantic

In its opening, the Government focused on the expected evidence that Camarena was "forced into the back seat" of a "small, compact, light-colored vehicle." 4 RT 5. The Government noted that agents found forensic evidence in a Volkswagen Atlantic and specifically stated that the jury would "hear that name mentioned frequently." *Id.* at 25.

---

[6] The Government also argues that Petitioner's admissions to Leyva about recognizing him at the airport on February 9, 1985, supports his convictions for violent acts in aid of racketeering, conspiracy, kidnapping and felony murder. *See* 11 RT 215–16. However, this evidence was introduced for the purpose of showing that Petitioner was an accessory-after-the-fact, and that conviction was overturned for insufficient evidence. *See Lopez-Alvarez*, 970 F.2d at 593–96. Moreover, it does not appear that Petitioner disputed that he was present at the airport when Caro fled, but he stated that he was there in his capacity as a State Judicial Police Officer. *See* 11 RT 93–94. Thus, that Petitioner was at the airport, saw Leyva, and years later acknowledged that he recognized Leyva from the airport encounter has little probative value as to whether Petitioner directly participated in the abduction or interrogation of Camarena.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-03436 JAK<br>LA CR87-00422 JAK | Date | February 23, 2023 |
|---|---|---|---|
| Title | Raul Lopez-Alvarez v. United States of America<br>United States of America v. Raul Lopez-Alvarez | | |

The materiality of this vehicle became apparent through the course of trial. One agent testified that a light, tan-colored Volkswagen Atlantic was found at Lope de Vega. 8B RT 141. Malone testified that hair samples taken from that vehicle matched Camarena, and that some of the samples were forcibly removed. 10 RT 153–54. Malone also testified that, based on his forensic analysis, he believed Camarena had been at "Lope de Vega and the Volkswagen and the Mercury and in a position with respect to the Volkswagen, the guest house, and bedroom 4 where his hairs could have been forcibly removed." 10 RT 189. Further, in testimony that is very significant to this issue and focused substantially on Petitioner, Reyes Garcia stated that Petitioner told him Camarena was abducted in a Volkswagen:

> Q      Did he tell you what kind of car was used?
> A      It was a Caribe.
> Q      Is that a Volkswagen, sir?
> A      Yes, a Volkswagen.

12A RT 35.

The importance of forensic evidence in the Volkswagen Atlantic was highlighted in the Government's closing arguments. In addressing the forensic evidence while discussing the charges against Petitioner's co-defendant Verdugo, the Government stated:

> [A]s you will recall, on the premises was the Volkswagen Atlantic, a small, kind of like a Jetta, tan-colored vehicle. Inside that vehicle were found Camarena's hair, and inside that vehicle were also found hair that had been forcibly removed from [Camarena], again indicating that this vehicle was used, and possible – very possibly – used initially in the abduction of [Camarena]; and when he was placed in that vehicle, force was used to keep him there, to push him down, to push his head down, so that he would not be seen or heard from passerby. And during that struggle with his captors was how his hair was forcibly removed and deposited in the Volkswagen Atlantic.

28 RT 145–46.

> b)      Black Mercury Grand Marquis

The black Mercury Grand Marquis was also material to the case presented against Petitioner. Reynoso testified that Petitioner told him both that there was song made called the "Band of the Black Marquis," which was about the Camarena case, and that Petitioner was part of the "gang" about which the song was written. 11 RT 82. Further, an agent testified that a black Grand Marquis was found as part of the investigation of the case. 8B RT 135–36. Malone testified that hair matching Camarena was found in the black Mercury Grand Marquis. 10 RT 146–47. Reynoso testified that Petitioner told him that, when he was originally arrested by Mexican authorities, he was in a black Mercury Grand Marquis. 11 RT 89–90, 111–12.

Similar to its presentation about the significance of the Volkswagen, the Government focused on the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-03436 JAK<br>LA CR87-00422 JAK | Date | February 23, 2023 |
|---|---|---|---|
| Title | Raul Lopez-Alvarez v. United States of America<br>United States of America v. Raul Lopez-Alvarez | | |

black Mercury Grand Marquis in its closing arguments. It stated that March 26, 1985, was a "significant date" because that is when DEA received a tip that led to finding the black Mercury Grand Marquis surrounded by bricks in a garage. 28 RT 85. The Government argued that because "two of Camarena's hairs were found in the vehicle," the car "definitely had a connection with the kidnapping. It was the vehicle that was used at some point during the kidnapping." *Id.*

c)      Lope de Vega

Finally, the forensic evidence located at Lope de Vega was highly relevant to establishing Camarena was taken there after his abduction. In opening statements, the Government stated that the jury would "hear evidence frequently through the trial regarding the residence of Lope de Vega," which it said was "[Caro's] residence" and the location where fabrics, hair samples and other forensic evidence was located and tested. 4 RT 24. The Government pointed out that hair samples taken from several rooms at Lope de Vega matched Camarena, Petitioner's co-defendant, Verdugo, as well as another individual who was not a defendant but who allegedly participated in the interrogation. 4 RT 25–26. Malone's testimony about hair analysis was significant to whether Camarena was detained and interrogated at Lope de Vega. It was important circumstantial evidence that placed Camarena at Caro's residence.[7] Although neither Reynoso or Reyes Garcia testified that Petitioner stated expressly that Camarena was taken to "Lope de Vega," during its closing and rebuttal arguments, the Government stated that Petitioner was at Lope de Vega and that Petitioner "went over to one of the residences of [Caro], and that was to . . . Lope de Vega." 32 RT 59.

d)      The False Testimony Was Material

The Government's theory of the case was that Petitioner was the "muscle" and participated directly in the holding and interrogation of Camarena at Lope de Vega. 4 RT 18; 11 RT 83–84. This is apparent from both its opening statement and closing arguments at trial. In its opening, the Government stated that, as to Petitioner:

> The evidence will show that [Petitioner's] position in the organization was a different one. The role that he assumed was one of muscle for the enterprise; that he participated directly with the torture and interrogation of [Camarena].

4 RT at 18. In its closing the Government argued:

---

[7] Malone also testified that his conclusion was supported by his analysis that compared, and found common, the fibers from the "adhesive blindfold" on the body of Camarena and those at Lope de Vega. *See* 9 RT 80; 10 RT 149–50. The Government has not conceded that the testimony about fibers was false. However, the OIG Report states that Malone's testimony pertaining to fiber evidence misstated the capability of a microspectrophotometer. Malone provided testimony on this issue at trial. Moreover, given the admission that Malone engaged in significant misconduct in this and other cases, it is appropriate to give substantially less weight to his testimony about fiber analyses. The Government also argues eyewitness testimony of real estate agent Jose Gomez-Espana linked Camarena to Lope de Vega. Further Opposition at 20. However, Gomez testified that he saw heavily armed men with Caro at Lope de Vega on February 7 or 8, 1985. 12B RT 141–43. He did not testify that he saw Camarena or Petitioner there.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-03436 JAK<br>LA CR87-00422 JAK | Date | February 23, 2023 |
|---|---|---|---|
| Title | Raul Lopez-Alvarez v. United States of America<br>United States of America v. Raul Lopez-Alvarez | | |

> Again Defendant Verdugo and [Petitioner] are charged relative to count four, the kidnapping count. . . . [T]he Government maintains that the evidence is this case has proven that [Camarena] was unlawfully held at 881 Lope de Vega, that he was unlawfully confined against his will at 881 Lope de Vega . . . .
>
> . . . .
>
> Both Verdugo and [Petitioner] are charged as aiders and abett[o]rs relative to this offense, and I will explain this in a little more detail. [Petitioner] in fact is charged as a principal. Let me make that clarification and correction. He is in fact charged as a principal, physically involved, physically participated himself in the holding and in the interrogation of . . . Camarena.

28 RT at 119–20.

The jury was presented with hair sample evidence, identified as "No. 1" in significance, 11 RT 45, showing that Camarena was in the Volkswagen Atlantic found at Lope de Vega, 10 RT 189, that Camarena's hair had been "forcibly" removed while in the Volkswagen Atlantic, *id.* at 153–54, and that this vehicle was "very possibly" the car initially used in Camarena's abduction, 28 RT 145–46. The basis for this was that Petitioner told Reyes Garcia he participated directly in kidnapping Camarena, and that the car used was a Volkswagen. 12A RT 35. The jury was also presented with evidence showing Camarena was present in a Grand Marquis, a vehicle which Petitioner told Reynoso was used in the kidnapping, and the same model of a car in which he was found when originally arrested. 11 RT 88–89. The Government argued the Grand Marquis "definitely had a connection with the kidnapping. . . . [I]t was the vehicle that was used at some point during the kidnapping." 28 RT 85. Finally, as detailed above, the jury was provided with substantial hair-sample evidence supporting the inference that Camarena was at Lope de Vega.

Standing alone, Malone's testimony that Camarena's hair was found in these locations did not directly implicate Petitioner. However, viewing the evidence in the context of the entire record, Malone's testimony significantly supported the inference that Petitioner's statements to Reynoso and Reyes Garcia were truthful and undermined Petitioner's defense that he was blustering or repeating what he heard or read. Without Malone's testimony, the jury could have more readily concluded that Camarena was held elsewhere in Guadalajara. Further, without Malone's testimony, the inference that the Volkswagen Atlantic or the black Mercury Grand Marquis was used at some point during Camarena's abduction would have been substantially less likely. On the issue of whether Petitioner was a direct participant, the Government's theory was that he had personal knowledge of the details of the crime because he was there. Malone's testimony provided the jury with evidence from which it could reasonably infer that Petitioner's testimony was accurate when he told Reyes Garcia that Camarena was abducted in a Volkswagen and taken to Caro's residence.

The Government's arguments to the contrary are unpersuasive. The Government argues that Petitioner's admissions discussed other details only he could have known because he had observed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-03436 JAK<br>LA CR87-00422 JAK | Date | February 23, 2023 |
|----------|-----------------------------------------|------|-------------------|
| Title | Raul Lopez-Alvarez v. United States of America<br>United States of America v. Raul Lopez-Alvarez | | |

the events personally. Opposition at 19; *see* Further Opposition at 14. The Government begins by referring to Reynoso's testimony that Petitioner told him Mexican authorities showed "credentials" to get Camarena to go with them on February 7, 1985. *See* Opposition at 19. This is uncorroborated in the record. Additionally, although Reynoso testified that Petitioner told him he was arrested with those who participated in the abduction, Petitioner never told him he abducted Camarena. Reynoso also acknowledged on cross-examination that Petitioner had first told him his friend was present, but that Petitioner was not.

Next, the Government points to Reynoso's testimony that Petitioner told him the interrogation was videotaped. *Id.* Tape recordings of the interrogation were found and admitted at trial. However, the taped recordings do not establish that Petitioner was present at the interrogation. Petitioner's voice was never identified in the tapes. At most, Petitioner's admissions show that he learned at some point prior to 1987 that Camarena's interrogation was recorded. This supports the inference that Petitioner may have been present. It is not compelling evidence on that issue.

The Government also points out that Petitioner told Reynoso, "We even used heated iron" pipes to beat Camarena. *See* Further Opposition at 12. However, like the use of credentials, whether heated metal was used to harm Camarena was uncorroborated in the record. Further, Reyes Garcia offered contrary testimony, *i.e.*, that Petitioner said he only observed Camarena being slapped and hit.

The Government also notes that the Ninth Circuit affirmed Petitioner's conviction without mentioning forensic evidence. *Id.* at 19. However, the sufficiency-of-the-evidence standard that was applied during the direct appeal of Petitioner's convictions is different than the one that applies here. Thus, even where there is sufficient unchallenged evidence to support a conviction, a motion under Section 2255 may be granted. The Ninth Circuit has emphasized that the analysis under *Napue* requires that the unchallenged evidence be so "overwhelming" that the petitioner "cannot demonstrate that the alleged errors had a substantial and injurious effect or influence in determining the jury's verdict." *Jackson*, 513 F.3d at 1079 (internal quotation marks omitted). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Hall v. Director of Corrections*, 343 F.3d 976, 983-84 (9th Cir.2003).

*Miller v. Pate*, 386 U.S. 1 (1967) is also helpful in defining the appropriate standard of review. There, the defendant was convicted of sexually assaulting and murdering a child. The evidence presented at trial included: (1) a pair of men's underwear that had been found near the body covered with dark reddish-brown stains, which a chemist who was a prosecution witness testified were from blood of the victim's blood type; and (2) evidence that the defendant confessed to several individuals, including law enforcement personnel, that he committed the murder, and signed a written confession. *See United States ex rel. Miller v. Pate*, 342 F.2d 646, 648 (7th Cir. 1965), *rev'd sub nom. Miller*, 386 U.S. 1. Following trial, it was discovered that the chemist had given false testimony, and the stains on the shorts were paint, not blood. *United States ex rel. Miller v. Pate*, 226 F. Supp. 541, 547 (N.D. Ill. 1963), *rev'd*, 342 F.2d 646 (7th Cir. 1965), *rev'd sub nom. Miller*, 386 U.S. 1. Notwithstanding the other evidence presented at trial, including defendant's oral and written confessions, the conviction was vacated by the district court. *Id.* The Seventh Circuit reversed this ruling. *See United States ex rel.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-03436 JAK<br>LA CR87-00422 JAK | Date | February 23, 2023 |
|---|---|---|---|
| Title | Raul Lopez-Alvarez v. United States of America<br>United States of America v. Raul Lopez-Alvarez | | |

*Miller*, 226 F.2d at 654. The Supreme Court reversed the Seventh Circuit. *Miller*, 386 U.S. at 7. It concluded that the shorts "were an important link in the chain of circumstantial evidence against the petitioner, and, in the context of the revolting crime with which he was charged, their gruesomely emotional impact upon the jury was incalculable." *Id.* at 4–5.

*Hall* is also instructive. There, the prosecution introduced jail house notes at trial which had been falsely altered and were used to corroborate the petitioner's confession. *Hall*, 343 F.3d at 984. The Ninth Circuit instructed the district court to issue an unconditional writ of habeas corpus unless the state court granted petitioner a new trial because the jail house notes were false and material to petitioner's conviction. *Id.* at 985. After concluding that the trial court had implicitly found that the jail house notes were false, the Ninth Circuit concluded the notes were material:

> There was absolutely no physical or forensic evidence connecting Hall to the body or the alley in which it was found. The only other evidence of Hall's guilt was his curious and largely uncorroborated confession, which was shown to contain multiple inconsistencies and inaccuracies. For the most part, the confession did not match the evidence of the crime, and the descriptions of the position and location of the body were public knowledge. Once Hall's statements were shown to contain multiple discrepancies, the jailhouse notes took on added importance.

*Id.* at 984.

Other cases have determined that *Napue* requires relief where independent and unchallenged evidence of guilt is not "overwhelming" and "conclusive." In *Hayes*, the Ninth Circuit overturned convictions of murder and burglary after finding that the prosecution had knowingly presented the false testimony of a prosecution witness, who denied that the state had agreed to dismiss felony charges against him in exchange for his testimony. *Hayes*, 399 F.3d at 988. The evidence supporting defendant's guilt was the testimony of that witness and the defendant's confession. *See id.* at 985–86. However, the confession was uncorroborated and in conflict with certain evidence from the crime scene. *See id.* at 986. Similarly, in *Drake v. Portuondo*, the Second Circuit granted a motion brought under Section 2255 and vacated a murder conviction. 553 F.3d 230 (2d Cir. 2009). There, the prosecution introduced the testimony of an expert witness who falsely stated that he had become aware of the facts of the case only one day prior to his testimony. *Id.* at 242–43. There was substantial evidence of the defendant's guilt, including his own testimony that he had unintentionally killed the two victims, as well rebuttal evidence that the actions that caused the deaths were intentional, including evidence that one of the victims had been sexually assaulted. *See id.* at 245–46.

When evaluating "the total context of the events at trial," *Frady*, 456 U.S. at 169, the Government presented evidence to the jury that Camarena was present at certain significant locations; these were ones which Petitioner's admissions suggested were relevant to the crimes against Camarena. Thus, the false testimony provided the jury with strong evidence supporting the reliability of the claim that Petitioner's statements to Reynoso and Reyes Garcia were truthful, and supported the inference that Petitioner knew these details because he was directly involved in the charged conduct. Accordingly, the standards of *Napue* have been met. The "false testimony or evidence was material to the conviction."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-03436 JAK<br>LA CR87-00422 JAK | Date | February 23, 2023 |
|----------|----------------------------------------|------|-------------------|
| Title | Raul Lopez-Alvarez v. United States of America<br>United States of America v. Raul Lopez-Alvarez | | |

360 U.S. at 269. It was material because there is a "reasonable likelihood that the false testimony *could* have affected the judgment of the jury." *Agurs*, 427 U.S. at 103 (emphasis added). Finally, the remaining, unchallenged evidence was not so "overwhelming" that the Petitioner "cannot demonstrate that the alleged errors had a substantial and injurious effect or influence in determining the jury's verdict." *Jackson*, 513 F.3d at 1079.

**IV.     Conclusion**

For the reasons stated in this Order, the Motion is **GRANTED**. The conviction and sentence in United States v. Raul Lopez-Alvarez, No. 2:87-CR-00422-JAK-5, are **VACATED** as to the four counts for which Petitioner was convicted: Count One, Count Three, Count Four and Count Five. Petitioner is granted a new trial as to each of these convictions.

Entry of judgment is deferred. Within 21 days of the issuance of this Order, after counsel meet and confer in part to seek to agree on the form of a proposed judgment, the Government shall file the following: (i) a status report as to whether it will proceed with a new trial with respect to any or all of the four counts at issue, and/or appeal this Order upon the entry of a judgment consistent with its terms; and (ii) a proposed judgment consistent with the terms of this Order, which includes language as to whether Petitioner should remain in custody pending the completion of any further proceedings in this matter. On or before the earlier of 28 days after the issuance of this Order or seven days after the Government's filing, Petitioner shall file any response and/or objections to the proposed judgment.

**IT IS SO ORDERED.**

_____     :     _____

Initials of Preparer     pk     _____